# In the U.S. District Court for the District of Columbia

### 333 Constitution Avenue, Washington, DC 20001

## No. 1:07-cv-1726, RMC

Don Hamrick, pro se                                          )
IN THE CAPACITY OF A                                   )
PRIVATE ATTORNEY GENERAL                    )
5860 Wilburn Road                                            )
Wilburn, AR 72179                                            )
      PLAINTIFF                                        )
                             )
v.                                                                              )
                             )
Dr. Richard S. Hoffman, MD.                           )
                             )
Crowley Maritime Corporation                       )
                             )
Seafarers International Union                         )
                             )
      DEFENDANTS                                      )

## RECEIVED

### NOV 7 – 2007

**NANCY MAYER WHITTINGTON, CLERK**
**U.S. DISTRICT COURT**

# PLAINTIFF'S OBJECTION TO DEFENDANTS' MOTION TO DISMISS

## A. Seamen are Wards of the Admiralty

Citing *Isbrandtsen Co.* v. *Johnson*, 343 U.S. 779, 782-784 (1952):

> Whenever congressional legislation in aid of seamen has been considered here since 1872, this Court has emphasized that such legislation is largely remedial and calls for liberal interpretation in favor of the seamen. The history and scope of the legislation is reviewed in *Aguilar* v. *Standard Oil Co.*, 318 U.S. 724, 727 -735, and notes. "Our historic national policy, both legislative and judicial, points the other way [from burdening seamen]. Congress has generally sought to safeguard seamen's rights." *Garrett* v. *Moore-McCormack Co.*, 317 U.S. 239, 246 . "[T]he maritime law by inveterate tradition has made the ordinary seaman a member of a favored class. He is a 'ward of the admiralty,' often ignorant and helpless, and so in need of protection against himself as well as others. . . . Discrimination may thus be rational in respect of remedies for wages." *Warner* v. *Goltra*, 293 U.S. 155 , [343 U.S. 779, 783]    162; *Cortes* v. *Baltimore Insular Line*, 287 U.S. 367, 375 , 377; *Wilder* v. *Inter-Island Navigation Co.*, 211 U.S. 239, 246 -248; *Patterson* v. *Bark Eudora*, 190 U.S. 169 ; *Brady* v. *Daly*, 175 U.S. 148, 155 -157. "The ancient characterization of seamen as 'wards of admiralty' is even more accurate now than it was formerly." *Robertson* v. *Baldwin*, 165 U.S. 275, 287 ; 5 *Harden* v. *Gordon*, 11 Fed. Cas. No. 6,047, 2 Mason (Cir. Ct. Rep.) 541, 556.

> Statutes which invade the common law or the general maritime law are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident. No rule of construction precludes giving a natural meaning to legislation like this that obviously is of a

remedial, beneficial and amendatory character. It should be interpreted so as to effect its purpose. Marine legislation, at least since the Shipping Commissioners Act of June 7, 1872, 17 Stat. 262, should be construed to make effective its design to change the general maritime law so as to improve the lot of seamen. "The rule that statutes in derogation of the common law are to be strictly construed does not require such an adherence to the letter as would defeat an obvious legislative purpose or lessen the scope plainly intended to be given to the measure." *Jamison* v. *Encarnacion*, 281 U.S. 635, 640 ; *Texas & P. R. Co.* v. *Abilene Cotton Oil Co.*, 204 U.S. 426, 437 , 440. [343 U.S. 779, 784]    The direction of the current of maritime legislation long has been evident on its face.

"In this country these notions were reflected early, and have since been expanded, in legislation designed to secure the comfort and health of seamen aboard ship, hospitalization at home and care abroad. . . . The legislation . . . gives no ground for making inferences adverse to the seaman or restrictive of his rights. . . . Rather it furnishes the strongest basis for regarding them broadly, when an issue concerning their scope arises, and particularly when it relates to the general character of relief the legislation was intended to secure." *Aguilar* v. *Standard Oil Co.*, 318 U.S. 724, 728 -729.


Citing *Nicholas Schreiber* v. *K-Sea Transportation Corp.* New York, Supreme Court,

Appellate Division, April 25, 2006; 5410N Index 104992/04 107571/04:

Petitioner, as a ward of the admiralty, is entitled to heightened protection from the courts. There is a long-standing policy to safeguard the rights of seamen, whose contracts are traditionally viewed with solicitude:

They are emphatically the wards of the admiralty; and though not technically incapable of entering into a valid contract, they are treated in the same manner, as courts of equity are accustomed to treat young heirs, dealing with their expectancies, wards with their guardians, and cestuis que trust with their trustees. . . . If there is any undue inequality in the terms, any disproportion in the bargain, any sacrifice of rights on one side, which are not compensated by extraordinary benefits on the other, the judicial interpretation of the transaction, is that the bargain is unjust and unreasonable, that advantage has been taken of the situation of the weaker party, and that pro tanto the bargain ought to be set aside as inequitable.

(*Garrett* v. *Moore-McCormack Co.*, 317 U.S. at 246, 1942 AMC at 1650, quoting *Harden* v. *Gordon*, 2000 AMC 893, 902, 11 Fed Cas 480, 485 [1823]).


## B. Related Case: Inter-American Commission on Human Rights, Petition No. P-1142-06

I have a human rights complaint against the United States and against the United Nations, at the *INTER-AMERICAN COMMISSION ON HUMAN RIGHTS* in Washington, DC, Petition No. P-1142-06. They oversee the *INTER-AMERICAN COURT OF HUMAN RIGHTS* in Costa Rica.

The hostile and arbitrary treatment of my cases from the federal courts comports to the documentation of judicial bias and bigotry against unrepresented civil plaintiff's are

being Cc:'d to the *INTER-AMERICAN COMMISSION ON HUMAN RIGHTS* evidence of human rights violations because the United States and the United Nations have poor track records on human rights.

## C. Judicial Hatred for Seamen as Unrepresented Civil Plaintiffs

From 2002 to the present the DC Circuit, the U.S. Supreme Court, the U.S. District Court for the Eastern District of Arkansas extorted their filing fee from me. The 8th Circuit dismissed my appeal outright because I refused to pay their filing fee standing in defense of my statutory right of exemption under 28 U.S.C. § 1916. The U.S. Department of Justice, the FBI, and the U.S. Marshals Service refuse to acknowledge a prosecutable crime under 18 U.S.C. § 872 when the evidence is clear and convincing. This implies the additional crime of obstructions of justice.

I have exhausted all available traditional remedies. I am forced to pursue the remedy of last resort, the Citizen's Arrest Warrant, under my Tenth Amendment powers reserved to the People (the power of citizen's arrest) and my Ninth Amendment right to exercise that power of citizen's arrest as a civil plaintiff acting in the capacity of a Private Attorney General because my Second Amendment case employs the civil RICO Act alleging the United States of racketeering an unlawful and an unconstitutional protection scheme under the Second Amendment, and alleging the United Nations of racketeering an unlawful protection scheme in violation of international human rights laws.

My Complaints were within my rights as a U.S. seaman to seek judicial review in the interest of justice as a private citizen. My claims were not frivolous nor were they ever ruled to be frivolous. My cases were dismissed with prejudice using inapplicable boilerplate case law generated by judicial bias and political ideologies against the Second Amendment and against an unrepresented civil plaintiff. The docket histories of my case prove that out as facts.

As presented to Judge Rosemary M. Collyer in my Second Amendment case (No. 07-1616) I now present the same information in this Breach of Contract case to show that there is a real possibility that the U.S. Supreme Court did, in fact and law, take notice of my pursuit of Citizen's Arrest as a lawful remedy for judicial Extortion Under Color of Law, 18 U.S.C. § 872, of my statutory right of exemption from filing fees as a seaman under the Seamen's Suit law, 28 U.S.C. §1916. The Defendant Parties should take notice that the current Chief Justice of the U.S. Supreme Court, John G. Roberts, was a judge of the DC Circuit and was a signatory to court orders compelling me to pay the filing fee of the DC Circuit in criminal violation of the Seamen's Suit law thereby committing Extortion Under Color of Law, 18 U.S.C. § 872. The federal courts have tried every dirty trick in the book to keep this fact from becoming public knowledge by having the U.S. Marshals Service run interference for the federal courts preventing me from executing a lawful Citizen's Arrest Warrant based on verifiable and undeniable evidence of Extortion Under Color of Law. Even the FBI refuses to investigate. Hence the constitutional reason for the right of citizen's arrest as part of the checks and balance system of our Republican form of Government.

Rule 40.2 of the *Rules of the Supreme Court of the United Staters* went unchanged since May 3, 1999. I have not done the research to determine how for back in time Rule 40.2 remained unchanged. However, because I have been actively pursuing reimbursement of all filing fees (estimated to be a total of $1,465) the above named courts have denied me the traditional remedies. My pursuit of the remedy of last resort, the Citizen's Arrest Warrant, have lead me to have face to facing meetings with the U.S. Marshals Service and the U.S.


Supreme Court Police (being treating as a criminal suspect).

Now I discover a change in the 2007 edition of Rule 40.2 of the *Rules of the Supreme Court of the United States*.

I find this change to be far more than just a coincidence not influenced by my pursuit of justice under Rule 40.2, the Seaman's Suit law 28 U.S.C. § 1916, and the law against Extortion under Color of Law 18 U.S.C. § 872. In fact, I rightly suspect that the change in Rule 40.2 was a direct result of my pursuit for a remedy under my Citizen's Arrest Warrant.

I want to know why this change was made! Did my dispute and litigation these past 4 years (since 2003 in Case No. 03-145) over the filing fees and/or my use of the Citizen's Arrest Warrant for Felony Extortion under Color of Law, 18 U.S.C. § 872 VERSUS 18 U.S.C. § 1916 as a remedy of *"Last Resort"* cause the change?

I have a human rights complaint against the United States and against the United Nations, at the *INTER-AMERICAN COMMISSION ON HUMAN RIGHTS* in Washington, DC, Petition No. P-1142-06. They oversee the *INTER-AMERICAN COURT OF HUMAN RIGHTS* in Costa Rica. The hostile and arbitrary treatment my cases have received by the federal courts because I am an unrepresented civil plaintiff are being Cc:'d to the *INTER-AMERICAN COMMISSION ON HUMAN RIGHTS* evidence of human rights violations because the United States and the United Nations have poor track records on human rights.The following is the information from my Second Amendment case.

From 2002 to the present the DC Circuit, the U.S. Supreme Court, the U.S. District Court for the Eastern District of Arkansas extorted their filing fee from me. The 8th Circuit dismissed my appeal outright because I refused to pay their filing fee standing in defense of my statutory right of exemption under 28 U.S.C. § 1916. The U.S. Department of Justice, the FBI, and the U.S. Marshals Service refuse to acknowledge a prosecutable crime under 18 U.S.C. § 872 when the evidence is clear and convincing. This implies the additional crime of obstructions of justice.

I have exhausted all available traditional remedies. I am forced to pursue the remedy of last resort, the Citizen's Arrest Warrant, under my Tenth Amendment powers reserved to the People (the power of citizen's arrest) and my Ninth Amendment right to exercise that power of citizen's arrest as a civil plaintiff acting in the capacity of a Private Attorney General because my Second Amendment case employs the civil RICO Act alleging the United States of racketeering an unlawful and an unconstitutional protection scheme under the Second Amendment, and alleging the United Nations of racketeering an unlawful protection scheme in violation of international human rights laws.

My Complaints were within my rights as a U.S. seaman to seek judicial review in the interest of justice as a private citizen. My claims were not frivolous nor were they ever ruled to be frivolous. My cases were dismissed with prejudice using inapplicable boilerplate case law generated by judicial bias and political ideologies against the Second Amendment and against an unrepresented civil plaintiff. The docket histories of my case prove that out as facts.

Rule 40.2 of the *Rules of the Supreme Court of the United Staters* went unchanged since May 3, 1999. I have not done the research to determine how for back in time Rule 40.2 remained unchanged. However, because I have been actively pursuing reimbursement of all filing fees (estimated to be a total of $1,465) the above named courts have denied me the traditional remedies. My pursuit of the remedy of last resort, the Citizen's Arrest Warrant, have lead me to have face to facing meetings with the U.S. Marshals Service and the U.S. Supreme Court Police (being treating as a criminal suspect).

Now I discover a change in the 2007 edition of Rule 40.2 of the *Rules of the Supreme Court*

*of the United States.*

I find this change to be far more than just a coincidence not influenced by my pursuit of justice under Rule 40.2, the Seaman's Suit law 28 U.S.C. § 1916, and the law against Extortion under Color of Law 18 U.S.C. § 872. In fact, I rightly suspect that the change in Rule 40.2 was a direct result of my pursuit for a remedy under my Citizen's Arrest Warrant.

I want to know why this change was made! Did my dispute and litigation these past 4 years (since 2003 in Case No. 03-145) over the filing fees and/or my use of the Citizen's Arrest Warrant for Felony Extortion under Color of Law, 18 U.S.C. § 872 VERSUS 18 U.S.C. § 1916 as a remedy of **"Last Resort"** cause the change?

# Rule 40.2.
# (May 3, 1999 and May 2, 2005 Editions)
http://www.supremecourtus.gov/ctrules/rulesofthecourt.pdf

*A seaman suing under 28 U. S. C. § 1916 may proceed without prepayment of fees or costs or furnishing security therefor, but is not entitled to proceed under Rule 33.2, except as authorized by the Court on separate motion under Rule 39.*

### REVISIONS TO RULES
### OF THE
### SUPREME COURT OF THE UNITED STATES
ADOPTION DATE: JULY 17, 2007
EFFECTIVE DATE: OCTOBER 1, 2007
http://www.supremecourtus.gov/ctrules/2007revisedrules.pdf

# Rule 40.2.
# (October 1, 2007 Revision)
http://www.supremecourtus.gov/ctrules/2007revisedrules.pdf

*A seaman suing under 28 U. S. C. § 1916 may proceed without prepayment of fees or costs or furnishing security therefor **and may file a motion for leave to proceed on papers prepared as required by Rule 33.2. The motion shall ask leave to proceed as a seaman and be accompanied by an affidavit or declaration setting out the moving party's seaman status. A copy of the motion shall precede and be attached to each copy of the petition for a writ of certiorari or other substantive document filed by the seaman.***

### [CLERK'S COMMENT [TO 2007 REVISION]:

**. . . THE REVISED RULES ALSO EXTENDS THE EXEMPTION FROM THE PREPARATION OF BOOKLET-FORMAT DOCUMENTS TO SEAMEN. IF THE REASON FOR THE STATUTORY EXEMPTIONS IS TO REMOVE COST BARRIERS, THE EXEMPTION OF THE PRINTING REQUIREMENT REMOVES THE BIGGEST COST BARRIER TO FILING IN THIS COURT.]**

===

# TUESDAY, JULY 17, 2007
# ORDER

http://www.supremecourtus.gov/orders/courtorders/071707pzr.pdf

IT IS ORDERED that the revised Rules of this Court, today approved by the Court and lodged with the Clerk, shall be effective October 1, 2007, and be printed as an appendix to the United States Reports.

IT IS FURTHER ORDERED that the Rules promulgated May 2, 2005, see 544 U.S. 1071, shall be rescinded as of September 30, 2007, and that the revised Rules shall govern all proceedings in cases commenced after that date and, to the extent feasible and just, cases then pending.

= = =

*(Included in My upcoming Petition for Writ of Certiorari
at the U.S. Supreme Court (8th Circuit, No. 07-2400))*

# CHINA ISSUES HUMAN RIGHTS
# RECORD OF THE UNITED STATES (2006)

China Embassy
March 8, 2007
http://www.china-embassy.org/eng/zt/zgrq/t302225.htm

On Thursday, March 8, 2007 China issued their *HUMAN RIGHTS RECORD OF THE UNITED STATES IN 2006* in response to the *COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES FOR 2006* issued by the U.S. Department of State on Tuesday, March 6, 2007.

Released by the Information Office of China's State Council, the Chinese report lists a multitude of cases to show the human rights situation in the United States and its violation of human rights in other countries.

"As in previous years, the State Department pointed the finger at human rights conditions in more than 190 countries and regions, including China, but avoided touching on the human rights situation in the United States," the document says.

By publishing the Human Rights Record of the United States in 2006, the document says it aims to "help people have a better understanding of the situation in the United States and promote the international cause of human rights".

Relying on its strong military power, the United States has trespassed on the sovereignty of other countries and violated human rights in other countries, the document says. . . .

**Even in the United States, people's life, property and personal security are not secured, the document says**.

The document quotes a report by the U.S. Justice Department on Sept. 10, 2006 as saying that there were 5.2 million violent crimes in the United States in 2005, up 2.5 percent from the previous year, the highest rate in 15 years.

---

**APPELLANT'S COMMENT:**

The Second Amendment right to *openly* keep and bear arms, i.e., *National Open Carry Handgun*, will go a long way to securing *life, property, and personal security.*

---

Statistics released by the department in 2006 showed that in 2005 American residents age 12 or above experienced 23 million crimes; for every 1,000 persons age 12 or older, there occurred 1 rape or sexual assault, 1 assault with injury, and 3 robberies.

**In the United States, human rights violations committed by law enforcement and judicial departments are also common.**

Following the Sept. 11 attacks in 2001, the Federal Bureau of Investigation and other government agencies have referred 6,472 individuals to prosecutors on terrorism-related charges.

The Transactional Records Access Clearinghouse at Syracuse University says nearly three-quarters of terrorism suspects seized by the United States in the five years following the September 11 attacks have not even made it to trial because of lack of evidence against them.

> **APPELLANT'S COMMENT:**
>
> This is especially true in my cases these past 5 years. I generally attribute the alleged obstructions of justice and the dismissive treatment from federal law enforcement agencies and the federal courts to the uniqueness of my Second Amendment case as an international human right where I am acting in the capacity of a Private Attorney General with expectations of specific compliance with official duties and ethics from the U.S. Government. However the inverse of this has proven to be the norm and hence are translated into violations of human .

In 64 percent of the cases, federal prosecutors decided that they were not worth prosecuting, while an additional nine percent were either dismissed by judges or the individuals were found not guilty, according to a report by the AFP on September 4, 2006.

In recent years, American citizens have suffered increasing civil rights infringements, as the U.S. government has put average Americans under intense surveillance as part of terrorism investigations since the Sept. 11 attacks.

According to a survey released in December 2006, two-thirds of Americans believe that the FBI and other federal agencies are intruding on their privacy rights, according to a Washington Post report on Dec. 13, 2006.

**The United States touts itself as the "beacon of democracy", but the U.S. mode of democracy is in essence one in which money talks, the Chinese document says.**

In 2004, candidates for the House of Representatives who raised less than one million U.S. dollars had almost no chance of winning, the USA TODAY quoted a spokesman for the Center for Responsive

> **APPELLANT'S COMMENT:**
>
> Money talks is absolute true with a corrupt federal judicial system.. The U.S. Supreme Court, 8th Circuit, DC Circuit, U.S. District Court (Little Rock) all committed Extortion Under Color of Law 18 U.S.C. § 872.

Politics as saying in a report on Oct. 29, 2006.

The average successful Senate campaign cost 7 million dollars, the USA Today says. In 2006, all state campaigns in the United States were predicted to cost about 2.4 billion dollars.

Seventy-four percent of respondents to a new Opinion Research poll say the U.S. Congress is generally out of touch with average Americans, as CNN reported on Oct. 18, 2006, and 79 percent of the surveyed say they feel big business does have too much influence over the administration's decisions.

### The Chinese document also slams the United States for its lack of proper guarantee for people's economic, social and cultural rights.

A report released by the U.S. Census Bureau on Aug. 29, 2006 says there were 37 million people living in poverty in 2005, accounting for 12.6 percent of total U.S. population. The report also says there were 7.7 million families in poverty and one out of eight Americans was living in poverty in 2005.

"The ethnic minorities are at the bottom of American society," the Chinese report says.

> **APPELLANT'S COMMENT:**
>
> Taking the Second Amendment as a cultural human right the following United Nations pivotal documents on human rights apply: ■ The Convention Against Genocide; ■ Universal Declaration of Human Rights (exception to Article 29.3); ■ International Covenant on Economic, Social and Cultural Rights; ■ International Covenant on Civil and Political Rights;

Statistics released by the U.S. Census Bureau in November 2006 indicated that according to the 2005 data, the average yearly household income was 50,622 U.S. dollars for whites, compared with 36,278 for Hispanics and 30,940 for blacks. White people's income was 64 percent more than the blacks and 40 percent more than the Hispanics.

Racial discrimination is also deep-rooted in America's law enforcement and judicial systems.

According to statistics of the National Urban League, of the sentences issued in 12 crime categories in the State Courts, sentences for black males were longer than white males in all of them.

Researchers pointed to poverty, a lack of opportunities, racism in the criminal justice system for the black-white prison gap.

**The document says the United States has lorded it over other countries by condemning their human rights practices while ignoring its own problems, which exposes double standard and hegemonism in the field of human rights.**

By publishing the *HUMAN RIGHTS RECORD OF THE UNITED STATES IN 2006*, the document says it aims to "***help the world people have a better understanding of the situation in the United States and promote the international cause of human rights***".

This is the eighth consecutive year that China has issued human rights record of the United States in answer to the U.S. State Department annual report.

---

**APPELLANT'S COMMENT:**

*THE HUMAN RIGHTS RECORD OF THE UNITED STATES IN 2006* by China effectively describes a despotic and tyrannical government operating outside the limits of the U.S. Constitution and outside the bounds of international human rights. This corresponds with the growing grassroots Secessionist Movements active in 25 states at last count giving birth to The Chattanooga Declaration sponsored by New York's Middlebury Institute and the League of the South at the 14th annual conference.

# EVIDENCE OF JUDICIAL BIAS AGAINST AN UNREPRESENTED CIVIL PLAINTIFF BY THE U.S. SUPREME COURT

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

### *Sean Silveira, et al.* v. *Bill Lockyer, Atty. General of California, et al.*
### U.S. Supreme Court
### Case No. 03-51

**Docketed: July 8, 2003**
Lower Ct: United States Court of Appeals for the Ninth Circuit
Case Nos.: (01-15098)
Decision Date: December 5, 2002
Rehearing Denied: May 6, 2003

| ~~~Date~~~ | ~~~~~~Proceedings and Orders~~~~~~~~~~~~~ |
|---|---|
| Jul 3 2003 | Petition for writ of certiorari filed. (Response due August 7, 2003) |
| Jul 30 2003 | Brief amicus curiae of Pink Pistols filed. |
| Jul 30 2003 | Brief amicus curiae of Women Against Gun Control filed. |
| Jul 30 2003 | Brief amicus curiae of Jews for the Preservation of Firearms Ownership filed. |
| Aug 6 2003 | Brief amicus curiae of Second Amendment Sisters, Inc. filed. |
| Aug 7 2003 | Brief amicus curiae of National Rifle Association filed. |
| Aug 7 2003 | Brief amicus curiae of Doctors for Sensible Gun Laws filed. |
| **Aug 7 2003** | **Waiver of right of respondent Bill Lockyer, Attorney General of California to respond filed.** |
| Aug 20 2003 | DISTRIBUTED for Conference of September 29, 2003. |
| **Sep 22 2003** | **Response Requested . (Due October 22, 2003)** |
| **Oct 22 2003** | **Brief of respondents Bill Lockyer, Attorney General of California, and Gray Davis, Governor in opposition filed.** |
| **Oct 27 2003** | **Reply of petitioners Sean Silveira, et al. filed.** |
| Nov 5 2003 | DISTRIBUTED for Conference of November 26, 2003. |
| **Dec 1 2003** | **Petition DENIED.** |

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

*Don Hamrick* v. *George W. Bush, et al.*
**U.S. Supreme Court**
**Case No. 03-145**

# Docketed: July 28, 2003

Lower Ct: United States Court of Appeals for the District of Columbia Circuit
Case Nos.: (02-5334), Rule 11

~~~Date~~~        ~~~~~~~Proceedings  and  Orders~~~~~~~~~~

## Dec 27 2002   Petition for writ of certiorari before judgment filed.
(Response due August 27, 2003)

**Aug 19 2003**        **Waiver of right of respondent George W. Bush,
President of the United States, et al. to respond
filed.**

Aug 20 2003        DISTRIBUTED for Conference of September 29, 2003.

Oct 6 2003        Petition DENIED.

     The Court should note the passage of time between the date, December 27, 2002, when I filed my appeal under Rule 33.2, generating the case number, but the Supreme Court  rejected my appeal on technicalities  under Rule 33.1, and the date, July 28, 2003, my appeal was docketed under Rule 33.1. It took me a full 7 months and 4 redos of my Petition for Writ of Certiorari before I achieved perfection to the standards of an attorney as required by the U.S. Supreme Court under Rule 33.1.

     The U.S. Supreme Court, in effect, used Rule 33.1 as a barrier to prevent me from filing my Petition for Writ of Certiorari as a seaman in a timely manner under Rule 40.2. This allegation is supported by the fact that that the U.S. Supreme Court twice denied (see also, No. 04-1150) my statutory exemption under Rule 40.2 and under 28 U.S.C. § 1916 imposing the condition of payment of the filing fee before my Petition for Writ of Certiorari would be accepted as filed. By definition the U.S. Supreme Court twice committed Extortion under Color of Law, 18 U.S.C. § 872.

     The bottom line here is that the federal courts have used every dirty trick in the book to keep me from going to trial as an unrepresented civil plaintiff. What is even worse than that is that the U.S. District Court for the Eastern District of Arkansas even denied my Motion for Civil Gideon Representation under the American Bar Association's Task Force on Access to Civil Justice unanimous recommendation:

RESOLVED, That the American Bar Association urges federal, state, and territorial governments to provide legal counsel as a matter of right at public expense to low income persons in those categories of adversarial proceedings where basic human needs are at stake, such as those involving shelter, sustenance, safety, health or child custody as determined by each jurisdiction.

SOURCE: http://www.abanet.org/media/docs/112Arevised.pdf

All three Defendants have filed their Motion to Dismiss. I oppose their Motions to Dismiss.

The method in which a Motion to Dismiss converting to a Rule 56 Summary Judgment while the allegations in a Complaint are taken to be true then why does a Plaintiff (the adverse party have to set forth specific facts showing that there is a genuine issue for trial. Wouldn't the Complaint itself have already established the genuine issues of material fact for trial?

First, I will take the most flagrant misstatement or error of fact made by the Seafarers International Union. On page 4, second paragraph, item (3) states:

> (3) that plaintiff is "employing the Citizen's Arrest Warrant" as a
> means of forcing the Union to file an *Amicus Curiae* brief in support
> of his Second Amendment lawsuit seeking the right of seamen to
> bear arms.

Nothing can be farther from the truth. The truth of the matter is, as Judge Rosemary M. Collyer knows full well because she is also presiding over my Second Amendment case (No. 07-1616), rather unfairly I might add, that I am employing the Citizen's Arrest Warrant because the DC Circuit, the U.S. Supreme Court, and the U.S. District Court in Little Rock, Arkansas committed **EXTORTION UNDER COLOR OF LAW**, (18 U.S.C. § 872) of filing fees from me, a seaman in violation of the **SEAMEN'S SUIT LAW** (28 U.S.C. § 1916).

I am NOT forcing the Seafarers International Union to file Amicus Curiae briefs by employing the Citizen's Arrest Warrant! That claim is so ludicrous that I believe the Seafarers International Union is attempting to prejudicially influence the Court against my claims with deliberate fabrications and distortions of the facts.

The intent and purpose of notifying the Seafarers International Union of my activities with the Citizen's Arrest Warrant is the same intent and purpose of advising the union of all my other pleadings, motions, judicial notices and presumptions that I have filed with the Courts these past 5 years. I was presenting legal arguments on why the union should step up to the plate in defense of seamen's rights in the judicial arena as the do in the contracts arena with shipping companies. To date the union has not lifted a single finger to defend my rights in the federal courts.

I have had to stand my ground on my own to defend my rights against hostile federal judges simply because I cannot afford an attorney. The act of advising the union of the activities relating to the Citizen's Arrest Warrant was NOT to demand union involvement as a goal but to advise the union my activities relating to the Citizen's Arrest Warrant is either a direct or contributory consequence of their refusal to assist or intervene. And it is my claim that the federal judges took notice of the absence of support from the union, in addition to the absence of support from the National Rifle Association (NRA) any other Second Amendment advocacy group and took advantage of my lone standing on the issues of material fact to dismiss my cases with unlawful prejudice.

I sincerely believe that it does not matter how well I prepare this Objection to Defendants' Motion to Dismiss because certain defendants against an unrepresented civil plaintiff must always win as noted in the *COMMENTS ON THE NINTH CIRCUIT PRO SE TASK FORCE REPORT* on pages 31-32. My best hope is to show how corrupt the federal court is so that Judge Rosemary M. Collyer will be more judicially protective of my rights. But will she?

# DID JUDGE ROSEMARY M. COLLYER COMMIT TREASON AGAINST THE CONSTITUTION BY DISMISSING MY [SECOND AMENDMENT] CASE *Sua Sponte* WHERE GUNIUNE AND TRIABLE ISSUES OF MATERIAL FACT REMAIN?

## *Cohens v. Commonwealth of Virginia,* 19 U.S. 264 (1821)

It is most true that this Court will not take jurisdiction if it should not: but it is equally true, that it must take jurisdiction if it should. The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. **The one or the other would be treason to the constitution. Questions may occur which we would gladly avoid; but we cannot avoid them. All we can do is, to exercise our best judgment, and conscientiously to perform our duty.** In doing this, on the present occasion, we find this tribunal invested with appellate jurisdiction in all cases arising under the constitution and laws of the United States. We find no exception to this grant, and we cannot insert one.

Because my case has genuine and triable issues of material fact under four of the five international jurisdiction principles under the civil RICO Act as applied against the United Nations Judge Rosemary M. Collyer exercised poor judgment in her *sua sponte* dismissal of my case and by doing so committed "treason" against the Constitution because she acted in a manner to prevent my case from proceeding to trial to defend the Constitution and the Second Amendment against the United Nations global gun control agenda, hence my claim that the United Nations and the United States are waging a War of Aggression against the freedoms and liberties of the citizen's of the United States.

Judge Rosemary M. Collyer's *sua sponte* dismissal of my case just because she finds the content includes political poems criticizing the U.S. Government and the federal judicial system crystallizes the mounting evidence of a judicial and executive branch war on the Tenth Amendment and on the rights of the American people embodied in the Bill of Rights.

*Marbury* v. *Madison* was the first volley in the war over the First Amendment's right to petition the government for redress of grievances and in the war over the Tenth Amendment powers reserved to the people to interpret the U.S. Constitution for themselves and to say what it means. Thus we have a war between

Judicial Review and Popular Constitutionalism.

The federal courts and the executive branch is ignored and trampled my Ninth Amendment rights and Tenth Amendment powers reserved to the People to act in the capacity of a Private Attorney General as an unrepresented civil plaintiff with a civil RICO Act case let alone my statutory, civil, constitutional, and human rights.

# JUDGE LAY OF THE 8ᵀᴴ CIRCUIT ON ABUSIVE USE OF SUMMARY JUDGMENTS

*Melvin* v. *Car-Freshener Corporation*, 8th Circuit, No. 06-1279 (July 12, 2006), **Circuit Judge Lay, dissenting opinion**,
http://www.ca8.uscourts.gov/opndir/06/07/061279P.pdf:

> Too many courts in this circuit, both district and appellate, are utilizing summary judgment in cases where issues of fact remain. This is especially true in cases where witness credibility will be determinative. In these instances, a jury, not the courts, should ultimately decide whether the plaintiff has proven her case. Summary judgment should be the exception, not the rule. It is appropriate "*only . . . where it is quite clear what the truth is, . . . for the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try.*" *Poller* v. *Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467 (1962) (emphasis added) (citation and internal quotations omitted).

> It is undeniable that summary judgment is a valuable tool, the use of which allows overextended courts to remove cases that lack merit from their dockets. See *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 327 (1986). However, in accomplishing this goal, we have an obligation not to "overlook[] considerations which make . . . summary judgment an inappropriate means to that very desirable end." *Sartor* v. *Arkansas Natural Gas Corp.*, 321 U.S. 620, 627 (1944). As Justice Black explained,

> > The right to confront, cross-examine and impeach adverse witnesses is one of the most fundamental rights sought to be preserved by the Seventh Amendment provision for jury trials in civil cases. The advantages of trial before a live jury with live witnesses, and all the possibilities of considering the human factors, should not be eliminated by substituting trial by affidavit and the sterile bareness of summary judgment.

> *Adickes* v. *S.H. Kress & Co.*, 398 U.S. 144, 176 (1970) (Black, J., concurring).

> I express no opinion as to whether Melvin would ultimately be able to convince a jury in this case. However, she and all other similarly-situated plaintiffs should be afforded the opportunity to do so.

- - - - -

# WHY SUMMARY JUDGMENT IS UNCONSTITUTIONAL

Suja A. Thomas,
93 Virginia Law Review 139, 179-180 (2007)

## CONCLUSION

It is an appropriate time for the Court to change its jurisprudential course regarding the Seventh Amendment and hold summary judgment unconstitutional. Federal courts frequently employ summary judgment to dispose of cases, and the procedure has, thus, contributed to the decrease in the availability of civil jury trials.

Having recently taken renewed interest in the proper role of the jury under the Sixth Amendment, it would be fitting for the Court to examine this issue in the context of the Seventh Amendment. In the last seven years, in interpreting the Sixth Amendment, the Court has given power back to the criminal jury, emphasizing the historical role of the jury. In comparison, the text of the Seventh Amendment, which requires the court to follow the "common law," dictates an even more significant role for history in the preservation of the right to a civil jury trial under the Seventh Amendment.

As described in this Essay, three core principles emanate from the common law that demonstrate the unconstitutionality of summary judgment. First, under the common law, the jury or the parties determined the facts. The court itself never decided a case without such a determination. Second, a court would determine the sufficiency of the evidence only after a jury trial, and if the court believed that the evidence was insufficient, it would order only a new trial. The court would never order judgment for the moving party upon a review of the sufficiency of the evidence. Third, a jury would decide a case that had any evidence, however improbable that evidence was, unless the moving party admitted the facts and conclusions of the nonmoving party, including improbable facts and conclusions. Summary judgment, under which a court dismisses a case after its assessment of the sufficiency of the evidence, including the reasonableness of the factual inferences, wholly contrasts with these principles. Accordingly, the Court should, following the historical mandate of the Amendment, declare summary judgment unconstitutional.

## IOWA STATE COURT OF APPEALS

*Leonard v. Leonard*, Court of Appeals of Iowa, No. 5-611 / 05-0634 filed October 12, 2005, In Re The Marriage of Stephen Craig Leonard and Norma Jean Leonard:

> Our supreme court has admonished district courts to use restraint in exercising their power to dismiss actions *sua sponte. See Rush*, 240 N.W.2d at 439 (cautioning that "the more logical approach is to allow trial courts to exercise the power to sua sponte dismiss actions in a "restrained' manner.").

# DID THE U.S. SUPREME COURT CHANGE
# THEIR RULE 40.2 ON OCTOBER 2007
# BECAUSE OF MY CITIZEN'S ARREST WARRANT ACTIVITIES?

## EVIDENCE OF JUDICIAL HATRED FOR
## UNREPRESENTED CIVIL PLAINTIFFS

And now, Judge Rosemary M. Collyer of the U.S. District Court for the District of Columbia joins the rebellious and treasonous ranks of federal judges standing in defiance of basic human rights with her *sua sponte* dismissal of my case Ordering me to file an Amended Complaint just because an unrepresented civil plaintiff openly criticizes the United States Government for transgressions against the United States Constitution by the inclusion of highly critical political poems. Isn't the action of ordering an Amended Complaint because Judge Rosemary M. Collyer found the content to be objectionable a form of judicial censorship?

The 5 years of federal litigation I have endured has been like the old TV game show, Concentration. The game show was involved the combination of two key creative concepts: the children's game of matching cards, and the use of a *rebus puzzle* that was revealed as matching cards were removed from the board. In place of the playing cards, the gameboard featured numbered boxes (30 in all) on one side of each card, and prizes, that were to be matched, on the other. The gradual matching of card pairs slowly revealed elements of the rebus, a picture puzzle.

The original network daytime series, Concentration, aired on NBC for 14 years, 7 months and 3,796 telecasts (August 25, 1958 - March 23, 1973), the longest run of any game show on that network. This series was hosted by Hugh Downs and later by Bob Clayton. For a brief period in 1969, Ed McMahon hosted the series.

So it is not unlike the TV game show Concentration that the American people are beginning to recognize the United States Government as operating outside the limits of the United States Constitution. The *rebus* puzzle is rapidly being exposed to the extent that the American people are beginning to decypher the *rebus* puzzle of tyranny and oppression and are now defensively taking action against the deceptive *rebus* actions of the United States Government.

## EVIDENCE OF ONE GUNUINE AND TRIABLE ISSUE OF MATERIAL FACT: *DO AMERICAN SEAMEN HAVE SECOND AMENDMENT RIGHTS ABOARD SHIP AT SEA?*

# HIJACKED SHIP CREW OVERPOWERS PIRATES

Oct 30 09:48 AM US/Eastern
By EDWARD HARRIS
Associated Press Writer

NAIROBI, Kenya (AP) - The crew of a ship hijacked from Somalia overpowered their attackers Tuesday and regained control of the vessel, officials said.

About two dozen crew members of the North Korea-flagged vessel **were able to fight off the eight gunmen** who had seized the vessel late Monday, and the crew was piloting the ship back to the war-battered city's port in Mogadishu, said Andrew Mwangura, program coordinator of the Seafarers Assistance Program, which independently monitors piracy in the region.

He said first reports that the vessel was from South Korea were incorrect, and that the crew numbered about 22, instead of nearly twice that number as earlier reported.

**An international watchdog reported this month that pirate attacks worldwide jumped 14 percent in the first nine months of 2007, with the biggest increases off the poorly policed waters of Somalia and Nigeria.**

Reported attacks in Somalia rose rapidly to 26, up from eight a year earlier, the London-based International Maritime Bureau said through its piracy reporting center in Kuala Lumpur, Malaysia. **And some of those hijackings have turned deadly.**

Somalia has had 16 years of violence and anarchy, and is now led by a government battling to establish authority even in the capital. Its coasts are virtually unpoliced.

Piracy off Somalia increased this year after Ethiopian forces backing Somali government troops ousted an Islamic militia in December, said Andrew Mwangura, program coordinator of the Seafarers Assistance Program which independently monitors piracy in the region.

During the six months that the Council of Islamic Courts ruled most of southern Somalia, where Somali pirates are based, piracy abated, Mwangura said.

At one point, the Islamic group said it was sending scores of fighters to crack down on pirates there. Islamic fighters even stormed a hijacked, UAE-registered ship and recaptured it after a gunbattle in which pirates—but no crew members—were reportedly wounded.

In May, **pirates complaining their demands had not been met killed a crew member a month after seizing a Taiwan-flagged fishing vessel off Somalia's northeastern coast.**

Pirates even targeted vessels on humanitarian missions, such as the MV Rozen which was hijacked in February soon after it had delivered food aid to northeastern Somalia. The ship and its crew were released in April. France has offered naval vessels to escort ships carrying World Food Program food to Mogadishu beginning in November.

Indonesia remained the world's worst piracy hotspot, with 37 attacks in the first nine months of 2007. But that was an improvement from 40 in the same period a year earlier, IMB said.

The IMB said Southeast Asia's Malacca Strait, one of the world's busiest waterways, has been relatively quiet with 198 attacks on ships reported between January and September, up from 174 in the same period in 2006.

It said 15 vessels were hijacked, 63 crew members kidnapped and three killed.

Oil-rich Nigeria suffered 26 pirate attacks so far this year, up from nine in the same period last year.

# CIVIL RICO, FOREIGN DEFENDANTS, AND "ET"

Michael Goldsmith and Vicki Rinne
73 Minn. L. Rev. 1023, (April, 1989)

## II. JURISDICTIONAL BARRIERS TO EXTRATERRITORIAL RICO SUITS

Although courts have held that RICO applies to foreign as well as to United States defendants, *no extraterritorial RICO case has resulted in a judgment.*[1] *Jurisdictional requirements have raised serious obstacles.*[2] *To accept an extraterritorial RICO case, a court must have prescriptive, adjudicative, and enforcement jurisdiction.*[3] Although lack of adjudicative

---

[1] Plaintiffs have filed approximately one dozen extraterritorial RICO cases in United States courts, four of which were dismissed for failure to prove jurisdiction. See *Michelson* v. *Merrill Lynch, Pierce, Fenner & Smith*, 709 F. Supp. 1270, 1285 (S.D.N.Y. 1989) (finding no jurisdiction over foreign defendants); *Huang* v. *Sentinel Gov't Sec.*, 657 F. Supp. 485, 491-92 (S.D.N.Y. 1987) (same); *Ancilla Domini Health Servs.* v. *Communications Assocs.*, No. 84-C-2771a (N.D. Ill. Nov. 5, 1985) (LEXIS, Genfed library, Dist file) (same); *Nordic Bank PLC* v. *Trend Group, L.*, 619 F. Supp. 542, 564 (S.D.N.Y. 1985) (same); *Soltex Polymer Corp.* v. *Fortex Indus.*, 590 F. Supp. 1453, 1460 (E.D.N.Y. 1984) (same), aff'd, 832 F.2d 1325 (2d Cir. 1987). In another five cases, plaintiffs established jurisdiction, but their RICO claims were stayed or dismissed. See *Republic of Phil.* v. *Marcos*, 818 F.2d 1473, 1490 (9th Cir. 1987) (holding RICO claims barred by act of state and political question doctrines); *S.A. Mineracao da Trinidade-Samitri* v. *Utah Int'l, Inc.*, 745 F.2d 190, 191 (2d Cir. 1984) (staying "non-arbitrable" RICO claims pending arbitration of other claims); *FMC Corp.* v. *Varonos*, No. 87-C-9640 (N.D. Ill. Oct. 20, 1988) (LEXIS, Genfed library, Dist file) (finding RICO claims insufficient); *Selman* v. *American Sports Underwriters*, No. 84-0099-C (W.D. Va. Oct. 4, 1988) (LEXIS, Genfed library, Dist file) (same); *Chisholm & Col.* v. *Bank of Jamaica*, 643 F. Supp. 1393, 1404-05 (S.D. Fla. 1986) (same).

Courts have maintained RICO causes of action against foreign defendants in only four cases. See *In re All Terrain Vehicles Litig.*, No. 88-237 (E.D. Pa. Feb. 23, 1989) (LEXIS, Genfed library, Dist file) (denying foreign defendant's motion to dismiss); *Chamarac Properties, N.V.* v. *Pike, Fed. Sec. L. Rep.* (CCH) 93,761 (S.D.N.Y. 1988) (same); *North Carolina* v. *Alexander & Alexander Servs.*, 680 F. Supp. 746, 750 (E.D.N.C.), certification for immediate appeal denied, 685 F. Supp. 114, 117 (E.D.N.C. 1988) (same); *Shulton, Inc.* v. *Optel Corp.*, 1987-1 Trade Cas. (CCH) 67,436 (D.N.J. 1986) (same).

[2] See, e.g., *Michelson* v. *Merrill Lynch, Pierce, Fenner & Smith*, 709 F. Supp. 1270, 1285 (S.D.N.Y. 1989) (finding no jurisdiction over foreign defendants because foreign service of process lacking); *Huang* v. *Sentinel Gov't Sec.*, 657 F. Supp. 485, 491-92 (S.D.N.Y. 1987) (finding no jurisdiction over foreign defendants because minimum contacts lacking); *Ancilla Domini Health Servs.* v. *Communications Assocs.*, No. 84nC-2771 (N.D. Ill. Nov. 5, 1985) (LEXIS, Genfed library, Dist file) (finding no jurisdiction over foreign defendants because personal jurisdiction lacking); *Nordic Bank PLC* v. *Trend Group, L.*, 619 F. Supp. 542, 564 (S.D.N.Y. 1985) (denying jurisdiction over foreign defendants because foreign service of process lacking); *Soltex Polymer Corp.* v. *Fortex Indus.*, 590 F. Supp. 1453, 1460 (E.D.N.Y. 1984) (same), aff'd, 832 F.2d 1325 (2d Cir. 1987).

[3] Traditionally, discussions on international law divide jurisdiction into the right 73 to prescribe rules and the right to enforce them. J. Sweeney, C. Oliver & N. Leech, *CASES AND MATERIALS ON THE*

jurisdiction [*1043] appears to be the most frequent basis for rejecting an extraterritorial case, each jurisdictional predicate merits careful consideration.

## A. JURISDICTION TO PRESCRIBE

**Jurisdiction to prescribe**, also known as **subject matter jurisdiction**,[4] provides judicial authority over the topic of a dispute.[5] Under international law, prescriptive authority may derive from **territorial, nationality, passive personality, universality, or protective principles**.[6] These principles often work [*1044] together in practice,[7] but are best understood when treated separately.

---

INTERNATIONAL LEGAL SYSTEM 89 (2d ed. 1981). The RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES considers jurisdiction in three categories:

> (a) jurisdiction to prescribe, i.e., the authority of a state to make its law applicable to persons or activities;
>
> (b) jurisdiction to adjudicate, i.e., the authority of a state to subject particular persons or things to its judicial process; and
>
> (c) jurisdiction to enforce, i.e., the authority of a state to use the resources of government to induce or compel compliance with its law.

RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES Part IV, introductory note (1988) [hereinafter RESTATEMENT]. The Restatement recognizes that adjudication deals primarily with judicial function while enforcement often encompasses executive or administrative action in addition to the judicial process. Id.

[4] The RESTATEMENT uses the term jurisdiction to prescribe to avoid confusion with the term subject matter jurisdiction as used in a national context. Jurisdiction to prescribe addresses transnational activity. RESTATEMENT, supra note 73, § 401 comment c; see also Moessle, THE BASIC STRUCTURE OF THE UNITED STATES SECURITIES LAW ENFORCEMENT IN INTERNATIONAL CASES, 16 Cal. W. Int'l l.J. 1, 7 (1986) (stating that jurisdiction to prescribe is preferable term); see generally Lowenfeld, ANTITRUST, INTEREST ANALYSIS, AND THE NEW CONFLICT OF LAWS (Book Review), 95 Harv. L. Rev. 1976, 1980-84 (1982) (reviewing J. Atwood & K. Brewster, ANTITRUST AND AMERICAN BUSINESS ABROAD (2d ed. 1981)).

[5] See supra note [86]. Prescriptive jurisdiction occurs when a nation, by legislative action, executive decree, administrative regulation, or judicial decision, declares a principle or legal norm. J. Sweeney, C. Oliver & N. Leech, supra note [86], at 89. In practice, a court considering an extraterritorial case first must ask if national law applies to the conduct in dispute.

[6] United States v. King, 552 F.2d 833, 851 (9th Cir. 1976), cert. denied, 430 U.S. 966 (1977); Rocha v. United States, 288 F.2d 545, 549 n.4 (9th Cir.), cert. denied, 366 U.S. 948 (1961); 1 NAT. COMM'N ON THE REFORM OF FEDERAL CRIMINAL LAWS, Working Papers 72-73 (1970); see also United States v. Pizzarusso, 388 F.2d 8, 10 (2d Cir.) (stating that "International law has recognized, in varying degrees, five bases of jurisdiction" (citing HARVARD RESEARCH IN INTERNATIONAL LAW, JURISDICTION WITH RESPECT TO CRIME, 29 Am. J. Int'l l. Spec. Supp. 435, 445 (1935))), cert. denied, 392 U.S. 936 (1968); RESTATEMENT, supra note 73, § 402 (same). Some scholars recognize as a sixth basis for extraterritorial jurisdiction crimes under international law, including war crimes and crimes against humanity. See Attorney General of Isr. v. Eichmann, 36 I.L.R. 277 (Isr. Sup. Ct. 1962). Most authorities, however, treat this category as encompassed by the universality principle. Cf. I. Brownlie, PRINCIPLES OF PUBLIC INTERNATIONAL LAW 305 (3d ed. 1979) (noting distinction between universality and crimes under international law).

[7] The passive personality principle, for example, is similar to the protective principle, and the nationality, territorial, and protective principles also interrelate. I. Brownlie, supra note [89], at 306;

| Jurisdiction to Prescribe = Subject Matter Jurisdiction | |
|---|---|
| *Plaintiff's Case has Subject Matter Jurisdiction in 4 out of the 5 Principles of Jurisdiction* | |
| **(1) Territorial Principles** | U.N. treaties cannot displace the U.S. Constitution or the Bill of Rights. The United Nations global gun control agenda is repugnant to the Second Amendment of the Bill of Rights to the U.S. Constitution |
| (2) Nationality Principles | Based on the citizenship of the offender. This principle does not grant prescriptive jurisdiction in an extraterritorial RICO suit against foreign defendants. The nationality of the Secretary-General of the United Nations is South Korean. However, the United Nations includes the United States. Therefore, it may be a technicality of international law but the United Nations may very well be subject to the jurisdiction of the federal courts of the United States. |
| **(3) Passive Personality Principles** | Obverse of Nationality Principle, Passive Personality Principles confers jurisdiction based on the nationality of the victim. |
| **(4) Universality Principles** | Provides jurisdiction over acts which are condemned unconditionally by international law, such as piracy on the high seas and genocide. |
| **(5) Protective Principles** | Confers jurisdiction over foreign acts that threaten national security, such as the United Nations global gun control agenda. Disarming the citizens of the United States of their Second Amendment rights is construed to be a threat to national security. |

*The only way my case can be dismissed is by judicial bias, political ideology, and unlawful prejudice against an unrepresented civil plaintiff.*

---

see, e.g., *King*, 552 F.2d at 851-52 (finding jurisdiction established under both nationality and territorial principles); *United States* v. *Daniszewski*, 380 F. Supp. 113, 115-16 (E.D.N.Y. 1974) (finding jurisdiction established under nationality principle and indicating court was prepared to rely on protective principle as well).

# American Legal System Is Corrupt Beyond Recognition, Judge Tells Harvard Law School

By Geraldine Hawkins
MassNews.com
P.O. Box 5882
Holliston, MA  01746
781-237-2772
March 7, 2003

The American legal system has been corrupted almost beyond recognition, Judge Edith Jones of the U.S. Court of Appeals for the Fifth Circuit, told the Federalist Society of Harvard Law School on February 28.

She said that the question of what is morally right is routinely sacrificed to what is politically expedient. The change has come because legal philosophy has descended to nihilism.

"The integrity of law, its religious roots, its transcendent quality are disappearing. I saw the movie 'Chicago' with Richard Gere the other day. That's the way the public thinks about lawyers," she told the students.

"The first 100 years of American lawyers were trained on Blackstone, who wrote that: 'The law of nature … dictated by God himself … is binding … in all counties and at all times; no human laws are of any validity if contrary to this; and such of them as are valid derive all force and all their authority … from this original.' The Framers created a government of limited power with this understanding of the rule of law - that it was dependent on transcendent religious obligation," said Jones.

She said that the business about all of the Founding Fathers being deists is "just wrong," or "way overblown." She says they believed in "faith and reason," and this did not lead to intolerance.

"This is not a prescription for intolerance or narrow sectarianism," she continued, "for unalienable rights were given by God to all our fellow citizens. Having lost sight of the moral and religious foundations of the rule of law, we are vulnerable to the destruction of our freedom, our equality before the law and our self-respect. It is my fervent hope that this new century will experience a revival of the original understanding of the rule of law and its roots.

"The answer is a recovery of moral principle, the sine qua non of an orderly society. Post 9/11, many events have been clarified. It is hard to remain a moral relativist when your own people are being killed."

According to the judge, the first contemporary threat to the rule of law comes from within the legal system itself.

Alexis de Tocqueville, author of Democracy in America and one of the first writers to observe the United States from the outside looking-in, "described lawyers as a natural aristocracy in America," Jones told the students. "The intellectual basis of their profession and the study of law based on venerable precedents bred in them habits of order and a taste for formalities and predictability." As Tocqueville saw it, "These qualities enabled attorneys to stand apart from the passions of the majority. Lawyers were respected by the citizens and able to guide them and moderate the public's whims. Lawyers were essential to tempering the potential tyranny of the majority.

"Some lawyers may still perceive our profession in this flattering light, but to judge from polls and the tenor of lawyer jokes, I doubt the public shares Tocqueville's view anymore, and it is hard for us to do so."

"The legal aristocracy have shed their professional independence for the temptations and materialism associated with becoming businessmen. Because law has become a self-avowed business, pressure mounts to give clients the advice they want to hear, to pander to the clients' goal through deft manipulation of the law. ... While the business mentality produces certain benefits, like occasional competition to charge clients lower fees, other adverse effects include advertising and shameless self-promotion. The legal system has also been wounded by lawyers who themselves no longer respect the rule of law,"

The judge quoted Kenneth Starr as saying, "It is decidedly unchristian to win at any cost," and added that most lawyers agree with him.

However, "An increasingly visible and vocal number apparently believe that the strategic use of anger and incivility will achieve their aims. Others seem uninhibited about making misstatements to the court or their opponents or destroying or falsifying evidence," she claimed. "When lawyers cannot be trusted to observe the fair processes essential to maintaining the rule of law, how can we expect the public to respect the process?"

Lawsuits Do Not Bring 'Social Justice'

Another pernicious development within the legal system is the misuse of lawsuits, according to her.

"We see lawsuits wielded as weapons of revenge," she says. "Lawsuits are brought that ultimately line the pockets of lawyers rather than their clients. ... The lawsuit is not the best way to achieve social justice, and to think it is, is a seriously flawed hypothesis. There are better ways to achieve social goals than by going into court."

Jones said that employment litigation is a particularly fertile field for this kind of abuse.

"Seldom are employment discrimination suits in our court supported by direct evidence of race or sex-based animosity. Instead, the courts are asked to revisit petty interoffice disputes and to infer invidious motives from trivial comments or work-performance criticism. Recrimination, second-guessing and suspicion plague the workplace when tenuous discrimination suits are filed ... creating an atmosphere in which many corporate defendants are forced into costly settlements because they simply cannot afford to vindicate their positions.

"While the historical purpose of the common law was to compensate for individual injuries, this new litigation instead purports to achieve redistributive social justice. Scratch the surface of the attorneys' self-serving press releases, however, and one finds how enormously profitable social redistribution is for those lawyers who call themselves 'agents of change.'"

Jones wonders, "What social goal is achieved by transferring millions of dollars to the lawyers, while their clients obtain coupons or token rebates."

The judge quoted George Washington who asked in his Farewell Address, "Where is the security for property, for reputation, for life, if the sense of religious obligation desert the oaths ... in courts of justice?"

Similarly, asked Jones, how can a system founded on law survive if the administrators of the law daily display their contempt for it?

"Lawyers' private morality has definite public consequences," she said. "Their misbehavior feeds on itself, encouraging disrespect and debasement of the rule of law as the public become encouraged to press their own advantage in a system they perceive as manipulatable."

The second threat to the rule of law comes from government, which is encumbered with agencies that have made the law so complicated that it is difficult to decipher and often contradicts itself.

"Agencies have an inherent tendency to expand their mandate," says Jones. "At the same time, their decision-making often

becomes parochial and short-sighted. They may be captured by the entities that are ostensibly being regulated, or they may pursue agency self-interest at the expense of the public welfare. Citizens left at the mercy of selective and unpredictable agency action have little recourse."

Jones recommends three books by Philip Howard: The Death of Common Sense, The Collapse of the Common Good and The Lost Art of Drawing the Line, which further delineate this problem.

The third and most comprehensive threat to the rule of law arises from contemporary legal philosophy.

"Throughout my professional life, American legal education has been ruled by theories like positivism, the residue of legal realism, critical legal studies, post-modernism and other philosophical fashions," said Jones. "Each of these theories has a lot to say about the 'is' of law, but none of them addresses the 'ought,' the moral foundation or direction of law."

Jones quoted Roger C. Cramton, a law professor at Cornell University, who wrote in the 1970s that "the ordinary religion of the law school classroom" is "a moral relativism tending toward nihilism, a pragmatism tending toward an amoral instrumentalism, a realism tending toward cynicism, an individualism tending toward atomism, and a faith in reason and democratic processes tending toward mere credulity and idolatry."

No 'Great Awakening' In Law School Classrooms

The judge said ruefully, "There has been no Great Awakening in the law school classroom since those words were written." She maintained that now it is even worse because faith and democratic processes are breaking down.

"The problem with legal philosophy today is that it reflects all too well the broader post-Enlightenment problem of philosophy," Jones said. She quoted Ernest Fortin, who wrote in Crisis magazine: "The whole of modern thought … has been a series of heroic attempts to reconstruct a world of human meaning and value on the basis of … our purely mechanistic understanding of the universe."

Jones said that all of these threats to the rule of law have a common thread running through them, and she quoted Professor Harold Berman to identify it: "The traditional Western beliefs in the structural integrity of law, its ongoingness, its religious roots, its transcendent qualities, are disappearing not only from the minds of law teachers and law students but also from the consciousness of the vast majority of citizens, the people as a whole; and more than that, they are disappearing from the law itself. The law itself is becoming more fragmented, more subjective, geared more to expediency and less to morality. … The historical soil of the Western legal tradition is being washed away … and the tradition itself is threatened with collapse."

Judge Jones concluded with another thought from George Washington: "Of all the dispositions and habits which lead to prosperity, religion and morality are indispensable supports. In vain would that man claim the tribute of patriotism who should labor to subvert these great pillars of human happiness - these firmest props of the duties of men and citizens."

Upon taking questions from students, Judge Jones recommended Michael Novak's book, On Two Wings: Humble Faith and Common Sense.

"Natural law is not a prescriptive way to solve problems," Jones said. "It is a way to look at life starting with the Ten Commandments."

Natural law provides "a framework for government that permits human freedom," Jones said. "If you take that away, what are you left with? Bodily senses? The will of the majority? The communist view? What is it - 'from each according to his ability, to each according to his need?' I don't even remember

it, thank the Lord," she said to the amusement of the students.

"I am an unabashed patriot - I think the United States is the healthiest society in the world at this point in time," Jones said, although she did concede that there were other ways to accommodate the rule of law, such as constitutional monarchy.

"Our legal system is way out of kilter," she said. "The tort litigating system is wreaking havoc. Look at any trials that have been conducted on TV. These lawyers are willing to say anything."

Potential Nominee to Supreme Court

Judge Edith Jones has been mentioned as a potential nominee to the Supreme Court in the Bush administration, but does not relish the idea.

"Have you looked at what people have to go through who are nominated for federal appointments? They have to answer questions like, 'Did you pay your nanny taxes?' 'Is your yard man illegal?'

"In those circumstances, who is going to go out to be a federal judge?"

Judge Edith H. Jones has a B.A. from Cornell University and a J.D. from the University of Texas School of Law. She was appointed to the Fifth Circuit by President Ronald Reagan in 1985. Her office is in the U.S. Courthouse in Houston.

The Federalist Society was founded in 1982 when a group of law students from Harvard, Stanford, the University of Chicago and Yale organized a symposium on federalism at Yale Law School. These students were unhappy with the academic climate on their campuses for some of the reasons outlined by Judge Jones. The Federalist Society was created to be a forum for a wider range of legal viewpoints than they were hearing in the course of their studies.

From the four schools mentioned above, the Society has grown to include over 150 law school chapters. The Harvard chapter, with over 250 members, is one of the nation's largest and most active. They seek to contribute to civilized dialogue at the Law School by providing a libertarian and conservative voice on campus and by sponsoring speeches and debates on a wide range of legal and policy issues.

The Federalist Society consists of libertarians and conservatives interested in the current state of the legal profession. It is founded on three principles: 1) the state exists to preserve freedom, 2) the separation of governmental powers is central to our Constitution and 3) it is emphatically the province and duty of the judiciary to state what the law is, not what it should be.

# Comments on the Ninth Circuit
# pro se Task Force Report

Prepared by Charles W. Heckman, Dr. Sci.
Submitted in behalf of A Matter of Justice Coalition
Committee for the Ninth Circuit
See **http://www.amatterofjustice.org**

*Charles W. Heckman, Dr. Sci., habil., Professor, researcher, lecturer, speaker, writer, Washington State coordinator for the Veterans' Voting Bloc, Member of the Board of Directors of A Matter of Justice Coalition, presently producing a series of at least 10 volumes for identifying South American aquatic insects to species. Three of the volumes have already been published.*

## Basic summary of the Task Force's report

The report of the Task Force summarizes the many problems faced by the United States courts when persons not educated or trained as attorneys attempt to present their own legal arguments in various kinds of proceedings. It then introduces a variety of proposals to reduce the problems identified by the Task Force members, ranging from simplifying procedures to enlisting the assistance of pro bono attorneys or law students to minimize procedural errors, present arguments in an objective way without introducing the emotional responses typically elicited when a person discusses personal conflicts, and give litigants a better understanding of legal and practical limitations to the actions of a court. It takes note of the fact that prior discussions of legal aspects of a lawsuit with an attorney often disabuse a litigant of misunderstandings of the law before the court is required to instruct the litigant about erroneous principles on which a lawsuit is based.

The recommendations of the task force are practical and include suggested improvements that would alleviate many of the problems addressed. Most of these suggestions can be accepted, and it is hoped that resources can be found to effect the improvements.

What must be faulted in this report is not the solutions proposed for the problems presented but rather the failure to address the most frequent complaints of pro se litigants, which are similar to complaints frequently voiced by litigants represented by attorneys with average or less than average capabilities.

## Fundamental role of the judiciary

In 1947, Justice William O Douglas wrote that the basic function of any court is to judge the case on the merits. That means that two factors and only two should influence the decision: the law and the facts. If all is functioning as it should, then any case in which the facts indicate that one party must prevail under the law should have only one outcome. This is true regardless of whether or not the party whose case is supported by the law and the facts is represented by counsel.

Justice should not depend upon whether or not a person can afford a lawyer. While it is true that a litigant acting pro se might be less likely to present a clear case than an experienced lawyer and might not be able to cite all of the laws that might support his case, if the facts support any claim he makes under any law, he should prevail. If a litigant arguing his own case lets his emotions show, thereby provoking a negative reaction, or if the litigant lacks skill in expressing himself, it is understandable that he may suffer disadvantage where the facts are not altogether clear. However, it is the function of a court, especially the jury, to sort through the evidence presented and provide a

decision in accord with the law and facts, even if some extra effort has to be exerted. Any court that permits factors other than the law and the facts to influence the outcome of any proceeding has failed in its fundamental duty.

# Problems not addressed in the report

## The role of bias

One of the many serious complaints often voiced by litigants but not seriously addressed in the report of the Task Force is bias by the judge. However, the report clearly expresses a common attitude toward pro se litigants, starting on p. 6 of the report:

"Some judges and lawyers are convinced, for example, that pro se litigants as a class generally bring meritless claims, and that any program designed to educate or assist them would only increase the number of meritless claims in the court system. This point of view is doubtless influenced by those pro se cases that are brought by individuals suffering from a mental disability or for purposes of harassment. Closely related to that thought is the belief that appointing attorneys for pro se clients is a waste of resources and in the long run simply complicates efforts to keep the system clear of meritless cases."

The Task Force fails to identify who holds this opinion, but both lawyers and judges have frequently expressed it or opinions very much like it. The main focus of this task force should not be with methods by which unbiased judges can make the submissions of pro se litigants easier for the court to deal with but rather with developing methods to assist a pro se litigant who has been the victim of a judge with the preconception that whatever he submits to the court is without merit, and his lawsuit must be dismissed before any unnecessary time of the court is wasted.

If all judges were perfect human beings, we could assume that the private opinion of a lawyer or a judge would not be reflected the judge's rulings. However, we know that few people approach perfection, and prejudice by decision-makers against members of certain groups has been the cause of continuous, bitter conflict since the civil rights movement first brought the effects of biases of many kinds to public view.

Prejudices often have a greater impact on the outcome of administrative hearings and lawsuits than parties with an obligation to be impartial like to admit. Whether the prejudice is deliberate and malicious or entirely unintended, decisions colored by personal biases can be just as devastating to the victims of the resulting injustice.

An even more enlightening articulation of the prejudice litigants often face appeared in numerous discussions on the decision of a Washington State appeals court in ***Hill v. BCTI Income Fund***, 97 Wn. App. 657 (1999), later upheld by the Washington State Supreme Court. Although it is the decision of a state court, it draws on the en banc opinion of the U. S. Court of Appeals for the Second Circuit in ***Fisher v. Vassar College***, 70 F.3d 1420, 1437 (2d Cir.). The opinion in *Hill v. BCTI* defends a school of thought within the legal profession, which has been having a revolutionary effect on American jurisprudence. It parallels the controversial theory of a "living constitution," which condones the "updating" of the United States Constitution by the courts to conform to the personal opinion of judges concerning what the public wants and will accept. On a more mundane level, this revolution in judicial theory is interpreted by many judges as a mandate to quickly dismiss any lawsuit that can be dismissed without causing a public outcry, regardless of the merits of the case.

One of the main innovations introduced by the decision in *Fisher v. Vassar* is the acceptability and utility of lying to the court. This was discussed at length in a dissenting opinion by

the Chief Judge of the Court of Appeals of the Second Circuit, who pointed out the implications of the decision reached by his colleagues. Briefly stated, a jury of the trial court had determined that the spokesmen for Vassar had lied about the reason Fisher was denied tenure. It therefore concluded that the prima facie case Fisher had established had not been rebutted, and the relief she had demanded was granted. The Second Circuit, en banc, reversed the decision of the trial court by a single vote, ruling that the non-discriminatory reason given for not granting Fisher tenure had eliminated her prima facie case, even though the reason was shown unequivocally to be a lie. With the case in favor of Fisher eliminated, the court opined that she was required to meet a higher level of proof, which was not defined by the court and was apparently not humanly possible to meet, at least without the services of a certified mind-reader.

Expanding on this legal opinion, the Washington State courts in *Hill v. BCTI* set an unattainable burden of proof on a plaintiff who has alleged discrimination as soon as the defendant lies to the court and alleges that the motivation was not to discriminate against the plaintiff. According to the opinion of the Washington courts, proving conclusively that the defendant's allegation was a lie is not enough for a plaintiff to prevail. He must prove that the motive of the plaintiff was to discriminate against him for the reason alleged in the complaint. Hence, if age discrimination is alleged, the plaintiff must prove that the real reason for the discriminatory action and the subsequent lie by the defendant was actually the age of the plaintiff and not, for example, his religion, race, or gender. The judges of the Washington State Court of Appeals were well aware of the fact that the opposite decision had been reached by the United States Supreme Court, but they reasoned that the Supreme Court was wrong and the State of Washington was free to decide contrary to the highest Federal court because the State of Washington has its own constitution and its courts are therefore not bound by the United States Constitution, as interpreted by the Federal judiciary.

What is interesting about this case in the context of pro se litigation is not the decision itself but rather the opinion of an author who defended the decision as vital to preserve the integrity of the judicial system. He stated clearly in his article that if one person came to a court with a discrimination complaint and obtained relief, this would encourage other litigants to file similar lawsuits, and there are already too many lawsuits being filed. There is a strong undercurrent within the legal profession, as well as among corporations that are frequently sued, propagating the opinion that filing civil lawsuits is somehow sinister and un-American. They wish to discourage most lawsuits by denying justice to litigants and thereby discouraging other litigants from seeking justice in a court.

While there is a tradition from the Old West that a man settles his disputes by shooting it out with his adversary or settles lesser disputes with his fists, it was long thought that this was a less desirable alternative to letting a jury decide which party should prevail. Apparently, some members of the legal profession think otherwise and wish to close off the courts to ordinary citizens, returning dispute resolution to the means available in the "Wild West." It would be well to determine how closely the decrease in justice provided in civil suits has paralleled the increase in crimes of violence between people with no civilized means available to settle their dispute. How many of the civil disputes wrongfully dismissed or inequitably settled come back to the court as a criminal case?

The treatment of pro se litigants reflects the desire expressed by many politicians and judges that the number of lawsuits be reduced. Showing litigants who lack strong financial resources, the services of a first-class law firm, backing by an influential organization, or attention in the press that they have no chance of prevailing in a lawsuit or even of presenting their cases to a jury might well discourage other litigants from seeking redress in the courts but it also encourages persons in positions of authority to deliberately break the law, knowing that there is almost no chance that the victim would be able to obtain redress in a court of law.

It seems obvious to me that the flood of lawsuits is the result of a massive increase in white collar crime in the United States, most of which is ignored by law enforcement authorities on the excuse that their time is needed to combat crimes of violence. The victims are therefore forced to attempt to obtain redress in a civil lawsuit, and most are unable to obtain legal counsel. A recent estimate made by a group in Iowa suggested that 70% of the population of that state did not have enough money to retain the services of an attorney. Because most white collar criminals have learned the applicable law very well before embarking on their criminal careers and many seem to have the active assistance of local civil servants or even judges, attorneys do not see much chance of immediate success before a court and will therefore refuse to represent an indigent litigant on a contingency basis. Furthermore, many attorneys working out of small offices without a major law firm behind them hardly do better in court than pro se litigants. Therefore, as the white collar criminals, deliberate abusers of civil rights, unscrupulous business firms, and corrupt public officials become bolder, the victims have no way of protecting their property and livelihoods other than by representing themselves in a lawsuit. Even though an increasing number of pro se litigants see the courts as hostile to them and their needs for redress under the law, the flood of lawsuits grows because of the massive increase in the crimes that the current attitude of the courts has engendered.

Missing from the report by the Task Force is any adequate remedy for the actions of judges who adhere to the belief that pro se litigants do not deserve full consideration by the court. This can be justified by the self-fulfilling prophesy that pro se litigants never win. As a result, many judges believe that any time given to a lawsuit in which a litigant represents himself is wasted. Therefore, pro se litigants really do not win simply because the prophesy that they will lose is self-fulfilling.

## *Remedies that fail*

If a district judge summarily dismisses the civil lawsuit of a pro se plaintiff without reviewing any of the facts and writes a short opinion that fails to address the fundamental complaint, indicating that the judge barely knew what issues the complaint addressed, the plaintiff can appeal the dismissal to the court of appeals. In a great many cases, the plaintiff receives a brief affirmation of the district judge's opinion, which also fails to address the issues in the complaint and almost always contains the notation that the opinion cannot be cited as a precedent and should not be published.

The plaintiff can then file an appeal with the United States Supreme Court with near certainty that certiorari will not be denied. Many litigants lack the money to have their petitions for certiorari correctly printed and bound to the satisfaction of the clerk, and others fail to present the legal issues in an understandable manner. Even if all submissions are perfect, however, the petition will almost certainly be denied in favor of appeals that are given considerable publicity in the press, are promoted by major organizations, or are otherwise likely to bring fame and praise to the justices. The problems of ordinary citizens, no matter how devastating to them and their families, are ignored, and they find that they would have little more chance of success in getting a justified complaint before a jury than they would have of winning a lottery.

For example, after the courts in several circuits had summarily dismissed hundreds and perhaps thousands of lawsuits alleging employment discrimination at the complaint stage because the plaintiff had failed to provide enough hard evidence to establish a prima facie case when the complaint was submitted, the United States Supreme Court agreed to hear one of the appeals from the Second Circuit. In *Swierkiewicz v. Sorema N.A.*, 534 U.S. (2002), it decided unanimously that it is a gross violation of procedures to dismiss a lawsuit at this stage of the proceedings. Among the points the justices made were that a plaintiff can prevail without establishing a prima facie case at all, that a judge's opinion of whether or not a litigant will prevail before a jury is irrelevant to decision to dismiss a lawsuit, and that it is fundamentally unfair to dismiss a lawsuit before the whole body of

facts can be revealed through discovery. While this decision provided the plaintiff with a chance to have his lawsuit heard by a jury on the merits, it affirmed that thousands of litigants whose lawsuits had been improperly dismissed over the many years during which the appeals courts had been violating procedures had been left without any access to justice.

Still more perverse was the continued dismissal of lawsuits at the complaint stage, even after the Supreme Court had denounced this practice. It was well known to the judges guilty of this practice that any subsequent petitions for certiorari citing this issue would be denied on the grounds that the Supreme Court had already decided the issue and would not agree to decide it again. This would leave a litigant no way of redressing violations of his civil rights just because he had the bad luck of coming before a judge who is trying to discourage lawsuits by issuing non-precedential dismissals at the complaint stage and appeals court judges who affirm decisions of the lower court with a rubber stamp. Citing the clear opinion of the U.S. Supreme Court in *Swiercewicz v. Sorema N.A.* would have no effect on the outcome before a judge who assumes that anything filed pro se is without merit.

In case of particularly severe violations of the law, procedures, or ethics by a judge, a litigant is limited to filing a complaint with a judicial board established for hearing such complaints. Other avenues of redress are closed off because judicial immunity from civil liability was made absolute during the 1990s, even if corruption or malice motivated the judge's actions. Experience shows that the boards investigating misconduct by judges move extremely slowly, and a litigant has roughly one chance in a thousand of having a rogue judge censured, even mildly.

It can be concluded that a litigant whose lawsuit has been dismissed because of the bias of a judge against him, a class to which he belongs, pro se litigants in general, or the kind of lawsuit he has filed has almost no chance of redress, either on appeal or in complaint proceedings against a judge. Human nature clearly dictates that when members of any group are permitted to perform illegal, immoral, and unjust actions against other persons with complete impunity, many of them will do so, some because of laziness, others because of malice, and still others in anticipation of gratuities from a favored party. A pro se litigant has no recourse against a judge who does not want his complaint heard due to bias of any kind, and the fact that a judge has the power to deny him access to a jury effectively eliminates an important civil right supposedly guaranteed by Amendment VII of the United States Constitution.

## Common experiences of pro se litigants

The solutions proposed by the Task Force presume good will by the judges and conformity with the standards of ethics and behavior traditionally held by our society. Unfortunately, in speaking and corresponding with many pro se litigants, I have learned that there are common problems that reflect an erosion of human values and are often accompanied by abusive behavior by judges. These problems are less likely to arise when a litigant is represented by a lawyer, whose status as an "insider" in the legal profession might tend to restrain the opposing attorney and presiding judge from improper conduct. Such conduct is difficult for pro se litigants to cope with, but it is readily recognized when it occur. Eventually, pro se litigants make their opinions of the court public, and the increasing criticism leads to a general loss of faith in courts. The growing dissatisfaction of the public with the judicial system is rooted in the negative opinions developed by many litigants who know they have been improperly or illegally treated. Losing a lawsuit is fundamentally different from being denied due process and a fair hearing, and even pro se litigants without formal education in a law school can immediately tell the difference.

**The most common complaints by litigants of misconduct by the courts include the following:**

## 1. Perjury is tolerated by the judge

This complaint has been made by the great majority of pro se litigants with whom I have spoken. Very often, the false testimony is given by one or more government employees. Even when parts of the testimony are shown to be false, judges continue to give full credence to the witness in the remaining parts of the testimony. The judge then dismisses the lawsuit of a pro se litigant citing the perjured testimony as evidence that the lawsuit has no merit. Usually there are documents in the file clearly showing that the testimony was false, but these are simply disregarded by the judge.

Prosecutions for perjury have become rare to non-existent. Government employees have been given complete immunity for perjury they commit "in the line of duty," even if it is given with malice. Government prosecutors may suborn witnesses to perjury by promising them immunity for crimes they have been accused of. It has even been alleged that government employees can be fired for refusing to give false testimony at the behest of their supervisors. Many cases are known where civil servants have advanced their own careers by deliberately misleading courts, administrative boards, and even Congress to advance a political agenda espoused by the their supervisors.

## 2. Records submitted to the court disappear from the files

This complaint has frequently been made. Some litigants note that the entries of the documents are still in the court records but the documents themselves have disappeared. Even if copies of the records are retained by the litigant, they usually cannot be added to a record on appeal unless they are still in the file of the lower court.

## 3. Judges' opinions fail to address the issues of the lawsuit

Many litigants complain that orders for dismissal address issues that were never raised in the lawsuit and fail to address the issues that were. In light of the fact that most judges have earned a law degree, some decisions have convinced the litigants that the legal issues were deliberately misconstrued by the judge. For example, if a plaintiff seeks injunctive relief pursuant to the Administrative Procedures Act and monetary relief citing the Federal Tort Claim Act, a judge may deny the injunctive relief on the grounds that there are no provisions for such relief in the Federal Tort Claim Act and that the Administrative Procedures Act does not authorize monetary relief. Similarly, a lawsuit alleging failure of the Department of Labor to investigate a discrimination complaint against a private university was dismissed on the grounds that the plaintiff was seeking Federal employment through the courts. Even a law professor from Hofstra University complained in a speech that he was tired of reading decisions that did not address the issues of the case. At best, this means that the law professor was able to understand the issues of the lawsuit from the submissions, while the judge allegedly was not. At worst, this indicates that the judge was deliberately falsifying the issues in order to justify an obviously faulty decision. According to the law professor, after he finished his speech, a judge leaned over to him and said, "You don't know the half of it."

## 4. Certain litigants must always win

One of the most harmful practices of the courts becomes most evident when statistical surveys of the outcomes of litigation are conducted. Some judges have apparently developed strong biases for or against certain kinds of lawsuit or litigant and lose sight of the fact that each case

deserves a separate analysis. The outcomes of these lawsuits most frequently favor government agencies as defendants and major special interest groups, such as the American Civil Liberties Union, as representatives of a plaintiff. Decisions are reached without jury trial to assure that the favored litigant wins. The trend to summarily dismiss lawsuits without trials is reflected in surveys showing that more than 11% of all civil lawsuits were decided by juries in the early 1960s, while less than 2% reach a jury now.

It is not only the courts that are guilty of denying due process to protect favored litigants. Congress has also established special means of adjudication to remove the proceedings against certain agencies from the normal judicial channels. Some of the agencies established for administrative adjudication have earned a reputation for extreme bias in favor of the government agencies they are supposed to treat impartially. For example, the Merit System Protection Board (MSPB), which adjudicates complaints filed by veterans because their preference rights in the civil service have been violated, has never decided in favor of a veteran in any appeal. The United States Court of Appeals for the Federal Circuit, which is the only court with jurisdiction over appeals from the MSPB, has never decided in favor of a whistleblower, after hearing 71 appeals citing the Whistleblowers' Protection Act. It is also doubtful whether it has ever decided in favor of a veteran, although I have yet to find records on this point. It is noteworthy that under the law, the burden of proof is on the agency, and in the case of appeals filed by whistleblowers, clear and convincing evidence is required, giving whistleblowers a clear benefit of the doubt. Nevertheless, the agency always wins in such appeals, as well as those brought under veterans' laws.

The Veterans' Employment and Training Service (VETS) accepts employment discrimination complaints from veterans. All complaints it receives are not maintained in the agency files, but of 1029 complaints it did place in its records in 2001, five were brought to the courts, but only one was adjudicated as a civil lawsuit.

Any lawsuits brought by a plaintiff pro per fall into the category of "thousand to one shots," but so do discrimination lawsuits brought against government agencies with the assistance of "B" or "C-class" lawyers. Similarly, civil rights and employment discrimination lawsuits routinely fail, unless a major special interest group supports one of the parties.

Any time lawsuits that depend on an individual interpretation of the facts are decided so preponderantly in favor of one party without the assistance of a jury, suspicion of bias is justified. In conflicts between human beings, rank, job title, or affiliation do not determine which party has followed the law and which party has broken it. If the supervisor prevails one thousand times in whistleblower appeals for every time the whistleblower prevails, it is clear that the adjudication has not been impartial. This conclusion is given great support by the findings of Congress that reprisal against whistleblowers is a problem of massive proportions in the civil service, requiring several amendments to make the Whistleblowers' Protection Act considerably stronger. That the efforts of Congress have been consistently undermined by the judges on the United States Court of Appeals for the Federal Circuit reflects an imbalance that has been developing between the powers of the legislative and judicial branches in recent years.

## 5. Different standards are applied to different litigants

Powerful plaintiffs seek to delay litigation until the opponent dies or is forced to end the litigation for financial reasons. Some well-represented litigants do not respond to the summons until a motion for default has been entered, and judges routinely excuse the failure and refuse to enter a default judgment. The same judges are quick to dismiss lawsuits because a pro se plaintiff has missed a deadline by one or two days, even when the cause of the delay was beyond the control of

the litigant. The lack of impartiality is plainly evident when one party is permitted unlimited delays, in spite of the fact that the United States Department of Justice or a major law firm with a large staff of lawyers is representing that party, while a pro se litigant forced to act alone is held to the strictest standards stipulated in the FRCP and local rules. Allowing one litigant unlimited delays while the other is facing severe financial difficulties as long as the lawsuit remains unsettled is a tactic that clearly violates judicial fairness and at least the spirit of the United States Constitution, which demands a speedy trial in criminal matters and, by implication, reasonable speed in settling civil disputes, as well.

## 6. Recent handling of civil lawsuits by the courts have instigated a white collar crime wave

Many successful white collar criminals have obtained the cooperation of local courts to defraud private citizens out of large sums of money, often leaving the victim destitute. A few of the methods frequently used include abuse of bankruptcy procedures to loot estates, illegal foreclosures on real estate, seizure of cash or property without due process, and fraud during divorce proceedings.

Federal courts should have jurisdiction over obvious frauds perpetrated by state courts under the RICO statute and civil rights laws. However, failure of effective action by Federal judges to stop obvious fraud perpetrated by colleagues employed by state and local government encourages larcenous state officials, including judges, to conclude that their positions allow them to illegally enrich themselves at the expense of selected victims with complete impunity.

Litigants who have sought protection from state and local criminal gangs in Federal courts have encountered many years of delays, denial of jury trials, and refusals to issue decisions justified by the facts of the case. Many abuses have come to public attention in recent years, but the crime wave has grown so rapidly, many of the practices have not received sufficient publicity to warn potential victims. Crimes like identity theft, fraudulent foreclosure, fraud in stating fees and interest charges, and abuses of eminent domain have become epidemic throughout the United States. They can financially ruin victims, who have not found effective protection through either criminal or civil procedures.

## 7. Court orders go unheeded

Failure of courts to enforce their own orders granting relief to litigants may eventually result in more difficulties than adjudicating the initial petition for relief. Plaintiffs may prevail but gain no redress from the decision because judges refuse to issue effective orders mandating the remedies demanded by a jury. This is a problem that often arises when the delinquent party is a government agency. Common examples of deliberate resistance to court orders include ignoring orders to produce documents requested under the Freedom of Information or Privacy Act and failure of public officials to obey orders to return money or property unlawfully taken from citizens by law enforcement agencies.

## 8. Judges give orders contrary to law and accepted standards of behavior

Opposite the failure to enforce just orders for relief is issuing orders demanding illegal or obviously impractical relief from litigants. Examples of practices that have become common during the past few years include demands for support payments from one party to divorce proceedings that exceed the total earnings of the person ordered to pay, jailing of indigent litigants who cannot

pay what the court has demanded of them for other reasons, removal of children from their natural parents without due process, and imposition of medical treatment on minor children without informing their parents.

## 9. Judges refuse to take actions required by law

Many routine actions required of judges have created barriers to the enforcement of laws as intended by Congress. An excellent example of this is the action usually taken after a litigant complaints that he cannot obtain documents requested pursuant to the Freedom of Information Act. This law was passed by Congress because of the great resistance shown by Federal civil servants to making their unclassified documents available to the general public. Records created through the use of tax money should belong to the public and be made available on request.

Congress obviously intended that documents formally requested be made available immediately. It therefore specified a waiting period of no more than ten working days and permitted a person who requested the records to file a lawsuit to obtain the documents if the agency is not forthcoming. It requires agencies to assist people making requests to identify the documents and to provide the documents after charging only minimal copying fees.

Obviously, to uphold this law as Congress intended, a judge must order immediate release of the records to the court for distribution to the plaintiff after the court has ruled on any objections the agency has made to their release. Because obtaining records as quickly as possible is often necessary for a litigant to obtain some benefit to which he is entitled, complete an article for publication in a newspaper or periodical, or protect himself of a relative from the consequences of false information about him being distributed with official records, the rapid availability of records is vital.

Instead of upholding the high standards demanded by the Freedom of Information Act, judges have consistently permitted lawsuits to obtain public information to drag on for several years, often making the intended use of the documents impossible. Judges seem to attempt to avoid issuing orders to government agencies, even when the law mandates this. They fail to review contested records in camera, as provided for in the law, and simply hope the plaintiff will eventually withdraw his demand for the documents. Although obtaining documents often costs plaintiffs excessive amounts of money for the litigation, judges seldom offer the monetary relief specified in the law. They also fail to impose the requirement of the law that photocopy fees be reasonable. While private shops provide photocopies for 5 cents or less, agencies may charge exorbitant amounts to copy their documents. For example, about two years ago, one agency demanded 31 cents for each copy, or more than 6 times the price on the private market.

The failure of the courts to impose sanctions on civil servants who make it a sport to defy the Freedom of Information Act has led to the development of procedures to keep public documents out of the hands of citizens who want to obtain them.

## 10. Courts have become inconsistent and arbitrary

Courts have recently begun to establish very confusing precedents, reverse their own decisions, and ignore real issues rather than settling them. In recent years, different Courts of Appeals have issued opposite interpretations of the same law, making one action legal under the jurisdiction of one circuit and illegal under the jurisdiction of another. Because the United States Supreme Court denied certiorari each time a litigant attempted to obtain a definitive decision on some of these matters, Federal law can mean one thing in one circuit and the opposite in another.

For example, whether or not Federal law permits factory workers to speak with each other in a language other than English depends upon the area of the country in which the factory is located.

Changing public opinion or even an unusual personal opinion held by the judge to whom the case has been assigned may result in a lawsuit being decided in a manner contrary to other recent decisions in nearly identical cases. When judicial opinions on the interpretation of a law are continually fluctuating because one judge approves of the law while another does not, whichever litigant loses will feel cheated by the court because other litigants in exactly in the same position won their lawsuits. This situation causes more litigants to risk a lawsuit rather than settling the dispute out of court because winning or losing depends only on the whim of the judge hearing the case rather than on a consistent and unambiguous interpretation of the law. An advantage of being represented by counsel is often the knowledge he brings concerning which judges will be sympathetic to the litigant's case and which will favor the other party. In an impartial system, such considerations would not be a factor. The founding fathers hoped to eliminate this problem by insisting that decisions be rendered by juries, but by increasingly usurping the duties of the jurors, judges have permitted their own beliefs on the wisdom of individual laws to override the stated intentions of Congress. Because all judges do not hold the same opinions, an increasing inconsistency in decisions is becoming an increasing problem for pro se litigants and lawyers, alike.

## 11. Federalism theory interferes with practical justice

In recent history, Federal courts have intervened in many disputes between citizens and individual states, where the state court system was clearly violating or assisting in the violation of civil rights. Since the first Civil Rights statutes were passed in 1871, Congress has shown a clear intent to place the guarantees in Amendments XIII, XIV, and XV above the limitations on suits against states in Amendment XI. Federal courts belatedly struck down state laws deliberately passed to bar Americans of African descent from voting, attending schools with white children, and using public facilities. These rulings have clearly focused the attention of the nation on the fact that states are prone to commit actions against their citizens that violate Federal guarantees defined as civil and human rights by our Constitution.

Recently, the theory of federalism has been revived, and Federal courts have become less willing to interfere with the actions of state courts, no matter how unjust and reprehensible. One of the most important reasons for Federal courts to exist is to provide citizens with a final recourse against clearly illegal actions committed by state and local government, which are much more likely to fall under the influence of criminal conspirators than the much more diverse Federal system. If the Federal courts disqualify themselves from settling disputes between citizens and state governments, they have clearly left the citizens vulnerable to losing their civil rights through clearly illegal actions by small, corrupt political machines.

# Remedies

## What is the court supposed to do?

The basic reason for establishing a judicial system is to settle disputes that are addressed by existing laws. It has been repeatedly stated by experts on matters judicial in the United States that the ultimate goal is to decide all matters on the merits. That means to most reasonable persons that the court should concern itself with two factors and only two factors: the law and the material facts. The blindfold on the statue of Justice is there to keep attention on the scales and not on the race, color, national origin, age, gender, appearance, financial condition, social position, or friends of the litigants.

It stands to reason that a pro se litigant has as much chance of being entitled to relief according to the law and the facts as the litigant with enough money to afford the services of the best law firm in the country. The reason everyone who can afford it will seek the services of a class A law firm is that the presentation of the law and facts of the case in the arguments is reputed to sway judges and juries toward the side of one client where the issues are not entirely clear. However, if skill in arguing becomes the sole criterion for determining who prevails in a lawsuit, then the courts have failed in their duty to provide a fully impartial forum for presenting the facts.

The Task Force must address one primary problem: a failure of the court to be impartial. This failure is usually apparent from the outcome of lawsuits. If pro se litigants always or almost always lose, then the courts have failed. No class of litigants is right or wrong 100% of the time. If one person comes to the court for revenge after being fired for poor performance, the court cannot conclude that the next person raising the same claim was not fired for failing to become an accomplice to illegal actions his boss is engaged in, for belonging to a race that the boss does not like, or for being too old when the boss wants only youthful employees. If a father must be kept away from children he is abusing, that does not mean that the next father who seeks custody of his children is abusing them as well. If personal property was seized from one person because of his refusal to pay taxes, it cannot be concluded that there is no merit in the lawsuit of the next person who complains that his property was illegally confiscated by corrupt public officials.

As already discussed, pro se lawsuits are increasing for several reasons, which have nothing to do with the law or the facts in each individual case. These include 1) a white collar crime wave encouraged by the failure of prosecutors and judges to focus on anything but violent crime; 2) a breakdown in government accountability resulting in civil servants wasting funds on a massive scale and abusing the rights of citizens; 3) an increasing resistance by large corporations to being held accountable for the harm they do to ordinary citizens; 4) the continual erosion of traditional values, which formerly placed limits on the excesses society would tolerate; and 5) the combination of lower earnings by the average American and the increasing fees demanded by competent lawyers. A strict enforcement of the law and increasing penalties for wrongdoing would do much to eliminate all of these reasons. Misconduct will increase as long as most perpetrators escape all consequences for their actions and penalties remain inconsequential. Supply and demand regulate what lawyers charge and will result in lower fees when the causes for the increasing number of lawsuits are eliminated.

If the courts were functioning fairly and efficiently, the outcome of a lawsuit would be relatively easy to predict according to the circumstances and not dependent on non-merit factors. That means that a pro se litigant showing that his rights under any law had been violated and that he had suffered some kind of harm because of the violation would face no reduction in his chances of success because he was not represented by a lawyer. Only the law, which he would not necessarily have to cite correctly, and the facts of the case would determine the outcome. Any reduction in the chances of his success with a meritorious claim would indicate that the court has not fulfilled its function. The Task Force need only focus on a pro se litigant's chance of success with a meritorious claim to have performed its duties to the complete satisfaction of all.

If a pro se litigant fails to prevail in spite of the fact that his claim is meritorious, the system has failed. The Task Force should seek remedies assuring that each meritorious claim results in the relief prescribed by law regardless of whether or not the litigant is represented by counsel. It should seek a review process by which sufficient attention is given to each lawsuit to assure that the prejudice of one judge cannot perpetrate a miscarriage of justice for any reason. This may well require an increase in the personnel assigned to review each appeal and an increased recruitment of jurors. If so, then Congress should be forcefully informed that increased funding will be required.

It should not be the concern of the Task Force that baseless claims, lawsuits filed to harass, or esoteric challenges to established institutions are not given an appreciable amount of legal aid. It should also not concern the Task Force that jury decisions are challenged by the litigants who do not prevail. However, if almost every lawsuit filed pro se is dismissed without a trial, it should be clear that due process is not being provided by the courts.

## The solution in the United States Constitution

The Constitution of the United States includes all necessary ingredients for making the courts function fairly and efficiently. In clear and concise English, it is demanded that every person accused of a crime and every litigant in a lawsuit involving more than $20 has a right to a trial by jury. It does not provide for judges substituting their opinions for the decision of a jury of peers. It requires speedy trial of persons indicted for crimes and assures that the common law rights enjoyed by the English colonists at the time the United States declared its independence are respected. Later amendments guaranteed every citizen equal treatment under the law.

Determining whether any claim is meritorious after the facts have been presented belongs to a jury. It is a basic right of every litigant to have a jury decide whether or not he prevails based on the evidence presented. A judge may rig the outcome of a jury trial by refusing to let a litigant present material evidence or by giving false instructions to the jury. However, most complaints by pro se litigants result from their being denied any trial by jury at all.

Any litigant, with or without counsel, must provide a complaint alleging that a specific law was violated causing him some form of damage or denying him some right. As an example, we can take the typical outcome of what should be an open and shut case to see whether the Constitution is being followed. The Privacy Act requires correction of false records concerning any citizen, and a citizen files a complaint that an agency is maintaining records about him that he alleges are false. The Court is empowered to review the record and the evidence that the person presents and order correction or removal of the record. It also authorizes damages to the person who demanded the change and reasonable legal costs. Congress expressed the demand that agency responses be prompt.

In a typical case, the agency would respond to the complaint by claiming various immunities and file a motion for dismissal based on irrelevant claims of privilege and sovereign immunity. The matter would remain on the docket for more than a year without any action being taken, and finally the judge would dismiss the lawsuit. There would be no review of the records by either a judge or a jury, no review of the evidence, no discovery to reveal other relevant matters, and no consideration of the material facts. The judge would simply have assumed that the case would have no merit because it was filed pro se and any attention given to it would be a waste of time.

In such a case, there would be no question that the plaintiff alleged a violation of a law and that the law specifically waived sovereign immunity and authorized specific relief. That records existed would not be challenged, and neither would the existence of evidence calling the accuracy of the records into question. What was lacking is a review of the challenged records, a review of the evidence, and an impartial hearing to determine whether the preponderance of evidence indicates that the records are false.

Such a decision would naturally be unpublished, keeping it from the scrutiny of the legal profession, and the judge would enjoy absolute immunity whether or not the decision was in accord with the letter and spirit of the law. It should be obvious that the simple demands made of the judiciary by the Constitution were not followed. There was no due process, no fact-finding, no review by a jury, and different treatment given to the plaintiff than he would have received if he had

been represented by a major law firm or an influential organization. The remedy in this case would be simply for a judge to follow the procedures outlined in the Constitution. The improvement of the treatment of pro se litigants would simply entail following the procedures spelled out in the Constitution and in the wording of the Privacy Act, itself. By not doing this, the judge was deliberately producing a chilling effect to keep other citizens from filing lawsuits under the Privacy Act. If any government agent maliciously creates a false record after a dispute with a citizen, the record must remain to mislead anyone who reads in the future. The Privacy Act has therefore been repealed at the whim of one judge without any allegation that the statute violates the Constitution in any way, and it is made clear that the repeal by judicial fiat applies only in the case of the one plaintiff and may be reversed in the next decision if the plaintiff is deemed worthier by the judge. Equal treatment under the law therefore becomes another casualty of the court.

Another example of a failure to meet the Constitutional mandates would be a lawsuit involving employment discrimination based on age. It is evident from the wording of the law and earlier decisions of the Supreme Court that proof of motive is irrelevant in such cases because motive can be implied from circumstances. If a government agency passes over the 50-year-old plaintiff in spite of his 25 years of relevant experience and high examination score in favor of a 30-year-old applicant with three years of experience and a low examination score, the decision should provide relief for the plaintiff unless the agency can show that there was a valid reason for the choice. However, judges routinely dismiss such cases without a jury trial on the defense of a simple denial by the agency, even though any ordinary person would consider the denial to be without merit and contrary to the fact presented in the documents filed with the court. Again, the decision is unpublished, and appeal results in a rubber-stamped affirmation. With absolute immunity, the judge has nothing to fear even though a clear issue of fact remained to be decided by a jury under the Constitutional formula, and he illegally usurped the functions of the jury to create a chilling effect on the public and thereby discourage other people from filing what he regards as litigation that is too time-consuming.

In the examples given here, no problem exists with the laws cited, the issues are clear, and the relief is spelled out in the statutes. All submissions are timely, and no requirements for further fact-finding are recognized by the judge. The problem for the pro se litigants in such cases could not be remedied by better instruction on preparing submissions, assistance of law school students, or more helpful clerks. The problem is the failure of a judge to proceed according to common law and recognize the Constitutional rights of one of the litigants. It could only be remedied by making the judges follow established procedures without allowing their own personal opinions or prejudices to interfere with due process.

## The search for remedies by the Task Force

The remedies to the problems not addressed by the Task Force involve changing the attitudes of judges toward litigants. While there are people who attempt to convince the court to make fundamental changes rightfully belonging to the legislative branch and others who use litigation for revenge or to vex an enemy, most people seeking the assistance of a court to settle a dispute do so because necessity demands it. Some people are forced to file several lawsuits because unscrupulous office holders are able to create multiple problems for them, motivated by personal dislike, political disputes, or a desire to obtain a coveted piece of property. The civil rights movement clearly revealed the extent to which officers of state and local government, including judges, are willing to go to violate the rights of individuals because of their political activities or because they belong to certain minorities. Federal courts are the last resort of many people who find themselves robbed of their fundamental rights.

The remedies suggested by the Task Force might be sufficient if all judges and court officials were competent, honest, and incorruptible. If one judge does not live up to the high standards demanded of him, there must be some kind of machinery established to undo the damage he does. However, a litigant soon finds that if he is unfortunate enough to have his case assigned to a less than competent, opinionated, or dishonest judge, his chances for redress of his grievances have been eliminated even before the proceedings start. The eclipse of the jury trial as the main means of settling lawsuits has brought about a preponderance of "fast track" summary judgements, rubber stamped by inattentive appeals court judges, and deemed unworthy of consideration by the Supreme Court. Judges have made themselves impervious to complaints of misconduct and have even provided immunity to anyone employed by any government agency. The pro se plaintiff is therefore left without legal, civil, or human rights for want of a means of having those rights recognized and upheld.

Short of setting up an entirely new system of courts to pass judgement on the ones we already have, remedies will have to entail a more impartial treatment of lawsuits by judges. A person's social standing must no longer have an impact on a court's decision. The best way of preventing lawsuits from being rigged in favor of an influential or political powerful litigant is to leave decisions to a jury. If individual jurors are biased, there should hopefully be other jurors on the same jury who will hold different opinions. It is also much more difficult to influence 12 randomly selected citizens than it is to improperly influence one judge. Jury trials are made mandatory by the Constitution in most cases, so there is no reason for them to be denied short of a litigant's obvious failure to demonstrate any law that might authorize relief of any kind.

The overriding factor that will eliminate almost all genuine problems faced by pro se litigants is a restoration of strict ethics and impartiality to members of the court. If a person's legal rights have been violated, it is an absolute duty of the judge to provide him with a fair hearing and every opportunity to present the evidence that he has. If the judge does this, allows the issues of fact to be decided by an impartial jury, and provides equitable relief to the prevailing party, the recommendations of the Task Force would be sufficient to provide fairness to pro se litigants. If, however, any judge fails to live up to his responsibilities, there must be another means of redress provided to correct the injustice created by the court when it denies due process. An oversight body would have to be sufficiently independent, unbiased, and competent to determine not only the merits of the original lawsuit but also the fairness of the presiding judge. A special grand jury composed of ordinary citizens might be established to pre-sort all lawsuits in order to recommend those that lack merit for early dismissal and refer all others to the judge for trial by jury. It might also be given oversight of the actions of judges that may be prejudicial to one of the parties.

An alternative to this would be to remove all civil immunity from judges. This might result in a flood of lawsuits against judges, but it would be a deterrent to unjustified dismissal of lawsuits prior to jury trial. Aside from obviously doctoring the evidence or giving the jury false information about the laws under which the lawsuit was brought, no failure by the judge could result in his being found liable for misconduct as long as he permitted the decision to be made by a jury.

Other effective remedies might also be found, but it is suggested here that the Task Force should consider the worst case scenario, in which all judges handling the initial proceedings and the appeals fail to perform their duties in the prescribed way. It should then consider the best methods to 1) uphold the litigant's legal rights by overturning the initial decision against him; 2) take action against the judge who rendered the decision to prevent the incident from repeating itself during actions brought by other litigants; 3) hold a trial by jury unless waived by all litigants; 4) provide suitable relief, and 5) see to it that the orders of the court are promptly carried out.

# Closing Words

No demands are made here other than that the courts function as close to the system foreseen by the founding fathers as humanly possible. A decision for a lawsuit on the merits with consideration given only to the law and the material facts has become an unattainable dream for the majority of American citizens. Errors cannot be avoided, but it is the duty of all judges sitting on a court to minimize errors to the point that they become extremely rare. Many of the cases tossed out of the courts based on flimsy technicalities involve the life savings, health, or even the survival of one of the litigants. The Task Force is in an excellent position to insist on a review of the court's actions, and it should do so. If bias for or against members of any one group is found, swift action should be taken to correct the injustice. In the long run, it will depend upon the court itself to determine whether or not it wants to bring justice under the law to all people who seek relief from it. If the court takes effective action, the improvement will surely quiet all criticism. If it does not, public indignation is sure to increase to the point that Congress will be required to take some decisive action.

Respectfully

Don Hamrick

CERTIFICATION

Service was done by FEDEx Ground

Don Hamrick

# APPENDIX A.

# COURTESY COPY OF
# MY PETITION TO THE U.S. SUPREME COURT
# FOR WRIT OF CERTIORARI

# FIGHTING FOR MY
# SEVENTH AMENDMENT RIGHT
# TO A CIVIL JURY TRIAL

No. _____

IN THE

# 𝔖upreme 𝔠ourt of the 𝔘nited 𝔖tates

### DON HAMRICK, U.S. MERCHANT SEAMAN
### (A ward of the Admiralty)
*Acting in the Capacity of a Private Attorney General*
*Under the Authority of the Civil RICO Act*
5860 Wilburn Road
Wilburn, AR 72179
**PETITIONER**

v.

### PRESIDENT GEORGE W. BUSH, *et al*
White House
1600 Pennsylvania Ave.
Washington, DC 20500
**RESPONDENTS**

*On Petition For Writ of Certiorari To*
*The U.S. Court of Appeals for the 8ᵗʰ Circuit*
Case No. 07-2400

**Rule 33.2**

## PETITION FOR WRIT OF CERTIORARI

### THIS IS A SEAMEN'S SUIT UNDER 28 U.S.C. § 1916
Under the October 1, 2007 Revised Rule 40.2 of
The Rules of the Supreme Court of the United States

Don Hamrick, Petitioner, *Pro Se*
5860 Wilburn Road
Wilburn, Arkansas 72179
(501) 728-4235
4donhamrick@gmail.com

# QUESTIONS PRESENTED FOR REVIEW

(1) Are all federal courts, including the 8th Circuit, the U.S. District Court for the Eastern District of Arkansas, the DC Circuit, and the U.S. Supreme Court compelled by law to obey the Seamen's Suit law, 28 U.S.C. § 1916?

(2) Citing *Cohens* v. *Commonwealth of Virginia* 16 U.S. 264 (1821) Is Judicial Extortion Under Color of Law, 18 U.S.C. § 872, of filing fees from a seaman, 28 U.S.C. § 1916, prosecutable as an Act of Treason Against the Constitution of the United States or is the word *treason* in *Cohens* just a rhetorical term of no meaning, consequence, or remedy?

(3) Did the 8th Circuit unlawfully dismiss my appeal because it was handwritten or did they unlawfully dismiss my appeal in violation of the Seamen's Suit law, 18 U.S.C. § 1916 because I refused to pay the filing fee and did the 8th Circuit violate my Seventh Amendment right to a jury trial.?

(4) Does the dismissal of my appeal by the 8th Circuit for refusing to pay the Court's filing fee when I am exempt as a seaman under the Seamen's Suit law constitute an obstruction of justice?

(5) Does a history of obstructions of justice by the Executive and Judicial Branches preclude a federal court from granting the Motion to Dismiss

(6) Did the dismissal of my appeal by the 8th Circuit for refusing to pay the Court's filing fee when I am exempt as a seaman under the Seamen's Suit law

(7) Does an unrepresented civil plaintiff, a seaman, with a civil RICO Act complaint have authority to act as a *PRIVATE ATTORNEY GENERAL*?

(8) Does an unrepresented civil plaintiff, a seaman, with a civil RICO Act complaint have authority to execute a Citizen's Arrest Warrant on federal judges and their court clerks up to and including the Chief Justice of the U.S. Supreme Court (when he was a judge at the DC Circuit) for Extortion Under Color of Law, (18 U.S.C. § 872) when federal law enforcement agencies refuse to investigate my complaint of Extortion Under Color of Law?

2

(9) Did my activities relating to my Citizen's Arrest Warrant for federal judges and for Chief Justice John G. Roberts for *EXTORTION UNDER COLOR OF LAW* (18 U.S.C. § 872) directly or indirectly cause the U.S. Supreme Court to revise their Rule 40.2 on October 1, 2007?

# LIST OF DEFENDANTS

**President George W. Bush,** *et al*
White House
1600 Pennsylvania Ave.
Washington, DC 20500

**Michael Chertoff, Secretary**
Department of Homeland Security
Washington, DC

**Michael Prendergast**
Associate Director for Security Operations
U.S. Department of Transportation
400 7 th Street, SW
Washington, DC

**Admiral Thad Allen**
Commandant
U.S. Coast Guard
2100 2nd Street, SW
Washington, DC

**(1) Judge Reggie B. Walton**
**(2) Judge Ellen Segal Huvelle**
U.S. District Court for DC
333 Constitution Ave., NW
Washington, DC 20001

**Dennis Barghaan**
U.S. Attorney's Office
2100 Jamieson Ave.
Washington, DC 22314

**Heather Graham-Oliver**
U.S. Attorney's Office
Washington, DC

4

# TABLE OF CONTENTS

LIST OF DEFENDANTS............................................................................4

TABLE OF CONTENTS ...........................................................................5

POST-OPINION ORDER BELOW (1) ......................................................11

POST-OPINION ORDER BELOW (2) ......................................................12

JURISDICTION ......................................................................................13

STIGMATIC HARM AND STANDING......................................................15

    *A. Stigmatizing Trait of the Appellant:*.............................................*15*

    *B. Denial of Equal Treatment*...........................................................*15*

    *C. The Experience of the Stigmatized* .............................................*15*

    *D. Questions of Causation and Redressability*................................*20*

    *E. Denial of Equal Treatment*...........................................................*20*

STATEMENT OF THE CASE ..................................................................21

    *A. Judicial Fraud over the Second Amendment*................................*21*

    *B. Abuse of the Federal Rules of Civil Procedure*............................*24*

    *C. Seamen are Wards of the Admiralty*............................................*26*

    *D. Related Case:, Hamrick v. United States No. P-1142-06, Inter-American*
        *Commission on Human Rights*.................................................*28*

    *E. Judicial Hatred for Seamen as Unrepresented Civil Plaintiffs*......*28*

    *F. Demanding Justice from a Corrupt Federal Judicial System*.........*30*

    *G. Extortion with Intent to Obstruct of Justice*.................................*31*

    *H. Conspiracy to Obstruct Justice*....................................................*33*

    *H. Federal Courts as Criminal Enterprises* .....................................*33*

    *I. Revised Rule 40.2 (2007) as Admission of Guilt for Extortion Under Color of*
        *Law and Obstruction of Justice*...............................................*34*

CASE LAW ...........................................................................................36

MAGNA CARTA & THE SEVENTH AMENDMENT  – THE RIGHT TO A CIVIL JURY
    TRIAL – LEST THERE BE CIVIL DISOBEDIENCE FOR A CRIMINAL JURY
    TRIAL ...........................................................................................41

CIVIL DISOBEDIENCE SPRINGS FROM THE MAGNA CARTA'S § 40 "TO NO ONE
    WILL WE SELL,  TO NO ONE DENY OR DELAY  RIGHT OR JUSTICE" ........45

"WHEN JUSTICE IS DELAYED JUSTICE IS DENIED." ....................................45

REASONS FOR GRANTING THE WRIT ..................................................46

THE PEOPLE'S REPUBLIC OF CHINA, HUMAN RIGHTS RECORD OF THE UNITED
    STATES (2006).............................................................................48

CERTIFICATE OF COMPLIANCE...........................................................52

APPENDIX A: PROOF OF DOCKETING .................................................53

APPENDIX B. EVIDENCE OF JUDICIAL BIAS AGAINST AN UNREPRESENTED CIVIL PLAINTIFF BY THE U.S. SUPREME COURT ..................................................... 54

APPENDIX C: OP-ED – SCARY FEDERAL JUDICIARY ................................................. 56

APPENDIX D: DOCTRINE OF UNCONSTITUTIONAL CONDITIONS ........................... 59

APPENDIX E. COPY OF EMAIL ................................................................................... 63

APPENDIX F. JUDGE LAY OF THE 8TH CIRCUIT DISSENTING OPINION EXPOSING ABUSIVE USE OF SUMMARY JUDGMENTS ................................................... 66

APPENDIX G. WHY SUMMARY JUDGMENT IS UNCONSTITUTIONAL ....................... 67

APPENDIX H. AMERICAN LEGAL SYSTEM IS CORRUPT BEYOND RECOGNITION: JUDGE TELLS HARVARD LAW SCHOOL ....................................................... 68

APPENDIX I. COMMENTS ON THE NINTH CIRCUIT PRO SE TASK FORCE REPORT. 72

APPENDIX J. JUDGES GONE WILD, WORLD NET DAILY COMMENTARY NOV. 3, 2007 ................................................................................................................. 87

APPENDIX K. ENDING ATTORNEY AND JUDICIAL TYRANNY, OP-ED, OCT. 25, 2007 ............................................................................................................................ 90

APPENDIX L.  PHYLLIS SCHLAFLY SPEAKS OUT ON JUDICIAL ACTIVISM, OCTOBER 18, 2007 ............................................................................................................ 96

APPENDIX M:  EVIDENCE OF JUDICIAL TREASON AGAINST THE U.S. CONSTITUTION UNDER COHENS V. VIRGINIA ............................................. 99

# TABLE OF AUTHORITIES
## CASES

*Aguilar* v. *Standard Oil Co.*, 318 U.S. 724, 727 -735 (1943)......................................26

*Aguilar* v. *Standard Oil Co.*, 318 U.S. 724, 728-729 (1943)........................................27

*Boyd* v. *United States*, 116 U.S. 616 at 635 (1885).......................................................36

*Boyd* v. *United States*, 116 U.S. 616, 635 (1886) ........................................................26

Bracey v. Gramley, 519 U.S. 1074, 117 S.Ct. 726 (1997)..........................................34

*Brady* v. *Daly*, 175 U.S. 148, 155-157 (1899). "The ancient characterization
   of seamen as 'wards of admiralty' is even more accurate now than it was
   formerly."..........................................................................................................27

*Chandler* v. *Judicial Council*, 398 U.S. 74, at 140 (1970)...........................................39

*Chandris, Inc.* v. *Latsis*, No. 94-325, ___ U.S. ___ (1995) .........................................26

*Conley* v. *Gibson*, 355 U.S. 41 at 48 (1957)..........................................................37, 39

*Cortes* v. *Baltimore Insular Line*, 287 U.S. 367, 375, 377 (1932)................................26

*Davis* v. *Wechler*, 263 U.S. 22, 24 (1923) .................................................................38

*District of Columbia, et al.,* v. *Heller*,  No. 07-290........................................................46

*Downs* v. Bidwell, 182 U.S. 244 (1901) ......................................................................36

*Duncan* v. *Missouri*, 152 U.S. 377, 382 (1894) ....................................................37, 38

*Forrester* v. *White*, 484 U.S. 219 227-229 (1988) ........................................................39

*Garrett* v. *Moore-McCormack Co.*, 317 U.S. 239, 246 (1942) .....................................26

*Garrett* v. *Moore-McCormack Co.*, 317 U.S. at 246, 1942 AMC at 1650...................28

*Gomillion* v. *Lightfoot*, 364 U.S. 155 (1966) ..............................................................36

Hamrick v. United States No. P-1142-06, Inter-American Commission on
   Human Rights ...................................................................................................28

*Hamrick* v. *United States*, INTER-AMERICAN COMMISSION ON HUMAN RIGHTS,
   Petition No. P-1142-06 .......................................................................................47

*Harden* v. *Gordon*, 11 Fed. Cas. No. 6,047, 2 Mason (Cir. Ct. Rep.) 541, 556...........27

*Harden* v. *Gordon*, 2000 AMC 893, 902, 11 Fed Cas 480, 485 [1823]) .....................28

*Hartford Fire Ins. Co.* v. *California*, 509 U.S. 764 (1993) .........................................38

*Isbrandtsen Co.* v. *Johnson*, 343 U.S. 779, 782-784 (1952).........................................26

*Jamison* v. *Encarnacion*, 281 U.S. 635, 640 (1900)....................................................27

*Juliard* v. *Greeman*, 110 U.S. 421 (1884) ...................................................................36

*Kentucky Railroad Tax Cases*, 115 U.S. 321, 337 (1885) ............................................37

*Nicholas Schreiber* v. *K-Sea Transportation Corp.* New York, Supreme Court,
    Appellate Division, April 25, 2006; 5410N Index 104992/04 107571/04 .............. 27

*Norton* v. *Warner Co.*, 321 U.S. 565, 572 (1944) ........................................ 26

*Olmstad* v. *United States*, 277 U.S. 438 (1928) ........................................ 36

Owen v. City of Independence ............................................................... 37

*Patterson* v. *Bark Eudora*, 190 U.S. 169 (1903) ........................................ 27

*Perry* v. *United States*, 294 U.S. 330, 358 (1935) ..................................... 37

*Robertson* v. *Baldwin*, 165 U.S. 275, 287 (1897) ...................................... 27

*Seegars* v. *Ashcroft*, [U.S. District Court for DC, No. 03-834-RBW;]
    297 F. Supp. 2d 201, 239 (D.D.C. 2004), *aff'd in part, rev'd in part sub nom.*
    *Seegars* v. *Gonzales*, 396 F.3d 1248, *reh'g en banc denied*, 413 F.3d 1 (2005) ....... 21

*Shelly Parker, et al* v. *District of Columbia*, et al, DC Circuit, No. 04-7041
    (March 9, 2007) .......................................................................... 21

*Shelly Parker, et al.* v. *District of Columbia, et al.*, No. 07-335 ................................ 46

*Sherar* v. *Cullen*, 481 F. 2d 946 (1973) ................................................ 36

*Silveira* v. *Lockyer*, 312 F.3d 1052, 1060-87 (9th Cir. 2003) ......................... 21

*Simmons* v. *United States*, 390 U.S. 377 (1968) ....................................... 36

Slaughterhouse Cases, 83 U.S. 36 (1873) .................................................. 24

*Smith* v. *Allwright*, 321 U.S. 649.644 ................................................. 36

*Texas & P. R. Co.* v. *Abilene Cotton Oil Co.*, 204 U.S. 426, 437 (1907), 440 ............. 27

*The Buena Ventura*, 243 F. 797, 799 (SDNY 1916) ....................................... 26

*United States* v. *Chadwick*, 433 U.S. 1, at 16 (1976): ................................... 39

*United States* v. *Emerson*, 270 F.3d 203, 272 (2001) ................................... 21

*United States* v. *Lee*, 106 U.S. 196, 220 (1882), 1 S. Ct. 240, 261, 27 L. Ed 171
    (1882) .................................................................................... 37

*United States* v. *Lee*, 106 U.S. 196, at 220 (1882) ..................................... 38

United States v. Murphy, 768 F.2d 1518, 1531 (7th Cir. 1985) ............................ 33

*Walter Process Equipment* v. *Food Machinery*, 382 U.S. 172 (1965) .................. 37

*Warner* v. *Goltra*, 293 U.S. 155 (1934) ................................................ 26

*Warner* v. *Goltra*, 293 U.S. 155, 162 (1934) .......................................... 26

*Wilder* v. *Inter-Island Navigation Co.*, 211 U.S. 239, 246-248 (1908) ................. 27

*Wilson* v. *State*, 33 **Arkansas**, 557, 560 (1878) (*striking a ban on
    unconcealed carry*) ..................................................................... 38

STATUTES

18 U.S.C. § 2, 3 & 4 ........................................................................................... 34

18 U.S.C. § 872 ............................................................. 13, 28-31, 34, 64-65

28 U.S.C. § 1916 ........................................... 13, 28-31, 34-35, 45-46, 52, 64-65

28 U. S.C. § 1254(1) ...................................................................................... 13

Foreign Sovereign Immunities Act of 1976 (exceptions codified in
   18 U.S.C. § 1610) ...................................................................................... 46


TREATISES

Kathleen M. Sullivan's, *UNCONSTITUTIONAL CONDITIONS*, 10 Harv.L.Rev. 1413
   (May 1989) ................................................................................................. 59

Michael Anthony Lawrence, *SECOND AMENDMENT INCORPORATION THROUGH
   THE FOURTEENTH AMENDMENT PRIVILEGES OR IMMUNITIES AND DUE PROCESS
   CLAUSES*, (March 24, 2006). bepress Legal Series. Working Paper 1189 ............ 22

Thomas Healy, *STIGMATIC HARM AND STANDING*, 92 Iowa Law Review 417 (2007) . 15

William P. Quigley, *THE NECESSITY DEFENSE IN CIVIL DISOBEDIENCE CASE:
   BRING IN THE JURY*, 38 New England Law Review 1, at 66-67, 69-70, and 72
   (2003), p. 66-67: ....................................................................................... 41


OTHER AUTHORITIES

China Embassy, Human Rights
   Record of the United States (2006) .......................................................... 48

Frederick Douglass. [1857] (1985). "*THE SIGNIFICANCE OF EMANCIPATION IN THE
   WEST INDIES.*" Speech, Canandaigua, New York, August 3, 1857; collected in
   pamphlet by author. In *THE FREDERICK DOUGLASS PAPERS. SERIES ONE:
   SPEECHES, DEBATES, AND INTERVIEWS.* Volume 3: 1855-63. Edited by John W.
   Blassingame. New Haven: Yale University Press, p. 204. ...................................... 19

Peoples Republic of China, *HUMAN RIGHTS RECORD OF THE UNITED STATES
   IN 2006* ...................................................................................................... 48

Shipping Commissioners Act of June 7, 1872, 17 Stat. 262 ...................................... 27

# OPINION BELOW

## U.S. COURT OF APPEALS FOR THE EIGHTH CIRCUIT
### No: 07-2400

### Don Hamrick,

### Appellant

### v.

### President George W. Bush, White House, Washington, D. C., et al.,

### Appellees

Appeal from U.S. District Court for the Eastern District of Arkansas - Batesville
(1:06-cv-00044-JMM)

### JUDGMENT

Appellant Mr. Hamrick has not paid the full filing fee as directed in the court's order of July 17, 2007. It is hereby ordered that this appeal is dismissed for failure to prosecute. See Eighth Circuit Rule 3C.

Mandate shall issue forthwith.

August 03, 2007

Order Entered Under Rule 27B(a):
Clerk, U.S. Court of Appeals, Eighth Circuit.

/s/ Michael E. Gans

10

# POST-OPINION ORDER BELOW (1)

## U.S. COURT OF APPEALS FOR THE EIGHTH CIRCUIT
### No: 07-2400

### Don Hamrick,

#### Appellant

#### v.

### President George W. Bush, White House, Washington, D. C., et al.,

#### Appellees

---

Appeal from U.S. District Court for the Eastern District of Arkansas - Batesville
(1:06-cv-00044-JMM)

---

### ORDER

Appellant's motion to vacate this court's judgment of August 3, 2007, is denied.

September 17, 2007

Order Entered at the Direction of the Court:
Clerk, U.S. Court of Appeals, Eighth Circuit.

---

/s/ Michael E. Gans

# POST-OPINION ORDER BELOW (2)

## U.S. COURT OF APPEALS FOR THE EIGHTH CIRCUIT
### No: 07-2400

### Don Hamrick,

### Appellant

### v.

### President George W. Bush, White House, Washington, D. C., et al.,

### Appellees

Appeal from U.S. District Court for the Eastern District of Arkansas - Batesville
(1:06-cv-00044-JMM)

### ORDER

The petition for rehearing en banc is denied. The petition for rehearing by the panel is also denied.

September 13, 2007

Order Entered at the Direction of the Court:
Clerk, U.S. Court of Appeals, Eighth Circuit.

/s/ Michael E. Gans

# JURISDICTION

This Petition for Writ of Certiorari is filed under:

*RULE 10. CONSIDERATIONS GOVERNING REVIEW ON CERTIORARI.*

**(PARAPHRASED):**

A petition for a writ of certiorari will be granted only for compelling reasons. *EXTORTION UNDER COLOR OF LAW* AND *ATTEMPTED EXTORTION UNDER COLOR OF LAW*, 18 U.S.C. § 872 in violation of the *SEAMEN'S SUIT* law, 28 U.S.C. § 1916, by the *8TH CIRCUIT*, the *U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF ARKANSAS* (Little Rock), the *DC CIRCUIT*, and by even the *U.S. SUPREME COURT* are compelling reasons for the Court's discretion as indicative for the character of the reasons the Court considers have so far departed from the accepted and usual course of judicial proceedings, or sanctioned such a departure by a lower court as to call for an exercise of this Court's supervisory power;

The date of the 8th Circuit's ORDER denying both the petition for rehearing en banc and the petition for rehearing by the panel is September 13, 2007

The date of the 8th Circuit's JUDGMENT denying the appeal for failure to prosecute (refusal to pay the filing fee of the 8th Circuit) and the Motion to Vacate the 8th Circuit's Judgment was August 3, 2007.

Jurisdiction of this Court is invoked under 28 U. S.C. § 1254(1).

In accordance with Rule 29.4(a) service has been performed on the Solicitor General of the United States via prepaid Priority Mail.

## *Cohens* v. *Commonwealth of Virginia,*
## 19 U.S. 264 (1821)

It is most true that this Court will not take jurisdiction if it should not: but it is equally true, that it must take jurisdiction if it should. The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. **The one or the other would be treason to the constitution. Questions may occur which we would gladly avoid; but we cannot avoid them. All we can do is, to exercise our best judgment, and conscientiously to perform our duty**. In doing this, on the present occasion, we find this tribunal invested with appellate jurisdiction in all cases arising under the constitution and laws of the United States. We find no exception to this grant, and we cannot insert one.

# STIGMATIC HARM AND STANDING

Citing and adapting Thomas Healy, *STIGMATIC HARM AND STANDING*, 92 Iowa Law Review 417 (2007) to my case herein. Despite *Allen* v. *Wright* 468 U.S. 737 (1984) the Court has never completely ruled out stigmatic harm as a basis for standing. Citing the Conclusion:

## A. Stigmatizing Trait of the Appellant:

U.S Seaman as an Unrepresented Civil Plaintiff with a civil RICO Act case where the Pro Se Civil Plaintiff has the authority to act as a Private Attorney General applying the civil RICO Act against the Unied States Government and against the United Nations in defense of the Second Amendment as a constitutional right and as an international human right.

## B. Denial of Equal Treatment

> Read together, [Allen v. Wright, 468 U.S. 737 (1984) and Heckler v. Mathews, 465 U.S. 728 (1984)] suggest a fairly straightforward rule: a plaintiff who alleges that he was denied equal treatment can claim standing on the basis of stigmatic harm, while a plaintiff who alleges that governmental action stigmatizes a group of which he is a member lacks standing unless he personally was denied equal treatment. [Healy, 432]

Perpetual dismissals of my cases for the last 5 years combined with federal law enforcement agencies harassing me and my family just because I am exercising my First Amendment right to petition the Government for redress of grievance and my Seventh Amendment right to a civil jury trial constitutes a denial of equal treatment under the Rule of Law qualifies my case for standing on the basis of stigmatic harm.

## C. The Experience of the Stigmatized

> First, because the stigmatized are marked as less than fully human, they face the "ever-present possibility" that they will be the targets of prejudice and discrimination.282 . . . This threat of discrimination is harmful in itself, **producing anxiety and a feeling that one must**

**"be constantly on guard.**"284 But even more harmful is the actual discrimination experienced by the stigmatized. Research shows that "members of stigmatized groups are more likely to experience derision, exclusion, discrimination, and violence than are those who are not stigmatized."285 **This discrimination makes it harder for the stigmatized to obtain employment,** housing, education, and to develop lasting relationships with others.286 In the words of Goffman, "we exercise varieties of discrimination [against the stigmatized], through which we effectively, if often unthinkingly, reduce his life chances."287 [Healy, 453-454]

This highlight text above directly applies to me as evidenced by my current lawsuit, *Hamrick v. Hoffman, Crowley, and Seafarers International Union*, U.S. District Court for DC, No. 07-1726, dismissed without prejudiced, but ORDERED to file an Amended Complaint because Judge Rosemary M. Collyer apparently did not like my own authored political poems I included in the Complaint criticizing the corrupt federal judiciary and the U.S. Government. The lawsuit resulted from a breach of contract by the shipping company (Crowley). Crowley waived the pre-employment physical to get be aboard a container ship. But because I had been at the union clinic just long enough to be my high blood pressure taken and discovered before the pre-employment physical was canceled the clinic notified the shipping company one hour after the ship left for Europe with me on the ship. Crowley revoked the waiver and imposed blood pressure checks. I refused the blood pressure checks and light-duty status on the basis of breach of contract. The Master eventually threatened me with a logging which would involve the U.S. Coast Guard (The Coast Guard as named defendants already has Department of Transportation Bar Notices from 2004 and 2006 prohibiting me from visiting DOT, FAA, and USCG buildings in Washington, DC because of my litigious activities over my Second Amendment cases, another example of stigmatic harm). My employment was terminated on not fit for duty status and I was flown back to the United States from Europe.

Stigmatization also threatens one's self-esteem.288 Research has shown that most stigmatized individuals are aware that society views them as devalued and tainted.289 And social scientists have long maintained that people construct their self-identities, at least in part, on the basis of how others react to them.290 Thus, the knowledge that others view them as less than fully human can undermine the self-esteem of the stigmatized. They may even come to conclude that society is right—that they are in fact "less worthwhile, deserving, or valuable" than others.291 As the social psychologist Gordon Allport once asked rhetorically, "[W]hat would happen to your own personality if you heard it said over and over again that you were lazy . . . and had inferior blood"?292 . . . . [Healy, 454].

Implied in the above section stereotyping others as a class of people of lower standing stems from ignorance various degrees of sociopathic behavior patterns. I did not pick a litigious fight with the U.S. Government. In the early 1990s I initiated a course of self-education on the U.S. Constitution, the Bill of Rights and the Second Amendment because I was indeed ignorant on constitutional subject matters. In 2002 when I was extremely educated in constitutional law for a layman an opportunity presented itself to me by shear chance to attend a small arms class as a new Able Seaman aboard a U.S. Government ammunition ship coming out of the shipyard in Newport News, Virginia. I pass that small arms course. Finding 46 U.S.C. § 7306(a)(3) as the basis to submit my application to the U.S. Coast Guard for an endorsement on my Merchant Mariner's Document for "National Open Carry Handgun." The Coast Guard denied my application on the basis that in provided no benefit to marine safety or security and that there were no federal laws or regulations government my requested endorsement. Rather than rely on the U.S. Constitution and the Second Amendment as a basis of lawful authority the Coast Guard officer relied on his own prejudiced judgment thereby providing me with the legal cause of action for judicial review of a final agency action. From 2002 to the present day my cases have been treated with such disdain that I grew to feel as though I was nothing more than an annoying fly buzzing around the courts only to get shooed away with dismissals and most were with prejudice! So, I believe the federal courts view unrepresented civil plaintiffs as ignorant litigants.

Finally, the stigmatized are usually the targets of negative stereotypes, which can lead to self-fulfilling prophecies.310 One example is what social scientists have labeled "stereotype threat."311 In lay terms, stereotype threat exists when the fear of conforming to stereotype creates self-doubt that interferes with one's performance. . . . [Healy, 456]

> Stereotype threat involves the internalization of negative stereotypes by the stigmatized. Self-fulfilling prophecies also occur when a negative stereotype influences the way we treat a person and the person reacts to this treatment with behavior that confirms the stereotype.318 . . . [Healy, 457]

I began this litigious journey in 2002 with an awareness of a corrupt judicial system but naively believed that I had an iron-clad, open and shut case for Second Amendment rights from a merchant seaman's point of view. I had to navigate a sharp learning curve in the Federal Rules of Civil Procedure and Appellate Procedure and the Rules of the U.S. Supreme Court. The education was thrilling but the obstructions of justice by the federal bench and bar proved most frustrating. I felt like a typical outcast shunned by social cliques if the federal courts can be compared to high schools. I took a gamble on my future that I could make a difference for American seamen as a class of people. So far all I have achieved is what appears to be a coincidental change in the Supreme Court's Rule 40.2.

> Stigmatic harms are not insurmountable. Many stigmatized individuals develop ways of coping with their situations.323 As noted above, they may attribute negative outcomes to the prejudice of others rather than allow those outcomes to affect their self-esteem. They may also try to compensate for, or even eliminate, their stigmatizing traits by changing their behaviors or working harder.324 . . . But although these strategies can lessen the harms associated with stigma, they also carry costs.328 Reflexively blaming negative outcomes on prejudice can prevent one from understanding other reasons behind those outcomes.329 Attempting to change behavior can backfire if those efforts fail, causing one to feel even worse than before.330 And avoiding situations that might expose one to ridicule or prejudice limits one's access to important resources and "severely circumscribes one's freedoms."331 [Healy 457-458]

18

In short, stigmatization is a serious injury with harmful consequences. Not all stigmatized people experience these harms in the same way,332 and many individuals are able to overcome these harms and lead happy, fulfilling lives.333 But for the most part, "[p]eople who are stigmatized tend to experience more negative outcomes in their work lives and in their personal lives than do the nonstigmatized."334 [Healy, 458]

The above section is analogous to the famous Frederick Douglass quotation of 1857:

"Let me give you a word of the philosophy of reform. The whole history of the progress of human liberty shows that all concessions yet made to her august claims, have been born of earnest struggle. The conflict has been exciting, agitating, all-absorbing, and for the time being, putting all other tumults to silence. It must do this or it does nothing. If there is no struggle there is no progress. Those who profess to favor freedom and yet depreciate agitation, are men who want crops without plowing up the ground, they want rain without thunder and lightening. They want the ocean without the awful roar of its many waters."

"This struggle may be a moral one, or it may be a physical one, and it may be both moral and physical, but it must be a struggle. Power concedes nothing without a demand. It never did and it never will. Find out just what any people will quietly submit to and you have found out the exact measure of injustice and wrong which will be imposed upon them, and these will continue till they are resisted with either words or blows, or with both. The limits of tyrants are prescribed by the endurance of those whom they oppress. In the light of these ideas, Negroes will be hunted at the North, and held and flogged at the South so long as they submit to those devilish outrages, and make no resistance, either moral or physical. Men may not get all they pay for in this world; but they must certainly pay for all they get. If we ever get free from the oppressions and wrongs heaped upon us, we must pay for their removal. We must do this by labor, by suffering, by sacrifice, and if needs be, by our lives and the lives of others."

Frederick Douglass, 1857

Source: Frederick Douglass. [1857] (1985). "THE SIGNIFICANCE OF EMANCIPATION IN THE WEST INDIES." Speech, Canandaigua, New York, August 3, 1857; collected in pamphlet by author. In THE FREDERICK DOUGLASS PAPERS. SERIES ONE: SPEECHES, DEBATES, AND INTERVIEWS. Volume 3: 1855-63. Edited by John W. Blassingame. New Haven: Yale University Press, p. 204.

19

## D. *Questions of Causation and Redressability*

It is true that much of the harm experienced by the stigmatized likely would exist even in the absence of government action. It is also true that we cannot measure precisely the extent to which government action in a given case contributes to stigmatic harm. **But it seems clear that when the government stigmatizes members of a particular group, it exacerbates the harm they experience. By reinforcing the social belief that those with a particular trait are discredited, the government adds to the prejudice and discrimination against them, creates additional threats to their self-esteem, and reaffirms the stereotypes that lead to self-fulfilling prophecies. The government's role also likely increases the intensity of these harms, particularly the threat to self-esteem.** [Healy, 464].

## E. *Denial of Equal Treatment*

[Stigmatic Harm] would give access to the federal courts to plaintiffs who have been denied access in the past. It also would allow some claims to be heard in federal court that currently cannot be heard there. . . . when the government does stigmatize a group, members of that group should have standing to argue that the government's action is unlawful. If they do not have a meritorious claim, their cases will be dismissed. But they should not be turned away on the supposition that their injury is abstract. As I have tried to show, this is not true. Those who are stigmatized by government action are not simply concerned bystanders seeking to vindicate value interests. They suffer serious and concrete injuries and should therefore have the same standing in federal court as other plaintiffs alleging concrete harms. [Healy, 488].

# STATEMENT OF THE CASE

## A. Judicial Fraud over the Second Amendment

Citing Karen Lechraft Henderson, *Circuit Judge*, dissenting opinion in *Shelly Parker, et al* v. *District of Columbia*, et al, DC Circuit, No. 04-7041 (March 9, 2007):

> As has been noted by Fifth Circuit Judge Robert M. Parker in *United States* v. *Emerson*, 270 F.3d 203, 272 (2001) ("The fact that the 84 pages of dicta contained in [the majority opinion] are interesting, scholarly, and well written does not change the fact that they are dicta and amount to at best an advisory treatise on this long-running debate.") (Parker, J., concurring), exhaustive opinions on the origin, purpose and scope of the Second Amendment to the United States Constitution have proven to be irresistible to the federal judiciary. *See, e.g., Silveira v. Lockyer*, 312 F.3d 1052, 1060-87 (9th Cir. 2003) (as amended); *Emerson*, 270 F.3d at 218-72. **The result has often been page after page of "dueling dicta"—each side of the debate offering law review articles and obscure historical texts to support an outcome it deems proper.**[1] Today the majority adds another fifty-plus pages to the pile.[2] Its superfluity is even more pronounced, however, because the meaning of the Second Amendment in the District of Columbia (District) is purely academic. Why? As Judge Walton declared in *Seegars* v. *Ashcroft*, [U.S. District Court for DC, No. 03-834-RBW;]  297 F. Supp. 2d 201, 239 (D.D.C. 2004), *aff'd in part, rev'd in part sub nom. Seegars* v. *Gonzales*, 396 F.3d 1248, *reh'g en banc denied*, 413 F.3d 1 (2005), "the District of Columbia is not a state within the meaning of the Second Amendment and therefore the Second Amendment's reach does not extend to it."

---

[1] Appellant's emphasis.

[2] In declaring the District's challenged firearms ordinances unconstitutional, the majority takes over 45 pages, Maj. Op. at 12-58, explaining that the Second Amendment establishes an unrestricted individual right to keep and bear arms, *see id.* at 46. Its analysis can be summarized as follows: The Second Amendment's guarantee clause—"the right of the people to keep and bear Arms, shall not be infringed"—endows "the people" with a right analogous to the individual rights guaranteed in the First and Fourth Amendments. *Id.* at 18-21 (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). That right is unrestricted by the prefatory clause—"A well regulated Militia, being necessary to the security of a free State"—which simply enunciates the Amendment's "civic purpose," Maj. Op. at 46, and modifies only the word "Arms" in the operative clause, *id.* at 37-38 (citing *United States v. Miller*, 307 U.S. 174 (1939)).

Citing Michael Anthony Lawrence, SECOND AMENDMENT INCORPORATION THROUGH THE FOURTEENTH AMENDMENT PRIVILEGES OR IMMUNITIES AND DUE PROCESS CLAUSES, (March 24, 2006). bepress Legal Series. Working Paper 1189.[3]

## Conclusion

With the Declaration of Independence supplying the inspiration, the framers created a constitutional template for a nation the likes of which the world had never seen – a nation in which government would serve, instead of rule, the people; and one in which the people would enjoy a freedom approximating as nearly as possible that which occurs in a state of nature itself. Government would exercise its rightful necessary, limited role, and otherwise leave the people alone - with the Constitution standing ever watchful as guardian to assure that government would not overstep its bounds, as governments are apt to do.

After traveling nearly eighty years of hard road, and enduring a war in which 500,000 gave their lives, the people amended the Constitution in 1868 to correct serious defects in the original and to affirm, once again, the core underlying principles upon which the nation was founded: namely, individual freedom and limited government. Shortly thereafter, the Supreme Court, betraying the people and abdicating its constitutional responsibility, unilaterally nullified a key component of the amendment, the privileges or immunities clause. To this day, one hundred thirty years later, the Court has still failed to correct its initial error.

The people's true intent for the privileges or immunities clause was to apply the entire list of Bill of Rights restrictions, and more, to the States. Over time, the Court has devised an alternate mechanism, the due process clause, for applying most, but not all, of the Bill of Rights to the States. The Second Amendment, however, has never been so applied, and hence presents a useful vehicle for the Court finally to correct the errors of its ways and to recognize the privileges or immunities clause as it was intended by the people. Short of that, because the Second Amendment satisfies the requirements set forth in the Court's selective incorporation doctrine, the Court should apply the Second Amendment to the States through the due process clause.

---

[3] http://law.bepress.com/expresso/eps/1189

Do I have this right? The U.S. Supreme Court does not incorporate the Second Amendment through the Fourteenth Amendment for purposes of applying it against the States. So the Second Amendment does not apply to the States because it is not included in the Incorporation Doctrine. But the other Amendments in the Bill of Rights, with the questionable Seventh Amendment for unrepresented civil plaintiffs are included in the Incorporation Doctrine.

But Judge Reggie B. Walton in the *Seegars* case above ruled that the Second Amendment does not apply to the District of Columbia because DC is not a state.

[Scratch my head now to figure this out].

The Fourteenth Amendment gives us dual citizenship. Section 1 of the Fourteenth Amendment states:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, **are citizens of the United States and of the State wherein they reside**.

So, for people who are born and raised in the District of Columbia for their entire lives they are not citizens of any State. But they are however citizens of the United States because the District of Columbia is the seat of the United States Government. So, it would seem that the Second Amendment does actually does apply to the District of Columbia under the dictates of common logic but not under judicial logic.

The second sentence in Section 1 of the Fourteenth Amendment is equally disturbing:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

The prohibitive declaration "No State" does not include "the United States" in the subsequent list of wrongs. Therefore, logic dictates that the United States is free to make or enforce any law which abridges the privileges or immunities of

citizens of the United States; and deprives any person of life, liberty, or property, without due process of law; and deny to any person within its jurisdiction the equal protection of the laws.

This interpretation of the Fourteenth Amendment explains how the U.S. Supreme Court could arrive at their opinion in the *Slaughterhouse Cases*, 83 U.S. 36 (1873) stripping us of our privileges and immunities under our dual citizenship. Since the Fourteenth Amendment was ratified in 1868 and the Slaughterhouse Cases was handed down 5 years later in 1873 it could be said that Congress and the States acting by direction of the will of the People to protect our privileges and immunities as dual citizens and the U.S. Supreme Court continually wages a War of Aggression against our constitutional rights as evidence by the present case.

If the federal courts are incapable of reaching a judicial consensus on the Second Amendment right to keep and bear arms in your own home as one extreme and my Second Amendment case for the right to *openly* keep and bear arms not only in intrastate and interstate but also on the high seas as a merchant seaman to protext ourselves against the increase of piracy on the high seas as the next step from *Parker* and *Heller* the other extreme constitutional right under the Second Amendment under the Common Defence clause in the Preamble to the U.S. Constitution then that explains why the federal courts have pulled every dirty trick in the book to keep my case from going to trial.

## B. Abuse of the Federal Rules of Civil Procedure

The most flagrant and the criminal example of judicial corruptions is Judge Reggie B. Walton in U.S. District Court for DC, No. 03-2160, reacting to the DC Circuit in No. 04-5316 remanding my civil RICO Act case on Second Amendment grounds on January 26, 2006 (but, affirming the dismissal of my civil RICO Act claims). The DC Circuit's ORDER read, in part:

> **FURTHER ORDERED**, on the court's own motion, that appellant's Second Amendment claims against the non-judicial defendants, challenging federal firearms statutes and the denial of his "National

Open Carry Handgun" endorsement **be remanded for further proceedings**.[4] *Compare United States* v. *Miller*, 307 U.S. 174 (1939), and *United States* v. *Haney*, 264 F.3d 1161 (10th Cir. 2001), with *U.S.* v. *Emerson*, 270 F.3d 203, 227, 260-61 (5th Cir. 2001). The evidence suggests appellant filed an opposition to appellees' motion to dismiss. *See, e.g.,* Case No. 03cv2160, Docket No. 64, Appellees' Reply to Opposition to Motion to Dismiss. Furthermore, these Second Amendment claims are not barred by res judicata. *See Hoffman* v. *Blaski*, 363 U.S. 335, 340 n.9 (1960); *United States* v. *Dean*, 752 F.2d 535, 541 (11th Cir. 1985); *see also SEC* v. *Bilzerian*, 378 F.3d 1100, 1102 n.1 (D.C. Cir. 2004).

On May 18, 2006 the DC Circuit denied my Motion for Rehearing on Rehearing En Banc.

On June 7, 2006 the DC Circuit issued the Mandate.

On July 5, 2006 (the day after Independence Day of July 4, 2006) Judge Reggie B. Walton issued an ORDER that was tantamount to a redo of Rule 7 instead of proceeding to the Discovery Phase under Rules 16 and 26. Realizing Judge Reggie B. Walton was acting in a prejudicial manner involving bias against an unrepresented civil plaintiff and/or bias against the Second Amendment I filed my own Motion to Dismiss with the purpose of refiling my case with the U.S. District Court for the Eastern District of Arkansas (Little Rock), Northern Division (Batesville) (No. 06-0044) in accordance with 28 U.S.C. § 1402(a)(1). However, I did not escape judicial bias because my case got dismissed just so the judge could lighten his case load after the death of the judge who presided over my case.

Because of judicial ethics are impugned and the trial of my cases lead back to the U.S. District Court for the District of Columbia through 28 U.S.C. § 1402(a)(1) the U.S. Supreme Court has the authority and the duty to review all my cases these past 5 years.

---

[4] Appellant's emphasis. The DC Circuit refused to answer my Motion on whether the phrase *"remanded for further proceedings"* meant to proceed to the Discovery Phase under Rules 16 and 26 or to redo Rule 7 pleadings and face second Motion to Dismiss.

## C. Seamen are Wards of the Admiralty

The federal courts and the Bush Administrationh by all appearances are abandoning the Common Defence obligation of the U.S. Constitution as well as abandoning the duty to protect seamen against wrongful acts of shipping companies, seafaring unions, and even against wrongful acts of the U.S. Government.

> "It is the duty of the courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be *obsta principiis*." *Boyd* v. *United States*, 116 U.S. 616, 635 (1886).[5]

Citing *Chandris, Inc.* v. *Latsis*, No. 94-325, ___ U.S. ___ (1995):

> In *Warner* v. *Goltra*, 293 U.S. 155 (1934), we stated that "a seaman is a mariner of any degree, one who lives his life upon the sea." Id., at 157. Similarly, in *Norton* v. *Warner Co.*, 321 U.S. 565, 572 (1944), we suggested that " 'every one is entitled to the privilege of a seaman who, like seamen, at all times contributes to the labors about the operation and welfare of the ship when she is upon a voyage' " (quoting *The Buena Ventura*, 243 F. 797, 799 (SDNY 1916)).

Citing *Isbrandtsen Co.* v. *Johnson*, 343 U.S. 779, 782-784 (1952):

> Whenever congressional legislation in aid of seamen has been considered here since 1872, this Court has emphasized that such legislation is largely remedial and calls for liberal interpretation in favor of the seamen. The history and scope of the legislation is reviewed in *Aguilar* v. *Standard Oil Co.*, 318 U.S. 724, 727 -735 (1943), and notes. "Our historic national policy, both legislative and judicial, points the other way [from burdening seamen]. Congress has generally sought to safeguard seamen's rights." *Garrett* v. *Moore-McCormack Co.*, 317 U.S. 239, 246 (1942). "[T]he maritime law by inveterate tradition has made the ordinary seaman a member of a favored class. He is a 'ward of the admiralty,' often ignorant and helpless, and so in need of protection against himself as well as others. . . . Discrimination may thus be rational in respect of remedies for wages." *Warner* v. *Goltra*, 293 U.S. 155, 162 (1934); *Cortes* v. *Baltimore Insular Line*, 287 U.S. 367, 375, 377 (1932); *Wilder* v. *Inter-Island Navigation Co.*, 211

---

[5] The Latin phrase, obsta principiis, translates to "oppose beginnings" or "oppose first attempts".

U.S. 239, 246-248 (1908); *Patterson* v. *Bark Eudora*, 190 U.S. 169 (1903); *Brady* v. *Daly*, 175 U.S. 148, 155-157 (1899). "The ancient characterization of seamen as 'wards of admiralty' is even more accurate now than it was formerly." *Robertson* v. *Baldwin*, 165 U.S. 275, 287 (1897); 5 *Harden* v. *Gordon*, 11 Fed. Cas. No. 6,047, 2 Mason (Cir. Ct. Rep.) 541, 556.

Statutes which invade the common law or the general maritime law are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident. No rule of construction precludes giving a natural meaning to legislation like this that obviously is of a remedial, beneficial and amendatory character. It should be interpreted so as to effect its purpose. Marine legislation, at least since the Shipping Commissioners Act of June 7, 1872, 17 Stat. 262, should be construed to make effective its design to change the general maritime law so as to improve the lot of seamen. "The rule that statutes in derogation of the common law are to be strictly construed does not require such an adherence to the letter as would defeat an obvious legislative purpose or lessen the scope plainly intended to be given to the measure." *Jamison* v. *Encarnacion*, 281 U.S. 635, 640 (1900); *Texas & P. R. Co.* v. *Abilene Cotton Oil Co.*, 204 U.S. 426, 437 (1907), 440. The direction of the current of maritime legislation long has been evident on its face.

"In this country these notions were reflected early, and have since been expanded, in legislation designed to secure the comfort and health of seamen aboard ship, hospitalization at home and care abroad. . . . The legislation . . . gives no ground for making inferences adverse to the seaman or restrictive of his rights. . . . Rather it furnishes the strongest basis for regarding them broadly, when an issue concerning their scope arises, and particularly when it relates to the general character of relief the legislation was intended to secure." *Aguilar* v. *Standard Oil Co.*, 318 U.S. 724, 728-729 (1943).

Citing *Nicholas Schreiber* v. *K-Sea Transportation Corp.* New York, Supreme Court, Appellate Division, April 25, 2006; 5410N Index 104992/04 107571/04:

Petitioner, as a ward of the admiralty, is entitled to heightened protection from the courts. There is a long-standing policy to safeguard the rights of seamen, whose contracts are traditionally viewed with solicitude:

They are emphatically the wards of the admiralty; and though not technically incapable of entering into a valid contract, they are treated in the same manner, as courts of equity are accustomed to treat young heirs, dealing with their expectancies, wards with their guardians, and cestuis que trust with their trustees. . . . If there is any undue inequality in the terms, any disproportion in the bargain, any sacrifice of rights on one side, which are not compensated by extraordinary benefits on the other, the judicial interpretation of the transaction, is that the bargain is unjust and unreasonable, that advantage has been taken of the situation of the weaker party, and that pro tanto the bargain ought to be set aside as inequitable.

(*Garrett* v. *Moore-McCormack Co.*, 317 U.S. at 246, 1942 AMC at 1650, quoting *Harden* v. *Gordon*, 2000 AMC 893, 902, 11 Fed Cas 480, 485 [1823]).

## D. Related Case:, Hamrick v. United States No. P-1142-06, Inter-American Commission on Human Rights

I have a human rights complaint against the United States and against the United Nations, at the INTER-AMERICAN COMMISSION ON HUMAN RIGHTS in Washington, DC, Petition No. P-1142-06. They oversee the INTER-AMERICAN COURT OF HUMAN RIGHTS in Costa Rica.

The hostile and arbitrary treatment of my cases from the federal courts comports to the documentation of judicial bias and bigotry against unrepresented civil plaintiffs are being Cc:'d to the INTER-AMERICAN COMMISSION ON HUMAN RIGHTS evidence of human rights violations because the United States and the United Nations have poor track records on human rights.

## E. Judicial Hatred for Seamen as Unrepresented Civil Plaintiffs

From 2002 to the present the DC Circuit, the U.S. Supreme Court, the U.S. District Court for the Eastern District of Arkansas extorted their filing fee from me. The 8th Circuit dismissed my appeal outright because I refused to pay their filing fee standing in defense of my statutory right of exemption under 28 U.S.C. § 1916. The U.S. Department of Justice, the FBI, and the U.S. Marshals Service refuse to acknowledge a prosecutable crime under 18 U.S.C. § 872 when the evidence is clear and convincing. This implies the additional

crime of obstructions of justice.

I have exhausted all available traditional remedies. I am forced to pursue the remedy of last resort, the Citizen's Arrest Warrant, under my Tenth Amendment powers reserved to the People (the power of citizen's arrest) and my Ninth Amendment right to exercise that power of citizen's arrest as a civil plaintiff acting in the capacity of a Private Attorney General because my Second Amendment case employs the civil RICO Act alleging the United States of racketeering an unlawful and an unconstitutional protection scheme under the Second Amendment, and alleging the United Nations of racketeering an unlawful protection scheme in violation of international human rights laws.

My Complaints were within my rights as a U.S. seaman to seek judicial review in the interest of justice as a private citizen. My claims were not frivolous nor were they ever ruled to be frivolous. My cases were dismissed with prejudice using inapplicable boilerplate case law generated by judicial bias and political ideologies against the Second Amendment and against an unrepresented civil plaintiff. The docket histories of my case prove that out as facts.

Rule 40.2 of the *Rules of the Supreme Court of the United Staters* went unchanged since May 3, 1999. I have not done the research to determine how for back in time Rule 40.2 remained unchanged. However, because I have been actively pursuing reimbursement of all filing fees (estimated to be a total of $1,465) the above named courts have denied me the traditional remedies. My pursuit of the remedy of last resort, the Citizen's Arrest Warrant, have lead me to have face to facing meetings with the U.S. Marshals Service and the U.S. Supreme Court Police (being treating as a criminal suspect).

Now I discover a change in the 2007 edition of Rule 40.2 of the *Rules of the Supreme Court of the United States*.

I find this change to be far more than just a coincidence not influenced by my pursuit of justice under Rule 40.2, the Seaman's Suit law 28 U.S.C. § 1916, and the law against Extortion under Color of Law 18 U.S.C. § 872. In fact, I rightly suspect that the change in Rule 40.2 was a direct result of my pursuit for a remedy under my Citizen's Arrest Warrant.

I want to know why this change was made! Did my dispute and litigation these past 4 years (since 2003 in Case No. 03-145) over the filing fees and/or my use of the Citizen's

Arrest Warrant for Felony Extortion under Color of Law, 18 U.S.C. § 872 VERSUS 28 U.S.C. § 1916 as a remedy of *"Last Resort"* cause the change?

## F. Demanding Justice from a Corrupt Federal Judicial System

The present case is a straight forward, open and shut case of attempted *EXTORTION UNDER COLOR OF LAW* by the *8TH CIRCUIT* (No. 07-2400) and a case of *EXTORTION UNDER COLOR OF LAW*,   18 U.S.C. § 872, by the *U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF ARKANSAS* (Little Rock) (No. 06-0044) of filing fees from me, the unrepresented civil Plaintiff-Appellant, a U.S. merchant seaman exempt from paying filing fees of all courts of the United States under 28 U.S.C. § 1916.

The DC Circuit and the U.S. Supreme Court are also implicated in my allegations of *EXTORTION UNDER COLOR OF LAW* under *RULE 10. CONSIDERATIONS GOVERNING REVIEW ON CERTIORARI*:

▶ **U.S. COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA** (a considerable number of judges. Among them is the current Chief Justice, John G. Roberts, of the U.S. Supreme Court):

*Extortion Under Color of Law*: Nos. 02-5334, 03-5021, 04-5316;

*Attempted Extortion Under Color of Law*:  05-5414, 05-5429;

▶ **U.S. SUPREME COURT**

*Extortion Under Color of Law*: Case Nos. 04-1150, 03-145

The U.S. Supreme Court should note in its own Docket Report for Case No. 03-145 the passage of time between the date, December 27, 2002, when I filed my Petition for Writ of Certiorari under Rule 33.2, generating the case number, but the Supreme Court administratively rejected my appeal for non-compliance on the technicalities  of Rule 33.1, and the date, July 28, 2003, when my appeal was finally accepted as compliant with Rule 33.1 and docketed. It took me a full 7 months and 4 redos of my Petition for Writ of Certiorari before I achieved perfection with the

standards of an attorney as required by the U.S. Supreme Court under Rule 33.1 even though I am an unrepresented civil plaintiff.

The U.S. Supreme Court, in effect, used Rule 33.1 as an economic barrier to prevent me from filing my Petition for Writ of Certiorari as a seaman in a timely manner under Rule 40.2. The U.S. Supreme Court twice denied (see also, No. 04-1150) my statutory exemption under Rule 40.2 and under 28 U.S.C. § 1916, coerced payment of the filing fee before my Petition for Writ of Certiorari would be accepted as filed. By definition the U.S. Supreme Court twice committed Extortion under Color of Law, 18 U.S.C. § 872. I paid a total of $600 to the U.S. Supreme Court.

The bottom line here is that the federal courts have used every dirty trick in the book to keep me from going to trial as an unrepresented civil plaintiff. What is even worse than that is that the U.S. District Court for the Eastern District of Arkansas even denied my Motion for Civil Gideon Representation under the American Bar Association's Task Force on Access to Civil Justice unanimous recommendation:

> RESOLVED, That the American Bar Association urges federal, state, and territorial governments to provide legal counsel as a matter of right at public expense to low income persons in those categories of adversarial proceedings where basic human needs are at stake, such as those involving shelter, sustenance, safety, health or child custody as determined by each jurisdiction.

SOURCE: http://www.abanet.org/media/docs/112Arevised.pdf

## G. Extortion with Intent to Obstruct of Justice

The *U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF ARKANSAS* (Little Rock), Northern Division (Batesville) Case No. 06-0044 (*dismissed with prejudice, appealed 8th Cir. No. 07-2400, dismissed for failure to prosecute, translated meaning I refused to pay the filing fee in accordance with the Seaman's Suit law, 28 U.S.C. § 1916.*) and now at the *U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA*, No. 02-1434 and 02-1435; No. 07-1616 (dismissed because the judge did not like my

political poems criticizing the U.S. Government and the federal judicial system, Ordered to refile an Amended Complaint for appeasement).

I have exhausted all available remedies through the Legislative Branch (House & Senate Judiciary Committees), the Executive Branch (the U.S. Department of Justice, the FBI, and the U.S. Marshals Service) except for the remedy of last resort: the Citizen's Arrest Warrant.

Because I initially emailed the U.S. Marshals Service as an unrepresented civil plaintiff employing the civil RICO Act in my Second Amendment case against the U.S. Government, and subsequently also against the United Nations asking for information and advice on my right to make citizen's arrest of federal judges and court clerks for extortion under color of law with evidence on file in the Docket Reports. I was hunted down like a common criminal by the U.S. Marshals Service, intercepting me in Richmond, Virginia on a Greyhound bus trip from Arkansas to visit the U.S. Marshals Service (fully advising the U.S. Marshals Service of my planned visit with them!) for information and advice on the law of citizen's arrest. Since my initial advisory to the U.S. Marshals Service the federal judges have denied my every motion, every judicial notice, every presumption, ignored and kept my documentary evidence denying my that evidence for use in later cases and dismissing my cases with inapplicable boilerplate case law.

The U.S. Marshals Service has harassed my elder mother asking my whereabouts when all the while I continually send email updates on the developments of my cases and my researching findings vindicating my rights. The U.S. Marshals Service can very easily respond by email to achieve the same requirements for information through investigation, saving manpower and tax dollars because I am an unrepresented civil plaintiff with a civil RICO Act case where I have the right under the Ninth Amendment, the duty and the power under the Tenth Amendment powers reserved to the People to act in the capacity of a *PRIVATE ATTORNEY GENERAL*.

## H. Conspiracy to Obstruct Justice

Because I have attempted to collect evidence supporting my case as a civil plaintiff acting in the capacity of a PRIVATE ATTORNEY GENERAL the U.S. Coast Guard conspired with the U.S. Department of Transportation, Office of Security to issue Bar Notices in 2004 and again in 2006 prohibiting me from visiting any FAA, DOT, and U.S. Coast Guard Headquarters buildings in Washington, DC. These Bar Notices effectively puts me in a Catch-22 situation with my civil RICO Act cases and is in fact an law, criminal acts of obstruction of justice. I a visit any of those buildings I will be arrest. The Bar Notices had no information about my rights to appeal the Bar Notices for an administrative hearing. Again, my complaints to the FBI and the U.S. Marshals Service were ignored.

It is because I am taking the novel approach of applying my right to make citizen's arrest and applying that right to the felony crime of extortion under color of law by federal judges and court clerks as a remedy of last resort, that it may provide the inexcusable reason why the Executive Branch is conspiring with the Judicial Branch to keep my case from proceeding to trial.

## H. Federal Courts as Criminal Enterprises

If the U.S. Supreme Court in Operation Greylord confirms that the Seventh Circuit Court of Appeals is a criminal enterprise (RICO Act) then it stands to reason that the U.S. Supreme Court can determine other Circuit Courts of Appeals and the U.S. Supreme Court to be a criminal enterprise if sufficient evidence is presented to make such a determination.

### EXAMPLE

#### SEVENTH CIRCUIT COURT IS A CRIMINAL ENTERPRISE

The Seventh Circuit Court of Appeals held that the Circuit Court of Cook County is a criminal enterprise. United States v. Murphy, 768 F.2d 1518, 1531 (7th Cir. 1985).

The United States Supreme Court recently acknowledged the judicial corruption in Cook County, when it stated that Judge "Maloney was one of many dishonest judges exposed and convicted through 'Operation Greylord', a

labyrinthine federal investigation of judicial corruption in Chicago". Bracey v. Gramley, 519 U.S. 1074, 117 S.Ct. 726 (1997).

Since judges who do not report the criminal activities of other judges become principals in the criminal activity, 18 U.S.C. § 2, 3 & 4, and since no judges have reported the criminal activity of the judges who have been convicted, the other judges are as guilty as the convicted judges.

The criminal activities that the Federal Courts found in the Circuit Court of Cook County still exist, and are today under the care, custody and control of Judge Greylord II (Chief Judge Donald O'Connell). The Circuit Court of Cook County remains a criminal enterprise.

## I. Revised Rule 40.2 (2007) as Admission of Guilt for Extortion Under Color of Law and Obstruction of Justice

Did the U.S. Supreme Court revise their Rule 40.2 on October 2007 directly or indirectly because of my Citizen's Arrest Warrant activities? Unless there is evidence proving otherwise I believe that the U.S. Supreme Court did, in fact and law, take notice of my pursuit of Citizen's Arrest as a lawful remedy for judicial Extortion Under Color of Law, 18 U.S.C. § 872, of my statutory right of exemption from filing fees as a seaman under the Seamen's Suit law, 28 U.S.C. § 1916.

The Defendant Parties should take notice that the current Chief Justice of the U.S. Supreme Court, John G. Roberts, was a judge of the DC Circuit and was a signatory to court orders compelling me to pay the filing fee of the DC Circuit in criminal violation of the Seamen's Suit law thereby committing Extortion Under Color of Law, 18 U.S.C. § 872. The federal courts have tried every dirty trick in the book to keep this fact from becoming public knowledge by having the U.S. Marshals Service run interference for the federal courts preventing me from executing a lawful Citizen's Arrest Warrant based on verifiable and undeniable evidence of Extortion Under Color of Law. Even the FBI refuses to investigate. Hence the constitutional reason for the right of citizen's arrest as part of the checks and balance system of our Republican form of Government.

I want copies of all documents regarding the reasons for the change in Rule 40.2 with web links to the same documents.

### Rule 40.2.
### (May 3, 1999 and May 2, 2005 Editions)
http://www.supremecourtus.gov/ctrules/rulesofthecourt.pdf

*A seaman suing under 28 U.S.C. § 1916 may proceed without prepayment of fees or costs or furnishing security therefor, but is not entitled to proceed under Rule 33.2, except as authorized by the Court on separate motion under Rule 39.*

### REVISIONS TO RULES
### OF THE
### SUPREME COURT OF THE UNITED STATES
ADOPTION DATE: JULY 17, 2007
EFFECTIVE DATE: OCTOBER 1, 2007
http://www.supremecourtus.gov/ctrules/2007revisedrules.pdf

### Rule 40.2.
### (October 1, 2007 Revision)
http://www.supremecourtus.gov/ctrules/2007revisedrules.pdf

*A seaman suing under* 28 U.S.C. § 1916 *may proceed without prepayment of fees or costs or furnishing security therefor* ***and may file a motion for leave to proceed on papers prepared as required by Rule 33.2. The motion shall ask leave to proceed as a seaman and be accompanied by an affidavit or declaration setting out the moving party's seaman status. A copy of the motion shall precede and be attached to each copy of the petition for a writ of certiorari or other substantive document filed by the seaman.***

### [CLERK'S COMMENT [TO 2007 REVISION]:

**. . . THE REVISED RULES ALSO EXTENDS THE EXEMPTION FROM THE PREPARATION OF BOOKLET-FORMAT DOCUMENTS TO SEAMEN. IF THE REASON FOR THE STATUTORY EXEMPTIONS IS TO REMOVE COST BARRIERS, THE EXEMPTION OF THE PRINTING REQUIREMENT REMOVES THE BIGGEST COST BARRIER TO FILING IN THIS COURT.]**

===

### TUESDAY, JULY 17, 2007
### ORDER
http://www.supremecourtus.gov/orders/courtorders/071707pzr.pdf

IT IS ORDERED that the revised Rules of this Court, today approved by the Court and lodged with the Clerk, shall be effective October 1, 2007, and be printed as an appendix to the United States Reports.

IT IS FURTHER ORDERED that the Rules promulgated May 2, 2005, see 544 U.S. 1071, shall be rescinded as of September 30, 2007, and that the revised Rules shall govern all proceedings in cases commenced after that date and, to the extent feasible and just, cases then pending.

= = =

# CASE LAW

*Boyd* v. *United States*, 116 U.S. 616 at 635 (1885):

> Justice Bradley, "It may be that it is the obnoxious thing in its mildest form; but illegitimate and unconstitutional practices get their first footing in that way; namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of persons and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of the Courts to be watchful for the Constitutional Rights of the Citizens, and against any stealthy encroachments thereon. Their motto should be *Obsta Principiis*."

*Downs* v. Bidwell, 182 U.S. 244 (1901):

> "It will be an evil day for American Liberty if the theory of a government outside supreme law finds lodgement in our constitutional jurisprudence. No higher duty rests upon this Court than to exert its full authority to prevent all violations of the principles of the Constitution."

*Gomillion* v. *Lightfoot*, 364 U.S. 155 (1966), cited also in *Smith* v. *Allwright*, 321 U.S. 649.644:

> "Constitutional 'rights' would be of little value if they could be indirectly denied."

*Juliard* v. *Greeman*, 110 U.S. 421 (1884):

> Supreme Court Justice Field, "There is no such thing as a power of inherent sovereignty in the government of the United States... In this country, sovereignty resides in the people, and Congress can exercise power which they have not, by their Constitution, entrusted to it. All else is withheld."

*Sherar* v. *Cullen*, 481 F. 2d 946 (1973):

> "There can be no sanction or penalty imposed upon one because of his exercise of constitutional rights."

*Simmons* v. *United States*, 390 U.S. 377 (1968):

> "The claim and exercise of a Constitution right cannot be converted into a crime"... "a denial of them would be a denial of due process of law".

*Olmstad* v. *United States*, 277 U.S. 438 (1928):

> "Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy."

*Owen* v. *City of Independence* 445 U.S. 622, 657 1980):

> "The innocent individual who is harmed by an abuse of governmental authority is assured that he will be compensated for his injury."

*Perry* v. *United States*, 294 U.S. 330, 358 (1935):

> "I do not understand the government to contend that it is any less bound by the obligation than a private individual would be..." "It is not the function of our government to keep the citizen from falling into error; it is the function of the citizen to keep the government from falling into error."

*United States* v. *Lee*, 106 U.S. 196, 220 (1882), 1 S. Ct. 240, 261, 27 L. Ed 171 (1882):

> "No man in this country is so high that he is above the law. No officer of the law may set that law at defiance, with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law are bound to obey it."

> "It is the only supreme power in our system of government, and every man who, by accepting office participates in its functions, is only the more strongly bound to submit to that supremacy, and toobserve the limitations which it imposes on the exercise of the authority which it gives."

*Walter Process Equipment* v. *Food Machinery*, 382 U.S. 172 (1965):

> In a "motion to dismiss, the material allegations of the complaint are taken as admitted". From this vantage point, courts are reluctant to dismiss complaints unless it appears the plaintiff canprove no set of facts in support of his claim which would entitle him to relief (see Conley v. Gibson, 355 U.S. 41 (1957)).

*Duncan* v. *Missouri*, 152 U.S. 377, 382 (1894):

> Due process of law and the equal protection of the laws are secured if the laws operate on all alike, and do not subject the individual to an arbitrary exercise of the powers of government."

*Kentucky Railroad Tax Cases*, 115 U.S. 321, 337 (1885):

> "The rule of equality... requires the same means and methods to be applied impartially to all the constitutents of each class, so that the law shall operate equally and uniformly upon all persons insimilar circumstances".

*Conley* v. *Gibson*, 355 U.S. 41 at 48 (1957):

> "Following the simple guide of rule 8(f) that all pleadings shall be so construed as to do substantial justice"... "The federal rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." The court also cited

Rule 8(f) FRCP, which holds that all pleadings shall be construed to do substantial justice.

*Davis* v. *Wechler*, 263 U.S. 22, 24 (1923):

". . .the assertion of federal rights, when plainly and reasonably made, are not to be defeated under the name of local practice."

*United States* v. *Lee*, 106 U.S. 196, at 220 (1882):

"No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it. It is the only supreme power in our system of government, and every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives."

*Duncan* v. *Missouri*, 152 U.S. 377, 382 (1894):

"[T]he privileges and immunities of citizens of the United States protected by the fourteenth amendment are privileges and immunities arising out of the nature and essential character of the federal government, and granted or secured by the constitution; and due process of law and the equal protection of the laws are secured if the laws operate on all alike, and do not subject the individual to an arbitrary exercise of the powers of government; . . ."

*Wilson* v. *State*, 33 **Arkansas**, 557, 560 (1878) (*striking a ban on unconcealed carry*).

"If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be pre vented by the penitentiary and gallows, and not by a general deprivation of a constitutional privilege."

*Hartford Fire Ins. Co.* v. *California*, 509 U.S. 764 (1993) **[PLAINTIFF'S NOTE: "I CAN PROVE MY CASE!]**

"[A] complaint should not be dismissed unless `it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *McLain* v. *Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 246 (1980) (quoting **Conley v. Gibson, 355 U.S. 41, 45 -46 (1957)**).

*Conley* v. *Gibson*, 355 U.S. 41 at 48 (1957)

"Following the simple guide of Rule 8 (f) that "all pleadings shall be so construed as to do substantial justice," we have no doubt that petitioners' complaint adequately set forth a claim and gave the respondents fair notice of its basis. The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits. Cf. *Maty* v. *Grasselli Chemical Co.*, 303 U.S. 197. (1938) *(Pleadings are intended to serve as a means of arriving at fair and just settlements of controversies between litigants. They should not raise barriers which prevent the achievement of that end.*)

*United States* v. *Chadwick*, 433 U.S. 1, at 16 (1976):

" . . . it is deeply distressing that the Department of Justice, whose mission is to protect the constitutional liberties of the people of the United States, should even appear to be seeking to subvert them by extreme and dubious legal arguments. It is gratifying that the Court today unanimously rejects the Government's position."

*Chandler* v. *Judicial Council*, 398 U.S. 74, at 140 (1970), Chief Justice Berger:

"If [judges] break a law, they can be prosecuted."

*Chandler* v. *Judicial Council*, 398 U.S. 74, at 140 (1970), Justice Black and Douglas in their dissenting opinion, 398 U.S. 74, at 141-142, agreed with Chief Justice Berger on the point above:

"While judges, like other people, can be tried, convicted, and punished for crimes . . ."

*Forrester* v. *White*, 484 U.S. 219 227-229 (1988):

This Court has never undertaken to articulate a precise and general definition of the class of acts entitled to immunity. The decided cases, however, suggest an intelligible distinction between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform. Thus, for example, the informal and ex parte nature of a proceeding has not been thought to imply that an act otherwise within a judge's lawful jurisdiction was deprived of its judicial character. See *Stump* v. *Sparkman*, 435 U.S. 349, 363 , n. 12 (1978). Similarly, acting to disbar an attorney as a sanction for contempt of court, by invoking a power "possessed by all courts which have authority to admit attorneys to practice,"

does not become less judicial by virtue of an allegation of malice or corruption of motive. Bradley v. Fisher, 13 Wall., at 354. [484 U.S. 219, 228]   As the Bradley Court noted: "Against the consequences of [judges'] erroneous or irregular action, from whatever motives proceeding, the law has provided for private parties numerous remedies, and to those remedies they must, in such cases, resort." Ibid.

Administrative decisions, even though they may be essential to the very functioning of the courts, have not similarly been regarded as judicial acts. In Ex parte Virginia, 100 U.S. 339 (1880), for example, this Court declined to extend immunity to a county judge who had been charged in a criminal indictment with discriminating on the basis of race in selecting trial jurors for the county's courts. The Court reasoned:

> "Whether the act done by him was judicial or not is to be determined by its character, and not by the character of the agent. Whether he was a county judge or not is of no importance. The duty of selecting jurors might as well have been committed to a private person as to one holding the office of a judge. . . . That the jurors are selected for a court makes no difference. So are court-criers, tipstaves, sheriffs, &c. Is their election or their appointment a judicial act?" Id., at 348.

Although this case involved a criminal charge against a judge, the reach of the Court's analysis was not in any obvious way confined by that circumstance.

Likewise, judicial immunity has not been extended to judges acting to promulgate a code of conduct for attorneys. Supreme Court of Virginia v. Consumers Union of United States, Inc., 446 U.S. 719 (1980). In explaining why legislative, rather than judicial, immunity furnished the appropriate standard, we said: "Although it is clear that under Virginia law the issuance of the Bar Code was a proper function of the Virginia Court, propounding the Code was not an act of adjudication but one of rulemaking." Id., at 731. Similarly, in the same case, we held that judges acting to enforce the Bar Code would be treated like prosecutors, and thus would [484 U.S. 219, 229] be amenable to suit for injunctive and declaratory relief. Id., at 734-737. Cf. Pulliam v. Allen, 466 U.S. 522 (1984). Once again, it was the nature of the function performed, not the identity of the actor who performed it, that informed our immunity analysis.

# MAGNA CARTA & THE SEVENTH AMENDMENT – THE RIGHT TO A CIVIL JURY TRIAL – LEST THERE BE CIVIL DISOBEDIENCE FOR A CRIMINAL JURY TRIAL

Citing William P. Quigley, *THE NECESSITY DEFENSE IN CIVIL DISOBEDIENCE CASE: BRING IN THE JURY*, 38 New England Law Review 1, at 66-67,  69-70, and 72 (2003), p. 66-67:

> It is important to recall the history of the right to trial by jury. This right was first secured in 1215 when rebel subjects forced King John to include the right in concessions which made up the Magna Carta.[6] Like most rights, it was not magnanimously bestowed by those in authority as an act of kindness—it was demanded. The most famous clauses of the Magna Carta are counted among the fundamental principles of law:
>
> > No free man shall be seized or imprisoned, or stripped of his rights or possessions, or outlawed or exiled, or deprived of his standing in any other way, nor will we proceed with force against him, or send others to do so, except by the lawful judgment of his equals or by the law of the land.
> >
> > To no one will we sell, to no one deny or delay right or justice.[7]

---

[6] Claire Breay, *MAGNA CARTA: MANUSCRIPTS AND MYTHS* 29, 45-46, 48 (2002). After several failed military campaigns which were costly both in terms of operating mercenary armies and the loss of vast revenue producing lands, King John tried to impose the costs of his reign on a significantly reduced number of feudal subjects. The King extracted ever larger amounts of money from taxes on office holders, fines from the justice system, and from payments and assessments on the feudal holders of land. King John exacted these funds in increasingly unscrupulous ways, including seizing lands, taking hostages and imprisoning people who resisted his demands. In response to these actions, the feudal barons demanded more fairness in their treatment and repeatedly attempted to meet with King John to persuade him to change his conduct to no avail. Finally, in May of 1215, a group of barons met and renounced their allegiance to the king, effectively declaring civil war. The rebel barons captured the Tower of London later that month and by June they were engaged in negotiations with representatives of the King at Runnymeade, a meadow between the camp of the barons and the castle of King John. On June 15, 1215, King John signed a series of concessions in an agreement with the barons; those concessions are now known as the Magna Carta. See generally id. at 7-33.

Other historians point out that while the jury system was as a right in the Magna Carta, it had been used before. Earlier forms of resolving disputes involved trial by battle and trial by ordeal. Twelve man juries were used by Henry II to resolve some land disputes. See Boyd C. Barrington, *THE MAGNA CHARTA AND OTHER GREAT CHARTERS OF ENGLAND* 115-16 (Fred B. Rothman & Co. 1993) (1900); Partrick Devlin, *TRIAL BY JURY*, 6-14 (Stevens & Sons 1966).

[7] Claire Breay, *MAGNA CARTA: MANUSCRIPTS AND MYTHS* 29, 45-46, 48 (2002) (quoting the MAGNA CARTA at 7). These rights can also be found in the third revision of the Magna Carta. *See also*

Blackstone placed the jury squarely between the arbitrary power of government and the freedom and due process of the citizen.[8] He recognized the demands on judicial economy, but rightly observed that such demands are but a small price to pay for the protections offered:

> The trial by jury. . . is also that trial by the peers of every Englishman, which, as the grand bulwark of his liberties, is secured to him by the great charter . . . .
>
> . . . .
>
> Our law has, therefore, wisely placed this strong and twofold barrier of a presentment and a trial by jury between the liberties of the people and the prerogative of the Crown. . . . So that the liberties of England cannot but subsist so long as this palladium remains sacred and inviolate, not only from all open attacks, (which none will be so hardy as to make), but also from all secret machinations, which may sap and undermine it; by introducing new and arbitrary methods of trial, by justices of the peace, commissioners of the revenue, and other tribunals similarly constituted. And, however convenient these may appear at first, as doubtless all arbitrary powers, well executed, are the most convenient, yet let it be again remembered, that delays and little inconveniences in the forms of justice are the price that all free nations must pay for their liberty in more substantial matters; that these inroads upon this sacred bulwark of the nation are fundamentally opposed to the spirit of our constitution; and that, though begun in trifles, the precedent may gradually increase and spread, to the utter disuse of juries in questions of the most momentous concern.[9]

Juries were always thought to be an important counterweight to judges. The right to trial by jury was a cornerstone of this country; judges, as an appointee of government and naturally partisan to the prosecution, were intended to be kept in check by the jury and to take up their proper role as referee, "enforcing the observance of the rules

---

1 Danby Pickering, *THE STATUTES AT LARGE, FROM THE MAGNA CHARTA TO THE END OF THE ELEVENTH PARLIAMENT OF GREAT BRITAIN* (Cambridge, J. Bentham 1762) at 10-11.

[8] 4 William Blackstone, *COMMENTARIES ON THE LAWS OF ENGLAND* 409-10 (Beacon Press 1962) (1765).

[9] *Id.*

by both parties, thus ensuring a more objective verdict by a trial jury."[10]

. . . [skip to p. 69-70]

This right was so important to early Americans "that it was the only procedural right included in the original Constitution."[11] **The Supreme Court has repeatedly stressed the importance of juries and has warned judges to retreat from attempts to limit the authority of juries**.[12] **Indeed, protection against overbearing and oppressive judges was one of the main arguments of the proponents of jury trials when the Bill of Rights were enacted**.[13] **Commentators agree that the purpose of the jury is to give the average person the opportunity to challenge governmental misconduct**.[14] **This is particularly important in protecting the citizens from government oppression**. As Roscoe Pound has stated: "The will of the state at large imposed on a reluctant community, the will of a majority imposed on a vigorous and determined minority, find the same obstacle in the local jury that formerly confronted kings and ministers."[15]    The

---

[10] Leonard W. Levy, *THE PALLADIUM OF JUSTICE: ORIGINS OF TRIAL BY JURY*, 36, 40 (1999) (noting that this English system differed from the continental system where judges had much more unchecked power and consequentially became much more inquisitorial).

[11] *THE OXFORD COMPANION TO AMERICAN*, 454 (Kermit L. Hall, et. al. eds., Oxford University Press 2002). "The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury." U.S. CONST. art. III. § 2.

[12] **This analysis applies to the need for civil juries as well. For example, in 1897 the Court held the "Seventh Amendment . . . requires that questions of fact in common law actions shall be settled by a jury, and that the court shall not assume directly or indirectly to take from the jury or to itself such prerogative.**" *Walker* v. *N.M. & S. Pac. R.R. Co.*, 165 U.S. 593, 596 (1897). **"Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care.**" *Dimick* v. *Schiedt*, 293 U.S. 474, 486 (1935).

[13] See Charles W. Wolfram, *THE CONSTITUTIONAL HISTORY OF THE SEVENTH AMENDMENT*, 57 Minn. L. Rev. 639, 670-71 (1973).

[14] See William V. Dorsaneo III, *REEXAMINING THE RIGHT TO TRIAL BY JURY*, 54 SMU L. REV. 1695, 1696-97 (2001) (providing an excellent summary of additional commentaries supporting this claim in footnote nine).

[15] Roscoe Pound, *LAW IN BOOKS AND LAW IN ACTION*, 44 Am. L. Rev. 12, 18 (1910) quoted in *United States* v. *Dougherty*, 473 F.2d 1113, 1130 n.32 (D.C. Cir. 1972).

Supreme Court has recognized that while juries are not perfect, they are essential to our judicial system:

> Jurors may be perverse; the ends of justice may be defeated by unrighteous verdicts, but so long as the functions of the judge and the jury are distinct, the one responding to the law, the other to the facts, neither can invade the province of the other without destroying the significance of trial by court and jury.[16]

### CONCLUSION [p. 72]

**The law of necessity** in the area of **civil disobedience** is vague, fragmented, political, and fraught with contradiction. It pits concerns about protecting law and order against concerns about social justice and individual freedom. While state courts have often interpreted and applied the necessity defense properly, **federal courts have failed to do so**. **The decisions of federal courts show judges engaging in logical contortions in an effort to avoid giving the words of the defense their simple and reasonable meaning.** The history of this nation is littered with the acts of regular people who fear too much order imposed by the government will result in the loss of individual freedom.

Order and freedom. Civil disobedience trials represent the clash between these two goods. The health of both principles demands that judges should not make pre-trial decisions about which of these goods should prevail, absent the adherence to a reasonable exercise of judgment and a clear use of the simple words of the law. Federal judges can learn a great deal from their state court counterparts. For the health of both order and freedom, especially in the many cases where it is not clear which principle should prevail, let the jury decide.

---

[16] *Morissette* v. *United States*, 342 U.S. 246, 274 (1952).

# CIVIL DISOBEDIENCE SPRINGS FROM THE MAGNA CARTA'S § 40 "TO NO ONE WILL WE SELL, TO NO ONE DENY OR DELAY RIGHT OR JUSTICE"

## "WHEN JUSTICE IS DELAYED JUSTICE IS DENIED."

In my case, justice has been delayed for 5 years!
Justice has been denied to me!

Rejecting this Petition for Writ of Certiorari will exhaust all my remedies for a civil jury trial. All other traditional remedies through the Executive Branch and the Legislative Branch have already be exhausted. All timely remedies have been denied to me except the Citizen's Arrest Warrant as a remedy of last resort as either an act in the capacity of a Private Attorney General or an act of civil disobedience in defiance of the threats of arrest from the U.S. Marshals Service in retaliation for exercising the common law right of Citizen's Arrest as applied against the Federal Government.

Perhaps I will achieve justice against governmental misconduct and/or racketeering activities with a criminal jury trial as a defendant where I failed to achieve justice as a civil plaintiff.


See **APPENDIX M.** for evidence extortion under color of law as racketeering activities of judicial tyranny and treason against the U.S. Constitution and denying a seaman, a ward of the Admiralty, his right to a jury trial and denying the seaman his statutory right of exemption under 28 U.S.C. § 1916 and unlawfully dismissing Seamen's Suit cases for refusal to pay filing fees.

45

# REASONS FOR GRANTING THE WRIT

The reasons for granting this Petition for Writ of Certiorari are self evident and proof of evidence for the reasons are found in the Docket Reports of my cases these past 5 years unless the U.S. Supreme Court intends to aid and abet the Extortions Under Color of Law in accordance with an undisclosed political agenda against unrepresented civil plaintiffs to effectively act in the capacity of a Private Attorney General. There are other reasons why this Petition for Writ of Certiorari should (must) be granted:

(1) My Second Amendment case is the *next step* from *Parker* and *Heller*. As a U.S. seaman my case challenges not only local, State, and Federal law & regulations for the right to travel intrastate and interstate under what I coin as "National Open Carry" but maritime law and United Nations covenants, conventions, and declarations on human rights law in defense of the human right of armed self-defense against piracy on the high seas. I have legal standing to sue the United Nations under the exceptions under the Foreign Sovereign Immunities Act of 1976 (exceptions codified in 18 U.S.C. § 1610) making my case a case of first impression.

(2) I have a reasonable suspicion with admissible supporting evidence that the U.S. Marshals Service has unlawfully influenced presiding judges to dismiss my cases these past 5 years in retaliation for my pursuit of justice through the Citizen's Arrest Warrant for Extortions Under Color of Law in violation of the Seaman's Suit law 28 U.S.C. § 1916.

(3) The U.S. Supreme Court as slated November 9, 2007 to consider *District of Columbia, et al.*, v. *Heller*,  No. 07-290 and *Shelly Parker, et al.* v. *District of Columbia, et al.*, No. 07-335. The cases concern the constitutionality of the District of Columbia gun control laws that ban people from keeping handguns in their homes. The issue is whether the Constitution protects an individual's right to bear arms for private

46

purposes, or just the states' right to arm individuals for the purpose of maintaining militias.

(4) If the U.S. Supreme Court subpoena and review my 4-volume complaint from the U.S. District Court for the Eastern District of Arkansas, No. 06-0044 the Court will find more than enough evidence to establish a pattern of obstructions of justice by the federal bench and bar and by the U.S. Department of Transportation, the U.S. Coast Guard, the U.S Department of Justice, the FBI, and the U.S. Marshals Service, to name a few, and find that such obstructions of justice violated my procedural and substantial due process rights under the Fifth and Fourteenth Amendments warranting a U.S. Supreme Court ORDER denying the Government's Motion to Dismiss thereby allowing my case to proceed to trial.

(5) The 8th Circuit did not even review the merits of my appeal. Instead the 8th Circuit dismissed my appeal because I refused to pay the filing fee, standing in defense of the Seamen's Suit law. The 8th Circuit disguised this retaliatory and unlawful action as a dismissal for lack of prosecution, a blame-shifting abuse of the Federal Rules of Appellate Procedure worthy of an FBI investigation similar to Operation Greylord.

(6) I have a human rights complaint, *Hamrick* v. *United States*, INTER-AMERICAN COMMISSION ON HUMAN RIGHTS, Petition No. P-1142-06 in Washington, DC., presently still pending. They oversee the INTER-AMERICAN COURT OF HUMAN RIGHTS in Costa Rica. Vindicating my human rights complaint against the United States is the March 8, 2007 "Human Rights Record of the United States in 2006" issued the China. This is the proverbial "Pot Calling the Kettle Black." Below is official Chinese Press Release with portions omitted as not directly relevant to my case:

# THE PEOPLE'S REPUBLIC OF CHINA, HUMAN RIGHTS RECORD OF THE UNITED STATES (2006)

China Embassy
March 8, 2007
http://www.china-embassy.org/eng/zt/zgrq/t302225.htm

On Thursday, March 8, 2007 the Peoples Republic of China, *HUMAN RIGHTS RECORD OF THE UNITED STATES IN 2006* in response to the *COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES FOR 2006* issued by the U.S. Department of State on Tuesday, March 6, 2007.

Released by the Information Office of China's State Council, the Chinese report lists a multitude of cases to show the human rights situation in the United States and its violation of human rights in other countries.

"As in previous years, the State Department pointed the finger at human rights conditions in more than 190 countries and regions, including China, but avoided touching on the human rights situation in the United States," the document says.

By publishing the Human Rights Record of the United States in 2006, the document says it aims to "help people have a better understanding of the situation in the United States and promote the international cause of human rights".

Relying on its strong military power, the United States has trespassed on the sovereignty of other countries and violated human rights in other countries, the document says. . . .

**Even in the United States, people's life, property and personal security are not secured, the document says**.

The document quotes a report by the U.S. Justice Department on Sept. 10, 2006 as saying that there were 5.2 million violent crimes in the United States in 2005, up 2.5 percent from the previous year, the highest rate in 15 years.

---

**APPELLANT'S COMMENT:**

The Second Amendment right to *openly* keep and bear arms, i.e., *National Open Carry Handgun*, will go a long way to securing *life, property, and personal security*.

---

Statistics released by the department in 2006 showed that in 2005 American residents age 12 or above experienced 23 million crimes; for every 1,000 persons age 12 or older, there occurred 1 rape or sexual assault, 1 assault with injury, and 3 robberies.

**In the United States, human rights violations committed by law enforcement and judicial departments are also common.**

Following the Sept. 11 attacks in 2001, the Federal Bureau of Investigation and other government agencies have referred 6,472 individuals to prosecutors on terrorism-related charges.

The Transactional Records Access Clearinghouse at Syracuse University says nearly three-quarters of terrorism suspects seized by the United States in the five years following the September 11 attacks have not even made it to trial because of lack of evidence against them.

---

**APPELLANT'S COMMENT:**

This is especially true in my cases these past 5 years. I generally attribute the alleged obstructions of justice and the dismissive treatment from federal law enforcement agencies and the federal courts to the uniqueness of my Second Amendment case as an international human right where I am acting in the capacity of a Private Attorney General with expectations of specific compliance with official duties and ethics from the U.S. Government. However the inverse of this has proven to be the norm and hence are translated into violations of human .

---

In 64 percent of the cases, federal prosecutors decided that they were not worth prosecuting, while an additional nine percent were either dismissed by judges or the individuals were found not guilty, according to a report by the AFP on September 4, 2006.

In recent years, American citizens have suffered increasing civil rights infringements, as the U.S. government has put average Americans under intense surveillance as part of terrorism investigations since the Sept. 11 attacks.

According to a survey released in December 2006, two-thirds of Americans believe that the FBI and other federal agencies are intruding on their privacy rights, according to a Washington Post report on Dec. 13, 2006.

**The United States touts itself as the "beacon of democracy", but the U.S. mode of democracy is in essence one in which money talks, the Chinese document says.**

In 2004, candidates for the House of Representatives who raised less than one million U.S. dollars had almost no chance of winning, the USA TODAY quoted a spokesman for the Center for Responsive Politics as saying in a report on Oct. 29, 2006.

---

**APPELLANT'S COMMENT:**

Money talks is absolute true with a corrupt federal judicial system.. The U.S. Supreme Court, 8th Circuit, DC Circuit, U.S. District Court (Little Rock) all committed Extortion Under Color of Law 18 U.S.C. § 872.

---

The average successful Senate campaign cost 7 million dollars, the USA Today says. In 2006, all state campaigns in the United States were predicted to cost about 2.4 billion dollars.

Seventy-four percent of respondents to a new Opinion Research poll say the U.S. Congress is generally out of touch with average Americans, as CNN reported on Oct. 18, 2006, and 79 percent of the surveyed say they feel big business does have too much influence over the administration's decisions.

**The Chinese document also slams the United States for its lack of proper guarantee for people's economic, social and cultural rights.**

A report released by the U.S. Census Bureau on Aug. 29, 2006 says there were 37 million people living in poverty in 2005, accounting for 12.6 percent of total U.S. population. The report also says there were 7.7 million families in poverty and one out of eight Americans was living in poverty in 2005.

"The ethnic minorities are at the bottom of American society," the Chinese report says.

---

**APPELLANT'S COMMENT:**

Taking the Second Amendment as a cultural human right the following United Nations pivotal documents on human rights apply: ■ The Convention Against Genocide; ■ Universal Declaration of Human Rights (exception to Article 29.3); ■ International Covenant on Economic, Social and Cultural Rights; ■ International Covenant on Civil and Political Rights;

---

Statistics released by the U.S. Census Bureau in November 2006 indicated that according to the 2005 data, the average yearly household income was 50,622 U.S. dollars for whites, compared with 36,278 for Hispanics and 30,940 for blacks. White people's income was 64 percent more than the blacks and 40 percent more than the Hispanics.

Racial discrimination is also deep-rooted in America's law enforcement and judicial systems.

According to statistics of the National Urban League, of the sentences issued in 12 crime categories in the State Courts, sentences for black males were longer than white males in all of them.

Researchers pointed to poverty, a lack of opportunities, racism in the criminal justice system for the black-white prison gap.

**The document says the United States has lorded it over other countries by condemning their human rights practices while ignoring its own problems, which exposes double standard and hegemonism in the field of human rights.**

By publishing the *HUMAN RIGHTS RECORD OF THE UNITED STATES IN 2006*, the document says it aims to "***help the world people have a better understanding of the situation in the United States and promote the international cause of human rights***".

This is the eighth consecutive year that China has issued human rights record of the United States in answer to the U.S. State Department annual report.

**APPELLANT'S COMMENT:**

*THE HUMAN RIGHTS RECORD OF THE UNITED STATES IN 2006* by China effectively describes a despotic and tyrannical government operating outside the limits of the U.S. Constitution and outside the bounds of international human rights. This corresponds with the growing grassroots Secessionist Movements active in 25 states at last count giving birth to The Chattanooga Declaration sponsored by New York's Middlebury Institute and the League of the South at the 14th annual conference.

---

For the above reasons the U.S. Supreme Court should (and must) grant my Petition for Writ of Certiorari.

Don Hamrick
5860 Wilburn Road
Wilburn, AR 72179

# CERTIFICATE OF COMPLIANCE

Petitioner hereby submits his Petition for Writ of Certiorari as compliant with Rule 33.1, being lawfully exempt from prepaying the filing fee under the contested Seaman's Suit law of 28 U.S.C. § 1916 but electing to pay the $300 filing fee while the case is pending review so that this Petition for Writ of Certiorari can proceed under Rule 10(a) without further delay due to its compelling cause of action.

Don Hamrick
5860 Wilburn Road
Wilburn, AR 72179

# APPENDIX A: PROOF OF DOCKETING

**General Docket**
**8th Circuit Court of Appeals**

07-2400                                                                                          07-2400

| | |
|---|---|
| **Court of Appeals Docket #:** 07-2400 | **Filed:** 06/18/2007 |
| **Nsuit:** 2440 Other Civil Rights | **Termed:** 08/03/2007 |

Don Hamrick v. President George Bush, et al
**Appeal From:** U.S. District Court for the Eastern District of
Arkansas – Batesville

**Case Type Information:**
    **1)** Civil
    **2)** United States as a party
    **3)** null

**Originating Court Information:**
    **District:** 0860-1 : 1:06-cv-00044-JMM
    **Trial Judge:** James M. Moody, U.S. District Judge
    **Date Filed:** 09/11/2006

| **Date Order/Judgment:** | **Date NOA Filed:** | **Date Rec'd COA:** |
|---|---|---|
| 06/04/2007 | 06/12/2007 | 06/13/2007 |

**Prior Cases:** S.Ct. No. 03-145; No. 04-1150.
**Current Cases:** U.S. District Court for DC, No. 07-1616

# APPENDIX B. EVIDENCE OF JUDICIAL BIAS AGAINST AN UNREPRESENTED CIVIL PLAINTIFF BY THE U.S. SUPREME COURT

*Sean Silveira, et al.* v. *Bill Lockyer, Atty. General of California, et al.*

**U.S. Supreme Court**

**Case No. 03-51**

**Docketed: July 8, 2003**

Lower Ct: United States Court of Appeals for the Ninth Circuit

Case Nos.: (01-15098)

Decision Date: December 5, 2002

Rehearing Denied: May 6, 2003

| ~~~Date~~~ | ~~~~~~Proceedings and Orders~~~~~~~~~~~~~ |
|---|---|
| Jul 3 2003 August 7, | Petition for writ of certiorari filed. (Response due 2003) |
| Jul 30 2003 | Brief amicus curiae of Pink Pistols filed. |
| Jul 30 2003 filed. | Brief amicus curiae of Women Against Gun Control |
| Jul 30 2003 | Brief amicus curiae of Jews for the Preservation of Firearms Ownership filed. |
| Aug 6 2003 Inc. filed. | Brief amicus curiae of Second Amendment Sisters, |
| Aug 7 2003 filed. | Brief amicus curiae of National Rifle Association |
| Aug 7 2003 Laws filed. | Brief amicus curiae of Doctors for Sensible Gun |
| **Aug 7 2003** **filed.** | **Waiver of right of respondent Bill Lockyer, Attorney General of California to respond** |
| Aug 20 2003 29, 2003. | DISTRIBUTED for Conference of September |
| **Sep 22 2003 2003)** | **Response Requested . (Due October 22,** |
| **Oct 22 2003 Attorney** | **Brief of respondents Bill Lockyer,** |

|  | General of California, and Gray Davis, |
| Governor in | |
|  | opposition filed. |
| **Oct 27 2003 filed.** | **Reply of petitioners Sean Silveira, et al.** |
| Nov 5 2003 2003. | DISTRIBUTED for Conference of November 26, |
| **Dec 1 2003** | **Petition DENIED.** |

============================

# APPENDIX C: OP-ED – SCARY FEDERAL JUDICIARY

## SCARY FEDERAL JUDICIARY

by Zena Crenshaw, Esq., Michael McCray, Esq., &
**Deputy U.S. Marshal Matt Fogg (INA)**
October 26, 2007
http://www.opednews.com/articles/opedne_zena_d___071025_scary_federal_judici.htm

*Crenshaw, McCray, and Fogg are administrators for The 3.5.7 Commission, a privately established commission considering the propriety of summary judgments entered against federal government employees under Title VII, the Civil Rights Act of 1964, and certain employees seeking relief under the False Claims Act. [ www.the357commission.org ] Ms. Crenshaw is also Executive Director of National Judicial Conduct and Disability Law Project, Inc., a nonprofit organization combating abuses of the legal system that are facilitated by judicial misconduct. [ www.njcdlp.org ] McCray is a $40,000,000 government whistleblower and business developer who considers judicial reform an essential element of government whistleblower protection. Fogg is a currently inactive Chief Deputy U. S. Marshal as well as international human rights advocate.*

This past June, the U. S. Judicial Conference Committee on Judicial Conduct and Disability submitted for public comment up to October 15, 2007, rules for the conduct of primarily federal judicial discipline proceedings. When effective, the proposed rules are to ". . . provide mandatory and nationally uniform provisions governing the substantive and procedural aspects of misconduct and disability proceedings . . ." for federal judges. They marvelously bridle discretion among chief circuit judges, the first responders to private citizens, prisoners, lawyers, court personnel and others, complaining that one or more federal judges are unethical or unable to properly function due to some mental and/or physical condition.

The actual or acting chief judge of any federal circuit in America can dismiss complaints alleging the misconduct and/or disability of his or her judicial colleagues, subject to certain appeals. Fortunately the rules at hand preclude those dismissals when underlying complaints pit the complainant's word against those of a targeted judge. That situation involves "a simple credibility conflict" and should proceed for special committee investigation.

"Where a judge's conduct has resulted in identifiable, particularized harm to the complainant or another individual, appropriate corrective action should include steps taken by that judge to acknowledge and redress the harm, if possible, such as by an apology, recusal from a case, and a pledge to

refrain from similar conduct in the future." Should the subject rules become enacted, minor corrections would be an insufficient response to serious allegations. Also, viable complaints could not be dismissed under the new rules if an alleged offender still performs judicial duties.

The foregoing provisions would soon give Americans good grounds for renewed confidence in the self-regulation of federal judges were it not for a disturbing message undermining the process. Through the preemption of complaints "directly related to the merits" of a decision or procedural ruling", federal judges suggest they are unaccountable for deliberate violations of rights accomplished through judicial proceedings. In contrast, the U. S. Constitution limits state power, ". . . however put forth, whether that action be executive, legislative, or judicial." *Ex Parte State of Virginia*, 100 U. S. 339 at 346 (1879).

In 2004, the late Chief Justice Rehnquist appointed a Judicial Conduct and Disability Act Study Committee to appease criticism about the act's implementation and corresponding effectiveness or lack thereof. Comprised only of judges, court personnel, and similar participants, the committee essentially confirms with its "Breyer Report" that court opinions rarely justify claims of unlawful judicial bias. Yet the circumstances of a court ruling may rebut the presumption that as to a particular litigant or litigants, the presiding judge is a person ". . . of conscience and intellectual discipline, capable of judging a particular controversy fairly . . ."    *cf., U. S.* v. *Morgan*, 313 U S 409 at 421 (1941). In

fact a judge's willfulness characterized by "open defiance or reckless disregard of a constitutional requirement" of record, may establish a criminal violation of rights under color of law. *See, Title 18 U.S.C. § 242* and *cf. U.S.* v. *Hayes*, 589 F.2d 811 at 821 (5th Cir. 1979). That willfulness would be inextricably related to, but exceed mere error.

America's federal judicial conference now anticipates a wondrous paradox of incorrect court rulings that result from, but in no way evidence improper judicial motive. Its rules are likely to preclude consideration of such matters ". . . to the extent (they attack) the merits" of a judicial ruling; though those linked to alleged collusion somehow go ". . . beyond a challenge to the correctness – 'the merits' of the ruling itself". Such a dividing line is as elusive as " . . . evidence apart from the ruling itself suggesting an improper motive". At best it creates an extremely tight rope that prospective complainants under the Judicial Conduct and Disability Act should not have to walk.

The U. S. Supreme Court ". . . makes clear that judges and other 'state officials integral to the judicial process' are subject to criminal liability for violating the constitutional rights of individuals." *Briscoe* v. *La Hue*, 460 U. S. 325, footnote 26 (1983). That the U. S. Judicial Conference is empowered to skirt such matters for federal judges is troubling, downright scary to say the least.

Apparently the conference will never fathom a criminal violation of rights under color of law warranting

57

impeachment. Of course the Breyer Report and U. S. Justice Department prosecution statistics combine to dubiously suggest that of late, judges are virtually incapable of such crimes.

As America emerged from the height of its civil rights movement, federal judges and Congress boldly restrained deliberate violations of rights by state judges among other state officials. The idea of federal judges needing more independence would be laughable were it not so offensive. But alas, it is an idea aggressively promoted this new millennium through the corridors of America's highest judicial officers and beyond. Feel free to share that hair raising story this Halloween.

# APPENDIX D: DOCTRINE OF UNCONSTITUTIONAL CONDITIONS

It is most appropriate to include herein a brief discussion on the Doctrine of Unconstitutional Conditions as necessary to a full understanding of Appellant's cause of action. Appellant will excerpt portions from Kathleen M. Sullivan's, *UNCONSTITUTIONAL CONDITIONS*, 10 Harv.L.Rev. 1413 (May 1989) that best describes Appellant's argument challenging the constitutionality of laws prohibiting National Open Carry Handgun and many other freedoms under the Bill of Rights associated with firearms possession, ownership, usage, and carriage for the purpose of personal security in dual-dependency relationship to the constitutional right to travel. The following are excerpts from Sullivan's law review (footnotes from original omitted):

> *Basic constitutional jurisprudence dictates that courts subject most government benefit decisions to minimal scrutiny, but scrutinize government actions that directly burden preferred liberties more closely. Unconstitutional conditions problems arise at the boundary between these two directives: when government conditions a benefit on the recipient's waiver of a preferred liberty, should courts review the conditioned benefit deferentially, as a benefit, or strictly, as a burden on a preferred liberty? . . . Professor Sullivan criticizes traditional analyses of unconstitutional conditions for focusing wrongly on whether conditions coerce individuals, distort legislative process, or permit alienation of constitutional rights. She articulates an alternative defense of close scrutiny, arguing that rights-pressuring conditions on government benefits skew distribution of power between government and rightholders, as well as among rightholders themselves. Professor Sullivan then develops this systemic approach, detailing both the circumstances in which courts should apply close scrutiny, and those in which government justifications may be strong enough to survive such scrutiny.*[17]

> The doctrine of unconstitutional conditions holds that government may not grant a benefit on the condition that the beneficiary surrender a constitutional right, even if the government may withhold that benefit

---

[17] Kathleen M. Sullivan's, *Unconstitutional Conditions*, 10 Harv.L.Rev. 1413 (May 1989) introduction. Italics in original.

altogether. It reflects the triumph of the view that government may not do indirectly what it may not do directly over the view that the greater power to deny a benefit includes the lesser power to impose a condition on its receipt. (Id. at 1415)

[A]ssuming that some set of constitutionally preferred liberties has been agreed upon, and that burdens on those liberties require especially strong justification, unconstitutional conditions doctrine performs an important function. It identifies a characteristic technique by which government appears not to, but in fact does burden those liberties, triggering a demand for especially strong justification by the state. Part I of this Article defines the basic elements of the technique. (Id. at 1419)

The central challenge for a theory of unconstitutional conditions is to explain why conditions on government benefits that "indirectly" pressure preferred liberties should be as suspect as "direct" burdens on those same rights, such as the threat of criminal punishment. (Id. at 1419)

### IV. Unconstitutional Conditions as Commodification

Unconstitutional conditions doctrine has a third possible theoretical explanation: that some constitutional rights are inalienable, and therefore may not be surrendered even through voluntary exchange. This approach identifies the harm in unconstitutional conditions as the commodification of rights the treatment of rights as transferable objects. (Id. at 1477)

**1. Paternalism.**

Making constitutional rights inalienable because citizens may undervalue the worth of those rights to themselves would be classic paternalism overruling individuals' choices for their own good.

Individuals' choices may diverge from their "best" interests for many reasons: for example, because they underassess risk or under-value their long-term interests. Choices to waive constitutional rights are no exceptions; invalidating such choices, even if perfectly voluntary, compels citizens to hang onto their rights for their own good. (Id. at 1480)

. . . The very existence of constitutional rights, however, unlike consumer tastes or preferences, results from the prior "paternalistic" act of enacting a Constitution. The framers' decision to place constitutional rights beyond majority decisionmaking reflects the prediction that citizens will undervalue those rights in the ordinary course of politics. Constitutional rights thus represent commitments by a constitutional majority to override the acts of future political

majorities' political version of Ulysses and the Sirens. If the Constitution overrides the legislative choices of improvident future political majorities, why not the trading choices of improvident future individual rightholders? This approach would conceive unconstitutional conditions doctrine as a mere backstop to constitutionalism itself, which among other things, places rights beyond the reach of politics because citizens, if left to their own devices, will squander them. (Id. at 1480-81)

### 4. *Personhood.*

Another sort of argument defends inalienability not because it promotes efficiency or equality, but because some things ought not to be traded on markets at all. Such wholesale anticommodification arguments rest on various theories. Some, for example, view market boundaries as essential to a distinction between the sacred and the profane. On such a view, reverence, mystery, and awe for something depend on its freedom from the pollution of trade. A second variant argues that noncommodificiation can help preserve social norms of altruism or donation. (Id. at 1484)

Such a "personhood" approach would hold that the opportunity to exchange rights for benefits wrongly commodifies rights. . . . Inalienability here would follow from the view that constitutional rights, like body parts and love, but unlike clothes or mass-market consumer goods, are essential attributes of personal identity. The metaphor of constitutionally protected liberties as a "birthright" captures this view. Free transfer of such rights is a form of dismemberment. If citizens could purchase and sell constitutional rights, they would have a different and inferior conception both of those constitutional rights and of themselves. (Id. at 1485)

### V. A Systemic Account of Unconstitutional Conditions

Neither coercion, corruption, nor commodification theories satisfactorily explain why conditions on benefits that pressure preferred liberties should receive the same strict scrutiny as "direct" constraints. . . . None of these three approaches suffices: coercion theory focuses too narrowly on the individual beneficiary, germaneness theory focuses wrongly on [the corruption of the] legislative process, and inalienability theory focuses too generally on problems with exchange. (Id. at 1489-90)

This Part argues for an alternative approach grounded in the systemic effects that conditions on benefits have on the exercise of constitutional rights. Such an approach starts from the proposition that the preferred constitutional liberties at stake in unconstitutional conditions cases do not simply protect individual rightholders piecemeal. Instead, they

also help determine the overall distribution of power between government and rightholders generally, and among classes of rightholders. (Id. at 1490)

Unconstitutional conditions, no less than "direct" infringements, can skew this distribution in three ways.

**First** they can alter the constitutional liberties generally declare desirable some realm of autonomy that should remain free from government encroachment. Government freedom to redistribute power over presumptively autonomous decisions from the citizenry to itself through the leverage of permissible spending or regulation would jeopardize that realm. **Second**, an unconstitutional condition can skew the distribution of constitutional rights among rightholders because it necessarily discriminates facially between those who do and those who do not comply with the condition. If government has an obligation of evenhandedness or neutrality with regard to a right, this sort of redistribution is inappropriate. **Third**, to the extent that a condition discriminates de facto between those who do and do not depend on a government benefit, it can create an undesirable caste hierarchy in the enjoyment of constitutional rights. (Id. at 1490)

### A. Constitutional Liberty as Distribution

A systemic approach to unconstitutional conditio ns problems recognizes that constitutional liberties regulate three relationships: the relationship between government and rightholders, horizontal relationships among classes of right holders, and vertical relationships among rightholders. . . . rights-pressuring conditions on government benefits potentially skew all three. (Id. at 1491)

Such an approach has important advantages over coercion, germaneness, and inalienability theories in illuminating unconstitutional conditions problems. Unlike coercion and unalienability theories, a systemic approach emphasizes the distinctive role of government: citizens' transactions with government require different analysis than interpersonal transactions, an analysis that focuses not on individuals but on the balance of power and freedom in the polity as a whole. (Id. at 1491)

# APPENDIX E. COPY OF EMAIL

Jul 21, 2007 8:28 AM

FROM: Don Hamrick

| TO: | | |
|---|---|---|
| | AskDOJ@usdoj.gov, | JUSTICE DEPARTMENT, ATTORNEY GENERAL |
| | inspector.general@usdoj.gov, | JUSTICE DEPARTMENT, INSPECTOR GENERAL |
| | Scott.A.Myers@usdoj.gov, | JUSTICE DEPARTMENT, INSPECTOR GENERAL |
| | AskPSN@usdoj.gov, | JUSTICE DEPARTMENT |
| | Daisy.D.Correa@usdoj.gov, | JUSTICE DEPARTMENT |
| | dc.outreach@usdoj.gov, | JUSTICE DEPARTMENT |
| | jane.duke@usdoj.gov, | U.S. ATTORNEY'S OFFICE, LITTLE ROCK, AR |
| | Kim.Squires@usdoj.gov, | U.S. ATTORNEY'S OFFICE, LITTLE ROCK, AR |
| | richard.pence@usdoj.gov, | U.S. ATTORNEY'S OFFICE, LITTLE ROCK, AR |
| | us.marshals@usdoj.gov, | U.S. MARSHALS SERVICE, WASHINGTON, DC |
| | robert.robeson@usdoj.gov, | U.S. MARSHALS SERVICE, WASHINGTON, DC |
| | dave.loyer@usdoj.gov, | U.S. MARSHALS SERVICE, LITTLE ROCK, AR |
| | little.rock@ic.fbi.gov, | FBI, LITTLE ROCK, AR |
| | stlouis@ic.fbi.gov, | FBI FIELD OFFICE, ST. LOUIS, MO. |
| | washington.field@ic.fbi.gov | FBI FIELD OFFICE, WASHDC for Director Mueller |

## SUBJECT: HAMRICK - CIVIL RIGHTS COMPLAINT TO FBI/JUSTICE DEPT

## IS THE JURY SYSTEM DYING?
July 18, 2007
http://jurylaw.typepad.com/deliberations/2007/07/is-the-jury-sys.html

## VANISHING TRIALS
### VANISHING JURIES
#### VANISHING CONSTITUTION
http://www.law.suffolk.edu/highlights/stuorgs/lawreview/documents/Young_Article_FINAL4.pdf

## WHY SUMMARY JUDGMENT IS UNCONSTITUTIONAL
http://www.virginialawreview.org/content/pdfs/93/139.pdf

## JUDGE WILLIAM G. YOUNG SPEECH AT JUDICIAL LUNCHEON
### THE FLORIDA BAR'S ANNUAL CONVENTION IN ORLANDO JUNE 28, 2007
http://www.floridabar.org/DIVCOM/JN/JNNews01.nsf/8c9f13012b96736985256aa90
0624829/5d3d1e61610d7e5c852573150051920d?OpenDocument

## CASES KEEP FLOWING IN, BUT THE JURY POOL IS IDLE
http://www.lexisone.com/news/nlibrary/n043007d.html

**TO: U.S. DEPARTMENT OF JUSTICE**
**TO: FBI**
**TO: U.S. MARSHALS SERVICE**
**TO: U.S. ATTORNEYS**

In light of Michael Gans of the 8th Circuit signing off on an ORDER compelling me to pay the Court's filing fee when the subject matter of my case clearly qualifies under the "safety" clause of the Seamen's Suit law, 28 U.S.C. § 1916 and in light of the the fact that I am a fully documented U.S. merchant seaman and in light of the fact that the ORDER "threatens" dismissal of my case for lack of prosecution if I do not pay the filing fee I will be mailing my CIVIL RIGHTS COMPLAINT to the FBI and to the CIVIL RIGHTS DIVISION OF THE U.S. DEPARTMENT OF JUSTICE.

The above links are confirmation of my suspicion that the obstructive nature federal litigation these past 5 years over my Second Amendment rights as a U.S. merchant seaman where nearly every Motion, Judicial Notice of Adjudicative Facts, Presumption in General, and Habit/Routine Practice have been denied and my cases dismissed with prejudice had to have a reason hidden behind the scenes.

The tipping scale moment was Senior Inspector Robert Robeson, U.S. Marshals Service of the U.S. District Court for DC/DC Circuit admission to me, in person, that on the morning after the 8th Circuit issued the ORDER that Mr. Robeson knew about that ORDER dismissing my previous appeal of the U.S. District Court's ORDER denying several Motions vital to my case. That admission, I believe, was made to intimidate me into withdrawing my case because he made that admission just as I was winning the argument about my legal and constitutional right to make citizen's arrest of court clerks and federal judges for felony extortion, 18 U.S.C. § 872, of filing fees illegal collected from me, a documented U.S. seaman with a Second Amendment case the qualifies under the "safety" clause of the Seamen's Suit law, 28 U.S.C. § 1916. (I apologize for my redundancy but it seems necessary to repeatedly state my rights to make you people in Government admit to certain facts and laws.)

The implication of Robert Robeson's admission of knowledge about the 8th Circuit's previous ORDER and Michael Gans signing off on the present ORDER invokes suspicion of a conspiracy to obstruct justice. Combine that with the judicial history of my cases these past 5 years with the ongoing scandals of voter fraud during the November 2004 presidential election in Jacksonville, Florida (voter supression known as "caging") and the fired 8 U.S. Attorneys, one of which was Arkansas U.S. Attorney Bud Cummins being replace by Tim Griffin who subsequently resigned because of his involvement with Carl Rove and the "caging" activities and because President Bush appointed Tim Griffin under the revised USA Patriot Act bypassing Senate confirmation culminating into relevant direct evidence to a loss of judicial independence through the politicalization of justice and the the politicalization of the U.S. Department of Justice.

It is no wonder why I cannot get past the Motion to Dismiss! The whole damn system of justice is CORRUPT!

Now I understand that the U.S. Marshals Service finds the idea of a political nobody having the justification, the legal and constitutional authority to make citizen's arrest of court clerks and federal judges, even the court clerk of the U.S. Supreme Court and the Chief Justice (Case No. 03-145) for felony extortion to be extremely repulsive. But the black letter reading of the law is clear especially when I employ the civil RICO Act in my Second Amendment case which authorizes me to act in the capacity of a PRIVATE ATTORNEY GENERAL. (See Pamela S. Karlan, DISARMING THE PRIVATE ATTORNEY GENERAL, Univ. of Illinois Law Review, Vol. 2003, No. 1) available online at:

http://home.law.uiuc.edu/lrev/publications/2000s/2003/2003_1/Karlan.pdf

All this bullying, all these acts of obstructing justice by the courts and by the Justice Department and by Robert Robeson, all these threats of arresting me and sending me to prison made by the U.S. Marshals Service just because I am exercising my civil, statutory, and constitutional rights under the Bill of Rights, and "powers reserved to the People" under the Tenth Amendment to the letter of the law against the U.S. Government wrongs done to me has to end for the sake of justice.

I will visit the FBI (HQ, DC, Little Rock, or St. Louis?) to see if the FBI can "admit" to a "finding of fact" that "felony extortion" by federal judges and court clerks were committed in violation of 18 U.S.C. § 872 and 28 U.S.C. § 1916. Then when with that admission of fact I will ask the FBI if they are going to make any arrests or persuade the offending courts to return the money to me (in the total amount of either $1,465 or $1,765 I am not sure which amount is correct).

If the FBI can admit to the finding of fact that several acts felony extortion were committed and if the FBI declines to act accordingly then I will ask the FBI to assist me with "citizen's arrest" as I am duly authorized (I believe) to act in the capacity of a PRIVATE ATTORNEY GENERAL. Now, if I am mistake in facts or law it is you duty to inform me of my mistaken understanding and provide me with the corrections of information so that I can act in a lawful manner. However, I prefer the return of the filing fees as the path of least resistance in this matter. It is the simplest of choices.

Signed: Don Hamrick

65

# APPENDIX F. JUDGE LAY OF THE 8ᵀᴴ CIRCUIT DISSENTING OPINION EXPOSING ABUSIVE USE OF SUMMARY JUDGMENTS

*Melvin v. Car-Freshener Corporation*, 8th Circuit, No. 06-1279 (July 12, 2006), **Circuit Judge Lay, dissenting opinion**, http://www.ca8.uscourts.gov/opndir/06/07/061279P.pdf:

Too many courts in this circuit, both district and appellate, are utilizing summary judgment in cases where issues of fact remain. This is especially true in cases where witness credibility will be determinative. In these instances, a jury, not the courts, should ultimately decide whether the plaintiff has proven her case. Summary judgment should be the exception, not the rule. It is appropriate "*only . . . where it is quite clear what the truth is, . . . for the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try.*" *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467 (1962) (emphasis added) (citation and internal quotations omitted).

It is undeniable that summary judgment is a valuable tool, the use of which allows overextended courts to remove cases that lack merit from their dockets. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). However, in accomplishing this goal, we have an obligation not to "overlook[] considerations which make . . . summary judgment an inappropriate means to that very desirable end." *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627 (1944). As Justice Black explained,

> The right to confront, cross-examine and impeach adverse witnesses is one of the most fundamental rights sought to be preserved by the Seventh Amendment provision for jury trials in civil cases. The advantages of trial before a live jury with live witnesses, and all the possibilities of considering the human factors, should not be eliminated by substituting trial by affidavit and the sterile bareness of summary judgment.

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 176 (1970) (Black, J., concurring).

I express no opinion as to whether Melvin would ultimately be able to convince a jury in this case. However, she and all other similarly-situated plaintiffs should be afforded the opportunity to do so.

- - - - -

# APPENDIX G. WHY SUMMARY JUDGMENT IS UNCONSTITUTIONAL

## WHY SUMMARY JUDGMENT IS UNCONSTITUTIONAL

Suja A. Thomas,
93 Virginia Law Review 139, 179-180 (2007)

CONCLUSION

It is an appropriate time for the Court to change its jurisprudential course regarding the Seventh Amendment and hold summary judgment unconstitutional. Federal courts frequently employ summary judgment to dispose of cases, and the procedure has, thus, contributed to the decrease in the availability of civil jury trials.

Having recently taken renewed interest in the proper role of the jury under the Sixth Amendment, it would be fitting for the Court to examine this issue in the context of the Seventh Amendment. In the last seven years, in interpreting the Sixth Amendment, the Court has given power back to the criminal jury, emphasizing the historical role of the jury. In comparison, the text of the Seventh Amendment, which requires the court to follow the "common law," dictates an even more significant role for history in the preservation of the right to a civil jury trial under the Seventh Amendment.

As described in this Essay, three core principles emanate from the common law that demonstrate the unconstitutionality of summary judgment. First, under the common law, the jury or the parties determined the facts. The court itself never decided a case without such a determination. Second, a court would determine the sufficiency of the evidence only after a jury trial, and if the court believed that the evidence was insufficient, it would order only a new trial. The court would never order judgment for the moving party upon a review of the sufficiency of the evidence. Third, a jury would decide a case that had any evidence, however improbable that evidence was, unless the moving party admitted the facts and conclusions of the nonmoving party, including improbable facts and conclusions. Summary judgment, under which a court dismisses a case after its assessment of the sufficiency of the evidence, including the reasonableness of the factual inferences, wholly contrasts with these principles. Accordingly, the Court should, following the historical mandate of the Amendment, declare summary judgment unconstitutional.

## IOWA STATE COURT OF APPEALS

*Leonard* v. *Leonard*, Court of Appeals of Iowa, No. 5-611 / 05-0634 filed October 12, 2005, In Re The Marriage of Stephen Craig Leonard and Norma Jean Leonard:

Our supreme court has admonished district courts to use restraint in exercising their power to dismiss actions *sua sponte*. *See Rush*, 240 N.W.2d at 439 (cautioning that "the more logical approach is to allow trial courts to exercise the power to sua sponte dismiss actions in a "restrained' manner.").

# APPENDIX H. AMERICAN LEGAL SYSTEM IS CORRUPT BEYOND RECOGNITION: JUDGE TELLS HARVARD LAW SCHOOL

## AMERICAN LEGAL SYSTEM IS CORRUPT BEYOND RECOGNITION: JUDGE TELLS HARVARD LAW SCHOOL

By Geraldine Hawkins
MassNews.com
P.O. Box 5882
Holliston, MA 01746
781-237-2772
March 7, 2003

The American legal system has been corrupted almost beyond recognition, Judge Edith Jones of the U.S. Court of Appeals for the Fifth Circuit, told the Federalist Society of Harvard Law School on February 28.

She said that the question of what is morally right is routinely sacrificed to what is politically expedient. The change has come because legal philosophy has descended to nihilism.

"The integrity of law, its religious roots, its transcendent quality are disappearing. I saw the movie 'Chicago' with Richard Gere the other day. That's the way the public thinks about lawyers," she told the students.

"The first 100 years of American lawyers were trained on Blackstone, who wrote that: 'The law of nature ... dictated by God himself ... is binding ... in all counties and at all times; no human laws are of any validity if contrary to this; and such of them as are valid derive all force and all their authority ... from this original.' The Framers created a government of limited power with this understanding of the rule of law - that it was dependent on transcendent religious obligation," said Jones.

She said that the business about all of the Founding Fathers being deists is "just wrong,"

or "way overblown." She says they believed in "faith and reason," and this did not lead to intolerance.

"This is not a prescription for intolerance or narrow sectarianism," she continued, "for unalienable rights were given by God to all our fellow citizens. Having lost sight of the moral and religious foundations of the rule of law, we are vulnerable to the destruction of our freedom, our equality before the law and our self-respect. It is my fervent hope that this new century will experience a revival of the original understanding of the rule of law and its roots.

"The answer is a recovery of moral principle, the sine qua non of an orderly society. Post 9/11, many events have been clarified. It is hard to remain a moral relativist when your own people are being killed."

According to the judge, the first contemporary threat to the rule of law comes from within the legal system itself.

Alexis de Tocqueville, author of Democracy in America and one of the first writers to observe the United States from the outside looking-in, "described lawyers as a natural aristocracy in America," Jones told the students. "The intellectual basis of their profession and the study of law based on

venerable precedents bred in them habits of order and a taste for formalities and predictability." As Tocqueville saw it, "These qualities enabled attorneys to stand apart from the passions of the majority. Lawyers were respected by the citizens and able to guide them and moderate the public's whims. Lawyers were essential to tempering the potential tyranny of the majority."

"Some lawyers may still perceive our profession in this flattering light, but to judge from polls and the tenor of lawyer jokes, I doubt the public shares Tocqueville's view anymore, and it is hard for us to do so.

"The legal aristocracy have shed their professional independence for the temptations and materialism associated with becoming businessmen. Because law has become a self-avowed business, pressure mounts to give clients the advice they want to hear, to pander to the clients' goal through deft manipulation of the law. ... While the business mentality produces certain benefits, like occasional competition to charge clients lower fees, other adverse effects include advertising and shameless self-promotion. The legal system has also been wounded by lawyers who themselves no longer respect the rule of law,"

The judge quoted Kenneth Starr as saying, "It is decidedly unchristian to win at any cost," and added that most lawyers agree with him.

However, "An increasingly visible and vocal number apparently believe that the strategic use of anger and incivility will achieve their aims. Others seem uninhibited about making misstatements to the court or their opponents or destroying or falsifying evidence," she claimed. "When lawyers cannot be trusted to observe the fair processes essential to maintaining the rule of law, how can we expect the public to respect the process?"

Lawsuits Do Not Bring 'Social Justice'

Another pernicious development within the legal system is the misuse of lawsuits, according to her.

"We see lawsuits wielded as weapons of revenge," she says. "Lawsuits are brought that ultimately line the pockets of lawyers rather than their clients. ... The lawsuit is not the best way to achieve social justice, and to think it is, is a seriously flawed hypothesis. There are better ways to achieve social goals than by going into court."

Jones said that employment litigation is a particularly fertile field for this kind of abuse.

"Seldom are employment discrimination suits in our court supported by direct evidence of race or sex-based animosity. Instead, the courts are asked to revisit petty interoffice disputes and to infer invidious motives from trivial comments or work-performance criticism. Recrimination, second-guessing and suspicion plague the workplace when tenuous discrimination suits are filed ... creating an atmosphere in which many corporate defendants are forced into costly settlements because they simply cannot afford to vindicate their positions.

"While the historical purpose of the common law was to compensate for individual injuries, this new litigation instead purports to achieve redistributive social justice. Scratch the surface of the attorneys' self-serving press releases, however, and one finds how enormously profitable social redistribution is for those lawyers who call themselves 'agents of change.'"

Jones wonders, "What social goal is achieved by transferring millions of dollars to the lawyers, while their clients obtain coupons or token rebates."

The judge quoted George Washington who asked in his Farewell Address, "Where is the security for property, for reputation, for life, if the sense of religious obligation desert the oaths ... in courts of justice?"

69

Similarly, asked Jones, how can a system founded on law survive if the administrators of the law daily display their contempt for it?

"Lawyers' private morality has definite public consequences," she said. "Their misbehavior feeds on itself, encouraging disrespect and debasement of the rule of law as the public become encouraged to press their own advantage in a system they perceive as manipulatable."

The second threat to the rule of law comes from government, which is encumbered with agencies that have made the law so complicated that it is difficult to decipher and often contradicts itself.

"Agencies have an inherent tendency to expand their mandate," says Jones. "At the same time, their decision-making often becomes parochial and short-sighted. They may be captured by the entities that are ostensibly being regulated, or they may pursue agency self-interest at the expense of the public welfare. Citizens left at the mercy of selective and unpredictable agency action have little recourse."

Jones recommends three books by Philip Howard: The Death of Common Sense, The Collapse of the Common Good and The Lost Art of Drawing the Line, which further delineate this problem.

The third and most comprehensive threat to the rule of law arises from contemporary legal philosophy.

"Throughout my professional life, American legal education has been ruled by theories like positivism, the residue of legal realism, critical legal studies, post-modernism and other philosophical fashions," said Jones. "Each of these theories has a lot to say about the 'is' of law, but none of them addresses the 'ought,' the moral foundation or direction of law."

Jones quoted Roger C. Cramton, a law professor at Cornell University, who wrote in the 1970s that "the ordinary religion of the law school classroom" is "a moral relativism tending toward nihilism, a pragmatism tending toward an amoral instrumentalism, a realism tending toward cynicism, an individualism tending toward atomism, and a faith in reason and democratic processes tending toward mere credulity and idolatry."

No 'Great Awakening' In Law School Classrooms

The judge said ruefully, "There has been no Great Awakening in the law school classroom since those words were written." She maintained that now it is even worse because faith and democratic processes are breaking down.

"The problem with legal philosophy today is that it reflects all too well the broader post-Enlightenment problem of philosophy," Jones said. She quoted Ernest Fortin, who wrote in Crisis magazine: "The whole of modern thought … has been a series of heroic attempts to reconstruct a world of human meaning and value on the basis of … our purely mechanistic understanding of the universe."

Jones said that all of these threats to the rule of law have a common thread running through them, and she quoted Professor Harold Berman to identify it: "The traditional Western beliefs in the structural integrity of law, its ongoingness, its religious roots, its transcendent qualities, are disappearing not only from the minds of law teachers and law students but also from the consciousness of the vast majority of citizens, the people as a whole; and more than that, they are disappearing from the law itself. The law itself is becoming more fragmented, more subjective, geared more to expediency and less to morality. … The historical soil of the Western legal tradition is being washed away … and the tradition itself is threatened with collapse."

Judge Jones concluded with another thought from George Washington: "Of all the dispositions and habits which lead to

70

prosperity, religion and morality are indispensable supports. In vain would that man claim the tribute of patriotism who should labor to subvert these great pillars of human happiness - these firmest props of the duties of men and citizens."

Upon taking questions from students, Judge Jones recommended Michael Novak's book, On Two Wings: Humble Faith and Common Sense.

"Natural law is not a prescriptive way to solve problems," Jones said. "It is a way to look at life starting with the Ten Commandments."

Natural law provides "a framework for government that permits human freedom," Jones said. "If you take that away, what are you left with? Bodily senses? The will of the majority? The communist view? What is it - 'from each according to his ability, to each according to his need?' I don't even remember it, thank the Lord," she said to the amusement of the students.

"I am an unabashed patriot - I think the United States is the healthiest society in the world at this point in time," Jones said, although she did concede that there were other ways to accommodate the rule of law, such as constitutional monarchy.

"Our legal system is way out of kilter," she said. "The tort litigating system is wreaking havoc. Look at any trials that have been conducted on TV. These lawyers are willing to say anything."

Potential Nominee to Supreme Court

Judge Edith Jones has been mentioned as a potential nominee to the Supreme Court in the Bush administration, but does not relish the idea.

"Have you looked at what people have to go through who are nominated for federal appointments? They have to answer questions like, 'Did you pay your nanny taxes?' 'Is your yard man illegal?'

"In those circumstances, who is going to go out to be a federal judge?"

Judge Edith H. Jones has a B.A. from Cornell University and a J.D. from the University of Texas School of Law. She was appointed to the Fifth Circuit by President Ronald Reagan in 1985. Her office is in the U.S. Courthouse in Houston.

The Federalist Society was founded in 1982 when a group of law students from Harvard, Stanford, the University of Chicago and Yale organized a symposium on federalism at Yale Law School. These students were unhappy with the academic climate on their campuses for some of the reasons outlined by Judge Jones. The Federalist Society was created to be a forum for a wider range of legal viewpoints than they were hearing in the course of their studies.

From the four schools mentioned above, the Society has grown to include over 150 law school chapters. The Harvard chapter, with over 250 members, is one of the nation's largest and most active. They seek to contribute to civilized dialogue at the Law School by providing a libertarian and conservative voice on campus and by sponsoring speeches and debates on a wide range of legal and policy issues.

The Federalist Society consists of libertarians and conservatives interested in the current state of the legal profession. It is founded on three principles: 1) the state exists to preserve freedom, 2) the separation of governmental powers is central to our Constitution and 3) it is emphatically the province and duty of the judiciary to state what the law is, not what it should be.

# APPENDIX I. COMMENTS ON THE NINTH CIRCUIT PRO SE TASK FORCE REPORT

Prepared by Charles W. Heckman, Dr. Sci.
Submitted in behalf of A Matter of Justice Coalition
Committee for the Ninth Circuit
See **http://www.amatterofjustice.org**

*Charles W. Heckman, Dr. Sci., habil., Professor, researcher, lecturer, speaker, writer, Washington State coordinator for the Veterans' Voting Bloc, Member of the Board of Directors of A Matter of Justice Coalition, presently producing a series of at least 10 volumes for identifying South American aquatic insects to species. Three of the volumes have already been published.*

## Basic summary of the Task Force's report

The report of the Task Force summarizes the many problems faced by the United States courts when persons not educated or trained as attorneys attempt to present their own legal arguments in various kinds of proceedings. It then introduces a variety of proposals to reduce the problems identified by the Task Force members, ranging from simplifying procedures to enlisting the assistance of pro bono attorneys or law students to minimize procedural errors, present arguments in an objective way without introducing the emotional responses typically elicited when a person discusses personal conflicts, and give litigants a better understanding of legal and practical limitations to the actions of a court. It takes note of the fact that prior discussions of legal aspects of a lawsuit with an attorney often disabuse a litigant of misunderstandings of the law before the court is required to instruct the litigant about erroneous principles on which a lawsuit is based.

The recommendations of the task force are practical and include suggested improvements that would alleviate many of the problems addressed. Most of these suggestions can be accepted, and it is hoped that resources can be found to effect the improvements.

What must be faulted in this report is not the solutions proposed for the problems presented but rather the failure to address the most frequent complaints of pro se litigants, which are similar to complaints frequently voiced by litigants represented by attorneys with average or less than average capabilities.

## Fundamental role of the judiciary

In 1947, Justice William O Douglas wrote that the basic function of any court is to judge the case on the merits. That means that two factors and only two should influence the decision: the law and the facts. If all is functioning as it should, then any case in which the facts indicate that one party must prevail under the law should have only one outcome. This is true regardless of whether or not the party whose case is supported by the law and the facts is represented by counsel.

Justice should not depend upon whether or not a person can afford a lawyer. While it is true that a litigant acting pro se might be less likely to present a clear case than an experienced lawyer and might not be able to cite all of the laws that might support his case, if the facts support any claim he makes under any law, he should prevail. If a litigant arguing his own case lets his emotions show, thereby provoking a negative reaction, or if the litigant lacks skill in expressing himself, it is understandable that he may suffer disadvantage where the facts are not altogether clear. However, it is the function of a court, especially the jury, to sort through the evidence presented and provide a

72

decision in accord with the law and facts, even if some extra effort has to be exerted. Any court that permits factors other than the law and the facts to influence the outcome of any proceeding has failed in its fundamental duty.

# Problems not addressed in the report

## *The role of bias*

One of the many serious complaints often voiced by litigants but not seriously addressed in the report of the Task Force is bias by the judge. However, the report clearly expresses a common attitude toward pro se litigants, starting of p. 6 of the report:

"Some judges and lawyers are convinced, for example, that pro se litigants as a class generally bring meritless claims, and that any program designed to educate or assist them would only increase the number of meritless claims in the court system. This point of view is doubtless influenced by those pro se cases that are brought by individuals suffering from a mental disability or for purposes of harassment. Closely related to that thought is the belief that appointing attorneys for pro se clients is a waste of resources and in the long run simply complicates efforts to keep the system clear of meritless cases."

The Task Force fails to identify who holds this opinion, but both lawyers and judges have frequently expressed it or opinions very much like it. The main focus of this task force should not be with methods by which unbiased judges can make the submissions of pro se litigants easier for the court to deal with but rather with developing methods to assist a pro se litigant who has been the victim of a judge with the preconception that whatever he submits to the court is without merit, and his lawsuit must be dismissed before any unnecessary time of the court is wasted.

If all judges were perfect human beings, we could assume that the private opinion of a lawyer or a judge would not be reflected the judge's rulings. However, we know that few people approach perfection, and prejudice by decision-makers against members of certain groups has been the cause of continuous, bitter conflict since the civil rights movement first brought the effects of biases of many kinds to public view.

Prejudices often have a greater impact on the outcome of administrative hearings and lawsuits than parties with an obligation to be impartial like to admit. Whether the prejudice is deliberate and malicious or entirely unintended, decisions colored by personal biases can be just as devastating to the victims of the resulting injustice.

An even more enlightening articulation of the prejudice litigants often face appeared in numerous discussions on the decision of a Washington State appeals court in ***Hill v. BCTI Income Fund***, 97 Wn. App. 657 (1999), later upheld by the Washington State Supreme Court. Although it is the decision of a state court, it draws on the en banc opinion of the U. S. Court of Appeals for the Second Circuit in ***Fisher v. Vassar College,*** 70 F.3d 1420, 1437 (2d Cir.). The opinion in *Hill v. BCTI* defends a school of thought within the legal profession, which has been having a revolutionary effect on American jurisprudence. It parallels the controversial theory of a "living constitution," which condones the "updating" of the United States Constitution by the courts to conform to the personal opinion of judges concerning what the public wants and will accept. On a more mundane level, this revolution in judicial theory is interpreted by many judges as a mandate to quickly dismiss any lawsuit that can be dismissed without causing a public outcry, regardless of the merits of the case.

One of the main innovations introduced by the decision in *Fisher v. Vassar* is the acceptability and utility of lying to the court. This was discussed at length in a dissenting opinion by

the Chief Judge of the Court of Appeals of the Second Circuit, who pointed out the implications of the decision reached by his colleagues. Briefly stated, a jury of the trial court had determined that the spokesmen for Vassar had lied about the reason Fisher was denied tenure. It therefore concluded that the prima facie case Fisher had established had not been rebutted, and the relief she had demanded was granted. The Second Circuit, en banc, reversed the decision of the trial court by a single vote, ruling that the non-discriminatory reason given for not granting Fisher tenure had eliminated her prima facie case, even though the reason was shown unequivocally to be a lie. With the case in favor of Fisher eliminated, the court opined that she was required to meet a higher level of proof, which was not defined by the court and was apparently not humanly possible to meet, at least without the services of a certified mind-reader.

Expanding on this legal opinion, the Washington State courts in *Hill v. BCTI* set an unattainable burden of proof on a plaintiff who has alleged discrimination as soon as the defendant lies to the court and alleges that the motivation was not to discriminate against the plaintiff. According to the opinion of the Washington courts, proving conclusively that the defendant's allegation was a lie is not enough for a plaintiff to prevail. He must prove that the motive of the plaintiff was to discriminate against him for the reason alleged in the complaint. Hence, if age discrimination is alleged, the plaintiff must prove that the real reason for the discriminatory action and the subsequent lie by the defendant was actually the age of the plaintiff and not, for example, his religion, race, or gender. The judges of the Washington State Court of Appeals were well aware of the fact that the opposite decision had been reached by the United States Supreme Court, but they reasoned that the Supreme Court was wrong and the State of Washington was free to decide contrary to the highest Federal court because the State of Washington has its own constitution and its courts are therefore not bound by the United States Constitution, as interpreted by the Federal judiciary.

What is interesting about this case in the context of pro se litigation is not the decision itself but rather the opinion of an author who defended the decision as vital to preserve the integrity of the judicial system. He stated clearly in his article that if one person came to a court with a discrimination complaint and obtained relief, this would encourage other litigants to file similar lawsuits, and there are already too many lawsuits being filed. There is a strong undercurrent within the legal profession, as well as among corporations that are frequently sued, propagating the opinion that filing civil lawsuits is somehow sinister and un-American. They wish to discourage most lawsuits by denying justice to litigants and thereby discouraging other litigants from seeking justice in a court.

While there is a tradition from the Old West that a man settles his disputes by shooting it out with his adversary or settles lesser disputes with his fists, it was long thought that this was a less desirable alternative to letting a jury decide which party should prevail. Apparently, some members of the legal profession think otherwise and wish to close off the courts to ordinary citizens, returning dispute resolution to the means available in the "Wild West." It would be well to determine how closely the decrease in justice provided in civil suits has paralleled the increase in crimes of violence between people with no civilized means available to settle their dispute. How many of the civil disputes wrongfully dismissed or inequitably settled come back to the court as a criminal case?

The treatment of pro se litigants reflects the desire expressed by many politicians and judges that the number of lawsuits be reduced. Showing litigants who lack strong financial resources, the services of a first-class law firm, backing by an influential organization, or attention in the press that they have no chance of prevailing in a lawsuit or even of presenting their cases to a jury might well discourage other litigants from seeking redress in the courts but it also encourages persons in positions of authority to deliberately break the law, knowing that there is almost no chance that the victim would be able to obtain redress in a court of law.

74

It seems obvious to me that the flood of lawsuits is the result of a massive increase in white collar crime in the United States, most of which is ignored by law enforcement authorities on the excuse that their time is needed to combat crimes of violence. The victims are therefore forced to attempt to obtain redress in a civil lawsuit, and most are unable to obtain legal counsel. A recent estimate made by a group in Iowa suggested that 70% of the population of that state did not have enough money to retain the services of an attorney. Because most white collar criminals have learned the applicable law very well before embarking on their criminal careers and many seem to have the active assistance of local civil servants or even judges, attorneys do not see much chance of immediate success before a court and will therefore refuse to represent an indigent litigant on a contingency basis. Furthermore, many attorneys working out of small offices without a major law firm behind them hardly do better in court than pro se litigants. Therefore, as the white collar criminals, deliberate abusers of civil rights, unscrupulous business firms, and corrupt public officials become bolder, the victims have no way of protecting their property and livelihoods other than by representing themselves in a lawsuit. Even though an increasing number of pro se litigants see the courts as hostile to them and their needs for redress under the law, the flood of lawsuits grows because of the massive increase in the crimes that the current attitude of the courts has engendered.

Missing from the report by the Task Force is any adequate remedy for the actions of judges who adhere to the belief that pro se litigants do not deserve full consideration by the court. This can be justified by the self-fulfilling prophesy that pro se litigants never win. As a result, many judges believe that any time given to a lawsuit in which a litigant represents himself is wasted. Therefore, pro se litigants really do not win simply because the prophesy that they will lose is self-fulfilling.

## Remedies that fail

If a district judge summarily dismisses the civil lawsuit of a pro se plaintiff without reviewing any of the facts and writes a short opinion that fails to address the fundamental complaint, indicating that the judge barely knew what issues the complaint addressed, the plaintiff can appeal the dismissal to the court of appeals. In a great many cases, the plaintiff receives a brief affirmation of the district judge's opinion, which also fails to address the issues in the complaint and almost always contains the notation that the opinion cannot be cited as a precedent and should not be published.

The plaintiff can then file an appeal with the United States Supreme Court with near certainty that certiorari will not be denied. Many litigants lack the money to have their petitions for certiorari correctly printed and bound to the satisfaction of the clerk, and others fail to present the legal issues in an understandable manner. Even if all submissions are perfect, however, the petition will almost certainly be denied in favor of appeals that are given considerable publicity in the press, are promoted by major organizations, or are otherwise likely to bring fame and praise to the justices. The problems of ordinary citizens, no matter how devastating to them and their families, are ignored, and they find that they would have little more chance of success in getting a justified complaint before a jury than they would have of winning a lottery.

For example, after the courts in several circuits had summarily dismissed hundreds and perhaps thousands of lawsuits alleging employment discrimination at the complaint stage because the plaintiff had failed to provide enough hard evidence to establish a prima facie case when the complaint was submitted, the United States Supreme Court agreed to hear one of the appeals from the Second Circuit. In *Swierkiewicz v. Sorema N.A.*, 534 U.S. (2002), it decided unanimously that it is a gross violation of procedures to dismiss a lawsuit at this stage of the proceedings. Among the points the justices made were that a plaintiff can prevail without establishing a prima facie case at all, that a judge's opinion of whether or not a litigant will prevail before a jury is irrelevant to decision to dismiss a lawsuit, and that it is fundamentally unfair to dismiss a lawsuit before the whole body of

facts can be revealed through discovery. While this decision provided the plaintiff with a chance to have his lawsuit heard by a jury on the merits, it affirmed that thousands of litigants whose lawsuits had been improperly dismissed over the many years during which the appeals courts had been violating procedures had been left without any access to justice.

Still more perverse was the continued dismissal of lawsuits at the complaint stage, even after the Supreme Court had denounced this practice. It was well known to the judges guilty of this practice that any subsequent petitions for certiorari citing this issue would be denied on the grounds that the Supreme Court had already decided the issue and would not agree to decide it again. This would leave a litigant no way of redressing violations of his civil rights just because he had the bad luck of coming before a judge who is trying to discourage lawsuits by issuing non-precedential dismissals at the complaint stage and appeals court judges who affirm decisions of the lower court with a rubber stamp. Citing the clear opinion of the U.S. Supreme Court in *Swierciewicz v. Sorema N.A.* would have no effect on the outcome before a judge who assumes that anything filed pro se is without merit.

In case of particularly severe violations of the law, procedures, or ethics by a judge, a litigant is limited to filing a complaint with a judicial board established for hearing such complaints. Other avenues of redress are closed off because judicial immunity from civil liability was made absolute during the 1990s, even if corruption or malice motivated the judge's actions. Experience shows that the boards investigating misconduct by judges move extremely slowly, and a litigant has roughly one chance in a thousand of having a rogue judge censured, even mildly.

It can be concluded that a litigant whose lawsuit has been dismissed because of the bias of a judge against him, a class to which he belongs, pro se litigants in general, or the kind of lawsuit he has filed has almost no chance of redress, either on appeal or in complaint proceedings against a judge. Human nature clearly dictates that when members of any group are permitted to perform illegal, immoral, and unjust actions against other persons with complete impunity, many of them will do so, some because of laziness, others because of malice, and still others in anticipation of gratuities from a favored party. A pro se litigant has no recourse against a judge who does not want his complaint heard due to bias of any kind, and the fact that a judge has the power to deny him access to a jury effectively eliminates an important civil right supposedly guaranteed by Amendment VII of the United States Constitution.

## Common experiences of pro se litigants

The solutions proposed by the Task Force presume good will by the judges and conformity with the standards of ethics and behavior traditionally held by our society. Unfortunately, in speaking and corresponding with many pro se litigants, I have learned that there are common problems that reflect an erosion of human values and are often accompanied by abusive behavior by judges. These problems are less likely to arise when a litigant is represented by a lawyer, whose status as an "insider" in the legal profession might tend to restrain the opposing attorney and presiding judge from improper conduct. Such conduct is difficult for pro se litigants to cope with, but it is readily recognized when it occur. Eventually, pro se litigants make their opinions of the court public, and the increasing criticism leads to a general loss of faith in courts. The growing dissatisfaction of the public with the judicial system is rooted in the negative opinions developed by many litigants who know they have been improperly or illegally treated. Losing a lawsuit is fundamentally different from being denied due process and a fair hearing, and even pro se litigants without formal education in a law school can immediately tell the difference.

**The most common complaints by litigants of misconduct by the courts include the following:**

## 1. Perjury is tolerated by the judge

This complaint has been made by the great majority of pro se litigants with whom I have spoken. Very often, the false testimony is given by one or more government employees. Even when parts of the testimony are shown to be false, judges continue to give full credence to the witness in the remaining parts of the testimony. The judge then dismisses the lawsuit of a pro se litigant citing the perjured testimony as evidence that the lawsuit has no merit. Usually there are documents in the file clearly showing that the testimony was false, but these are simply disregarded by the judge.

Prosecutions for perjury have become rare to non-existent. Government employees have been given complete immunity for perjury they commit "in the line of duty," even if it is given with malice. Government prosecutors may suborn witnesses to perjury by promising them immunity for crimes they have been accused of. It has even been alleged that government employees can be fired for refusing to give false testimony at the behest of their supervisors. Many cases are known where civil servants have advanced their own careers by deliberately misleading courts, administrative boards, and even Congress to advance a political agenda espoused by the their supervisors.

## 2. Records submitted to the court disappear from the files

This complaint has frequently been made. Some litigants note that the entries of the documents are still in the court records but the documents themselves have disappeared. Even if copies of the records are retained by the litigant, they usually cannot be added to a record on appeal unless they are still in the file of the lower court.

## 3. Judges' opinions fail to address the issues of the lawsuit

Many litigants complain that orders for dismissal address issues that were never raised in the lawsuit and fail to address the issues that were. In light of the fact that most judges have earned a law degree, some decisions have convinced the litigants that the legal issues were deliberately misconstrued by the judge. For example, if a plaintiff seeks injunctive relief pursuant to the Administrative Procedures Act and monetary relief citing the Federal Tort Claim Act, a judge may deny the injunctive relief on the grounds that there are no provisions for such relief in the Federal Tort Claim Act and that the Administrative Procedures Act does not authorize monetary relief. Similarly, a lawsuit alleging failure of the Department of Labor to investigate a discrimination complaint against a private university was dismissed on the grounds that the plaintiff was seeking Federal employment through the courts. Even a law professor from Hofstra University complained in a speech that he was tired of reading decisions that did not address the issues of the case. At best, this means that the law professor was able to understand the issues of the lawsuit from the submissions, while the judge allegedly was not. At worst, this indicates that the judge was deliberately falsifying the issues in order to justify an obviously faulty decision. According to the law professor, after he finished his speech, a judge leaned over to him and said, "You don't know the half of it."

## 4. Certain litigants must always win

One of the most harmful practices of the courts becomes most evident when statistical surveys of the outcomes of litigation are conducted. Some judges have apparently developed strong biases for or against certain kinds of lawsuit or litigant and lose sight of the fact that each case

deserves a separate analysis. The outcomes of these lawsuits most frequently favor government agencies as defendants and major special interest groups, such as the American Civil Liberties Union, as representatives of a plaintiff. Decisions are reached without jury trial to assure that the favored litigant wins. The trend to summarily dismiss lawsuits without trials is reflected in surveys showing that more than 11% of all civil lawsuits were decided by juries in the early 1960s, while less than 2% reach a jury now.

It is not only the courts that are guilty of denying due process to protect favored litigants. Congress has also established special means of adjudication to remove the proceedings against certain agencies from the normal judicial channels. Some of the agencies established for administrative adjudication have earned a reputation for extreme bias in favor of the government agencies they are supposed to treat impartially. For example, the Merit System Protection Board (MSPB), which adjudicates complaints filed by veterans because their preference rights in the civil service have been violated, has never decided in favor of a veteran in any appeal. The United States Court of Appeals for the Federal Circuit, which is the only court with jurisdiction over appeals from the MSPB, has never decided in favor of a whistleblower, after hearing 71 appeals citing the Whistleblowers' Protection Act. It is also doubtful whether it has ever decided in favor of a veteran, although I have yet to find records on this point. It is noteworthy that under the law, the burden of proof is on the agency, and in the case of appeals filed by whistleblowers, clear and convincing evidence is required, giving whistleblowers a clear benefit of the doubt. Nevertheless, the agency always wins in such appeals, as well as those brought under veterans' laws.

The Veterans' Employment and Training Service (VETS) accepts employment discrimination complaints from veterans. All complaints it receives are not maintained in the agency files, but of 1029 complaints it did place in its records in 2001, five were brought to the courts, but only one was adjudicated as a civil lawsuit.

Any lawsuits brought by a plaintiff pro per fall into the category of "thousand to one shots," but so do discrimination lawsuits brought against government agencies with the assistance of "B" or "C-class" lawyers. Similarly, civil rights and employment discrimination lawsuits routinely fail, unless a major special interest group supports one of the parties.

Any time lawsuits that depend on an individual interpretation of the facts are decided so preponderantly in favor of one party without the assistance of a jury, suspicion of bias is justified. In conflicts between human beings, rank, job title, or affiliation do not determine which party has followed the law and which party has broken it. If the supervisor prevails one thousand times in whistleblower appeals for every time the whistleblower prevails, it is clear that the adjudication has not been impartial. This conclusion is given great support by the findings of Congress that reprisal against whistleblowers is a problem of massive proportions in the civil service, requiring several amendments to make the Whistleblowers' Protection Act considerably stronger. That the efforts of Congress have been consistently undermined by the judges on the United States Court of Appeals for the Federal Circuit reflects an imbalance that has been developing between the powers of the legislative and judicial branches in recent years.

## 5. Different standards are applied to different litigants

Powerful plaintiffs seek to delay litigation until the opponent dies or is forced to end the litigation for financial reasons. Some well-represented litigants do not respond to the summons until a motion for default has been entered, and judges routinely excuse the failure and refuse to enter a default judgment. The same judges are quick to dismiss lawsuits because a pro se plaintiff has missed a deadline by one or two days, even when the cause of the delay was beyond the control of the litigant. The lack of impartiality is plainly evident when one party is permitted unlimited delays, in spite of the fact that the United States Department of Justice or a major law firm with a large staff of lawyers is representing that party, while a pro se litigant forced to act alone is held to the strictest standards stipulated in the FRCP and local rules. Allowing one litigant unlimited delays while the other is facing severe financial difficulties as long as the lawsuit remains unsettled is a tactic that clearly violates judicial fairness and at least the spirit of the United States Constitution, which demands a speedy trial in criminal matters and, by implication, reasonable speed in settling civil disputes, as well.

## 6. Recent handling of civil lawsuits by the courts have instigated a white collar crime wave

Many successful white collar criminals have obtained the cooperation of local courts to defraud private citizens out of large sums of money, often leaving the victim destitute. A few of the methods frequently used include abuse of bankruptcy procedures to loot estates, illegal foreclosures on real estate, seizure of cash or property without due process, and fraud during divorce proceedings.

Federal courts should have jurisdiction over obvious frauds perpetrated by state courts under the RICO statute and civil rights laws. However, failure of effective action by Federal judges to stop obvious fraud perpetrated by colleagues employed by state and local government encourages larcenous state officials, including judges, to conclude that their positions allow them to illegally enrich themselves at the expense of selected victims with complete impunity.

Litigants who have sought protection from state and local criminal gangs in Federal courts have encountered many years of delays, denial of jury trials, and refusals to issue decisions justified by the facts of the case. Many abuses have come to public attention in recent years, but the crime wave has grown so rapidly, many of the practices have not received sufficient publicity to warn potential victims. Crimes like identity theft, fraudulent foreclosure, fraud in stating fees and interest charges, and abuses of eminent domain have become epidemic throughout the United States. They can financially ruin victims, who have not found effective protection through either criminal or civil procedures.

## 7. Court orders go unheeded

Failure of courts to enforce their own orders granting relief to litigants may eventually result in more difficulties than adjudicating the initial petition for relief. Plaintiffs may prevail but gain no redress from the decision because judges refuse to issue effective orders mandating the remedies demanded by a jury. This is a problem that often arises when the delinquent party is a government agency. Common examples of deliberate resistance to court orders include ignoring orders to produce documents requested under the Freedom of Information or Privacy Act and failure of public officials to obey orders to return money or property unlawfully taken from citizens by law enforcement agencies.

79

## 8. *Judges give orders contrary to law and accepted standards of behavior*

Opposite the failure to enforce just orders for relief is issuing orders demanding illegal or obviously impractical relief from litigants. Examples of practices that have become common during the past few years include demands for support payments from one party to divorce proceedings that exceed the total earnings of the person ordered to pay, jailing of indigent litigants who cannot pay what the court has demanded of them for other reasons, removal of children from their natural parents without due process, and imposition of medical treatment on minor children without informing their parents.

## 9. *Judges refuse to take actions required by law*

Many routine actions required of judges have created barriers to the enforcement of laws as intended by Congress. An excellent example of this is the action usually taken after a litigant complaints that he cannot obtain documents requested pursuant to the Freedom of Information Act. This law was passed by Congress because of the great resistance shown by Federal civil servants to making their unclassified documents available to the general public. Records created through the use of tax money should belong to the public and be made available on request.

Congress obviously intended that documents formally requested be made available immediately. It therefore specified a waiting period of no more than ten working days and permitted a person who requested the records to file a lawsuit to obtain the documents if the agency is not forthcoming. It requires agencies to assist people making requests to identify the documents and to provide the documents after charging only minimal copying fees.

Obviously, to uphold this law as Congress intended, a judge must order immediate release of the records to the court for distribution to the plaintiff after the court has ruled on any objections the agency has made to their release. Because obtaining records as quickly as possible is often necessary for a litigant to obtain some benefit to which he is entitled, complete an article for publication in a newspaper or periodical, or protect himself of a relative from the consequences of false information about him being distributed with official records, the rapid availability of records is vital.

Instead of upholding the high standards demanded by the Freedom of Information Act, judges have consistently permitted lawsuits to obtain public information to drag on for several years, often making the intended use of the documents impossible. Judges seem to attempt to avoid issuing orders to government agencies, even when the law mandates this. They fail to review contested records in camera, as provided for in the law, and simply hope the plaintiff will eventually withdraw his demand for the documents. Although obtaining documents often costs plaintiffs excessive amounts of money for the litigation, judges seldom offer the monetary relief specified in the law. They also fail to impose the requirement of the law that photocopy fees be reasonable. While private shops provide photocopies for 5 cents or less, agencies may charge exorbitant amounts to copy their documents. For example, about two years ago, one agency demanded 31 cents for each copy, or more than 6 times the price on the private market.

The failure of the courts to impose sanctions on civil servants who make it a sport to defy the Freedom of Information Act has led to the development of procedures to keep public documents out of the hands of citizens who want to obtain them.

## 10. Courts have become inconsistent and arbitrary

Courts have recently begun to establish very confusing precedents, reverse their own decisions, and ignore real issues rather than settling them. In recent years, different Courts of Appeals have issued opposite interpretations of the same law, making one action legal under the jurisdiction of one circuit and illegal under the jurisdiction of another. Because the United States Supreme Court denied certiorari each time a litigant attempted to obtain a definitive decision on some of these matters, Federal law can mean one thing in one circuit and the opposite in another. For example, whether or not Federal law permits factory workers to speak with each other in a language other than English depends upon the area of the country in which the factory is located.

Changing public opinion or even an unusual personal opinion held by the judge to whom the case has been assigned may result in a lawsuit being decided in a manner contrary to other recent decisions in nearly identical cases. When judicial opinions on the interpretation of a law are continually fluctuating because one judge approves of the law while another does not, whichever litigant loses will feel cheated by the court because other litigants in exactly in the same position won their lawsuits. This situation causes more litigants to risk a lawsuit rather than settling the dispute out of court because winning or losing depends only on the whim of the judge hearing the case rather than on a consistent and unambiguous interpretation of the law. An advantage of being represented by counsel is often the knowledge he brings concerning which judges will be sympathetic to the litigant's case and which will favor the other party. In an impartial system, such considerations would not be a factor. The founding fathers hoped to eliminate this problem by insisting that decisions be rendered by juries, but by increasingly usurping the duties of the jurors, judges have permitted their own beliefs on the wisdom of individual laws to override the stated intentions of Congress. Because all judges do not hold the same opinions, an increasing inconsistency in decisions is becoming an increasing problem for pro se litigants and lawyers, alike.

## 11. Federalism theory interferes with practical justice

In recent history, Federal courts have intervened in many disputes between citizens and individual states, where the state court system was clearly violating or assisting in the violation of civil rights. Since the first Civil Rights statutes were passed in 1871, Congress has shown a clear intent to place the guarantees in Amendments XIII, XIV, and XV above the limitations on suits against states in Amendment XI. Federal courts belatedly struck down state laws deliberately passed to bar Americans of African descent from voting, attending schools with white children, and using public facilities. These rulings have clearly focused the attention of the nation on the fact that states are prone to commit actions against their citizens that violate Federal guarantees defined as civil and human rights by our Constitution.

Recently, the theory of federalism has been revived, and Federal courts have become less willing to interfere with the actions of state courts, no matter how unjust and reprehensible. One of the most important reasons for Federal courts to exist is to provide citizens with a final recourse against clearly illegal actions committed by state and local government, which are much more likely to fall under the influence of criminal conspirators than the much more diverse Federal system. If the Federal courts disqualify themselves from settling disputes between citizens and state governments, they have clearly left the citizens vulnerable to losing their civil rights through clearly illegal actions by small, corrupt political machines.

# Remedies

## *What is the court supposed to do?*

The basic reason for establishing a judicial system is to settle disputes that are addressed by existing laws. It has been repeatedly stated by experts on matters judicial in the United States that the ultimate goal is to decide all matters on the merits. That means to most reasonable persons that the court should concern itself with two factors and only two factors: the law and the material facts. The blindfold on the statue of Justice is there to keep attention on the scales and not on the race, color, national origin, age, gender, appearance, financial condition, social position, or friends of the litigants.

It stands to reason that a pro se litigant has as much chance of being entitled to relief according to the law and the facts as the litigant with enough money to afford the services of the best law firm in the country. The reason everyone who can afford it will seek the services of a class A law firm is that the presentation of the law and facts of the case in the arguments is reputed to sway judges and juries toward the side of one client where the issues are not entirely clear. However, if skill in arguing becomes the sole criterion for determining who prevails in a lawsuit, then the courts have failed in their duty to provide a fully impartial forum for presenting the facts.

The Task Force must address one primary problem: a failure of the court to be impartial. This failure is usually apparent from the outcome of lawsuits. If pro se litigants always or almost always lose, then the courts have failed. No class of litigants is right or wrong 100% of the time. If one person comes to the court for revenge after being fired for poor performance, the court cannot conclude that the next person raising the same claim was not fired for failing to become an accomplice to illegal actions his boss is engaged in, for belonging to a race that the boss does not like, or for being too old when the boss wants only youthful employees. If a father must be kept away from children he is abusing, that does not mean that the next father who seeks custody of his children is abusing them as well. If personal property was seized from one person because of his refusal to pay taxes, it cannot be concluded that there is no merit in the lawsuit of the next person who complains that his property was illegally confiscated by corrupt public officials.

As already discussed, pro se lawsuits are increasing for several reasons, which have nothing to do with the law or the facts in each individual case. These include 1) a white collar crime wave encouraged by the failure of prosecutors and judges to focus on anything but violent crime; 2) a breakdown in government accountability resulting in civil servants wasting funds on a massive scale and abusing the rights of citizens; 3) an increasing resistance by large corporations to being held accountable for the harm they do to ordinary citizens; 4) the continual erosion of traditional values, which formerly placed limits on the excesses society would tolerate; and 5) the combination of lower earnings by the average American and the increasing fees demanded by competent lawyers. A strict enforcement of the law and increasing penalties for wrongdoing would do much to eliminate all of these reasons. Misconduct will increase as long as most perpetrators escape all consequences for their actions and penalties remain inconsequential. Supply and demand regulate what lawyers charge and will result in lower fees when the causes for the increasing number of lawsuits are eliminated.

If the courts were functioning fairly and efficiently, the outcome of a lawsuit would be relatively easy to predict according the circumstances and not dependent on non-merit factors. That means that a pro se litigant showing that his rights under any law had been violated and that he had suffered some kind of harm because of the violation would face no reduction in his chances of success because he was not represented by a lawyer. Only the law, which he would not necessarily

82

have to cite correctly, and the facts of the case would determine the outcome. Any reduction in the chances of his success with a meritorious claim would indicate that the court has not fulfilled its function. The Task Force need only focus on a pro se litigant's chance of success with a meritorious claim to have performed its duties to the complete satisfaction of all.

If a pro se litigant fails to prevail in spite of the fact that his claim is meritorious, the system has failed. The Task Force should seek remedies assuring that each meritorious claim results in the relief prescribed by law regardless of whether or not the litigant is represented by counsel. It should seek a review process by which sufficient attention is given to each lawsuit to assure that the prejudice of one judge cannot perpetrate a miscarriage of justice for any reason. This may well require an increase in the personnel assigned to review each appeal and an increased recruitment of jurors. If so, then Congress should be forcefully informed that increased funding will be required.

It should not be the concern of the Task Force that baseless claims, lawsuits filed to harass, or esoteric challenges to established institutions are not given an appreciable amount of legal aid. It should also not concern the Task Force that jury decisions are challenged by the litigants who do not prevail. However, if almost every lawsuit filed pro se is dismissed without a trial, it should be clear that due process is not being provided by the courts.

## *The solution in the United States Constitution*

The Constitution of the United States includes all necessary ingredients for making the courts function fairly and efficiently. In clear and concise English, it is demanded that every person accused of a crime and every litigant in a lawsuit involving more than $20 has a right to a trial by jury. It does not provide for judges substituting their opinions for the decision of a jury of peers. It requires speedy trial of persons indicted for crimes and assures that the common law rights enjoyed by the English colonists at the time the United States declared its independence are respected. Later amendments guaranteed every citizen equal treatment under the law.

Determining whether any claim is meritorious after the facts have been presented belongs to a jury. It is a basic right of every litigant to have a jury decide whether or not he prevails based on the evidence presented. A judge may rig the outcome of a jury trial by refusing to let a litigant present material evidence or by giving false instructions to the jury. However, most complaints by pro se litigants result from their being denied any trial by jury at all.

Any litigant, with or without counsel, must provide a complaint alleging that a specific law was violated causing him some form of damage or denying him some right. As an example, we can take the typical outcome of what should be an open and shut case to see whether the Constitution is being followed. The Privacy Act requires correction of false records concerning any citizen, and a citizen files a complaint that an agency is maintaining records about him that he alleges are false. The Court is empowered to review the record and the evidence that the person presents and order correction or removal of the record. It also authorizes damages to the person who demanded the change and reasonable legal costs. Congress expressed the demand that agency responses be prompt.

In a typical case, the agency would respond to the complaint by claiming various immunities and file a motion for dismissal based on irrelevant claims of privilege and sovereign immunity. The matter would remain on the docket for more than a year without any action being taken, and finally the judge would dismiss the lawsuit. There would be no review of the records by either a judge or a jury, no review of the evidence, no discovery to reveal other relevant matters, and no consideration of the material facts. The judge would simply have assumed that the case would have no merit because it was filed pro se and any attention given to it would be a waste of time.

In such a case, there would be no question that the plaintiff alleged a violation of a law and that the law specifically waived sovereign immunity and authorized specific relief. That records existed would not be challenged, and neither would the existence of evidence calling the accuracy of the records into question. What was lacking is a review of the challenged records, a review of the evidence, and an impartial hearing to determine whether the preponderance of evidence indicates that the records are false.

Such a decision would naturally be unpublished, keeping it from the scrutiny of the legal profession, and the judge would enjoy absolute immunity whether or not the decision was in accord with the letter and spirit of the law. It should be obvious that the simple demands made of the judiciary by the Constitution were not followed. There was no due process, no fact-finding, no review by a jury, and different treatment given to the plaintiff than he would have received if he had been represented by a major law firm or an influential organization. The remedy in this case would be simply for a judge to follow the procedures outlined in the Constitution. The improvement of the treatment of pro se litigants would simply entail following the procedures spelled out in the Constitution and in the wording of the Privacy Act, itself. By not doing this, the judge was deliberately producing a chilling effect to keep other citizens from filing lawsuits under the Privacy Act. If any government agent maliciously creates a false record after a dispute with a citizen, the record must remain to mislead anyone who reads in the future. The Privacy Act has therefore been repealed at the whim of one judge without any allegation that the statute violates the Constitution in any way, and it is made clear that the repeal by judicial fiat applies only in the case of the one plaintiff and may be reversed in the next decision if the plaintiff is deemed worthier by the judge. Equal treatment under the law therefore becomes another casualty of the court.

Another example of a failure to meet the Constitutional mandates would be a lawsuit involving employment discrimination based on age. It is evident from the wording of the law and earlier decisions of the Supreme Court that proof of motive is irrelevant in such cases because motive can be implied from circumstances. If a government agency passes over the 50-year-old plaintiff in spite of his 25 years of relevant experience and high examination score in favor of a 30-year-old applicant with three years of experience and a low examination score, the decision should provide relief for the plaintiff unless the agency can show that there was a valid reason for the choice. However, judges routinely dismiss such cases without a jury trial on the defense of a simple denial by the agency, even though any ordinary person would consider the denial to be without merit and contrary to the fact presented in the documents filed with the court. Again, the decision is unpublished, and appeal results in a rubber-stamped affirmation. With absolute immunity, the judge has nothing to fear even though a clear issue of fact remained to be decided by a jury under the Constitutional formula, and he illegally usurped the functions of the jury to create a chilling effect on the public and thereby discourage other people from filing what he regards as litigation that is too time-consuming.

In the examples given here, no problem exists with the laws cited, the issues are clear, and the relief is spelled out in the statutes. All submissions are timely, and no requirements for further fact-finding are recognized by the judge. The problem for the pro se litigants in such cases could not be remedied by better instruction on preparing submissions, assistance of law school students, or more helpful clerks. The problem is the failure of a judge to proceed according to common law and recognize the Constitutional rights of one of the litigants. It could only be remedied by making the judges follow established procedures without allowing their own personal opinions or prejudices to interfere with due process.

## *The search for remedies by the Task Force*

The remedies to the problems not addressed by the Task Force involve changing the attitudes of judges toward litigants. While there are people who attempt to convince the court to make fundamental changes rightfully belonging to the legislative branch and others who use litigation for revenge or to vex an enemy, most people seeking the assistance of a court to settle a dispute do so because necessity demands it. Some people are forced to file several lawsuits because unscrupulous office holders are able to create multiple problems for them, motivated by personal dislike, political disputes, or a desire to obtain a coveted piece of property. The civil rights movement clearly revealed the extent to which officers of state and local government, including judges, are willing to go to violate the rights of individuals because of their political activities or because they belong to certain minorities. Federal courts are the last resort of many people who find themselves robbed of their fundamental rights.

The remedies suggested by the Task Force might be sufficient if all judges and court officials were competent, honest, and incorruptible. If one judge does not live up to the high standards demanded of him, there must be some kind of machinery established to undo the damage he does. However, a litigant soon finds that if he is unfortunate enough to have his case assigned to a less than competent, opinionated, or dishonest judge, his chances for redress of his grievances have been eliminated even before the proceedings start. The eclipse of the jury trial as the main means of settling lawsuits has brought about a preponderance of "fast track" summary judgements, rubber stamped by inattentive appeals court judges, and deemed unworthy of consideration by the Supreme Court. Judges have made themselves impervious to complaints of misconduct and have even provided immunity to anyone employed by any government agency. The pro se plaintiff is therefore left without legal, civil, or human rights for want of a means of having those rights recognized and upheld.

Short of setting up an entirely new system of courts to pass judgement on the ones we already have, remedies will have to entail a more impartial treatment of lawsuits by judges. A person's social standing must no longer have an impact on a court's decision. The best way of preventing lawsuits from being rigged in favor of an influential or political powerful litigant is to leave decisions to a jury. If individual jurors are biased, there should hopefully be other jurors on the same jury who will hold different opinions. It is also much more difficult to influence 12 randomly selected citizens than it is to improperly influence one judge. Jury trials are made mandatory by the Constitution in most cases, so there is no reason for them to be denied short of a litigant's obvious failure to demonstrate any law that might authorize relief of any kind.

The overriding factor that will eliminate almost all genuine problems faced by pro se litigants is a restoration of strict ethics and impartiality to members of the court. If a person's legal rights have been violated, it is an absolute duty of the judge to provide him with a fair hearing and every opportunity to present the evidence that he has. If the judge does this, allows the issues of fact to be decided by an impartial jury, and provides equitable relief to the prevailing party, the recommendations of the Task Force would be sufficient to provide fairness to pro se litigants. If, however, any judge fails to live up to his responsibilities, there must be another means of redress provided to correct the injustice created by the court when it denies due process. An oversight body would have to be sufficiently independent, unbiased, and competent to determine not only the merits of the original lawsuit but also the fairness of the presiding judge. A special grand jury composed of ordinary citizens might be established to pre-sort all lawsuits in order to recommend those that lack merit for early dismissal and refer all others to the judge for trial by jury. It might also be given oversight of the actions of judges that may be prejudicial to one of the parties.

85

An alternative to this would be to remove all civil immunity from judges. This might result in a flood of lawsuits against judges, but it would be a deterrent to unjustified dismissal of lawsuits prior to jury trial. Aside from obviously doctoring the evidence or giving the jury false information about the laws under which the lawsuit was brought, no failure by the judge could result in his being found liable for misconduct as long as he permitted the decision to be made by a jury.

Other effective remedies might also be found, but it is suggested here that the Task Force should consider the worst case scenario, in which all judges handling the initial proceedings and the appeals fail to perform their duties in the prescribed way. It should then consider the best methods to 1) uphold the litigant's legal rights by overturning the initial decision against him; 2) take action against the judge who rendered the decision to prevent the incident from repeating itself during actions brought by other litigants; 3) hold a trial by jury unless waived by all litigants; 4) provide suitable relief, and 5) see to it that the orders of the court are promptly carried out.

# Closing Words

No demands are made here other than that the courts function as close to the system foreseen by the founding fathers as humanly possible. A decision for a lawsuit on the merits with consideration given only to the law and the material facts has become an unattainable dream for the majority of American citizens. Errors cannot be avoided, but it is the duty of all judges sitting on a court to minimize errors to the point that they become extremely rare. Many of the cases tossed out of the courts based on flimsy technicalities involve the life savings, health, or even the survival of one of the litigants. The Task Force is in an excellent position to insist on a review of the court's actions, and it should do so. If bias for or against members of any one group is found, swift action should be taken to correct the injustice. In the long run, it will depend upon the court itself to determine whether or not it wants to bring justice under the law to all people who seek relief from it. If the court takes effective action, the improvement will surely quiet all criticism. If it does not, public indignation is sure to increase to the point that Congress will be required to take some decisive action.

APPENDIX J. JUDGES GONE WILD, WORLD NET DAILY
COMMENTARY NOV. 3, 2007

# JUDGES GONE WILD

By Ellis Washington
November 3, 2007
WorldNetDaily.com Exclusive Commentary
http://worldnetdaily.com/news/article.asp?ARTICLE_ID=58482

*Ellis Washington, former editor at The Michigan Law Review and law clerk at The Rutherford Institute, is a graduate of John Marshall Law School and a lecturer and freelance writer on constitutional law, legal history, political philosophy and critical race theory. He has written over a dozen law review articles and several books, including "The Inseparability of Law and Morality: The Constitution, Natural Law and the Rule of Law" (2002). See his law review article "Reply to Judge Richard Posner." Washington has just completed the manuscript to his latest book, "The Nuremberg Trials: Last Tragedy of the Holocaust" (2007).*

**There was in a city a judge, which feared not God neither regarded man.**
~ Saint Luke

**The Constitution isn't a suicide pact.**
~ Justice Robert H. Jackson

In our modern, post-Christian, post-monarchy, post-Enlightenment, post-rational society, the closest thing our humanist culture has to a "god" is the judge. In 1907, Chief Justice Charles Evan Hughes famously remarked: "We are under a Constitution, but the Constitution is what the judge says it is." Case closed! This inimical judicial philosophy was enshrined early in American constitutional law by that controversial Supreme Court decision authored by Chief Justice John Marshall, Marbury v. Madison (1803).

The Marbury opinion invented out of whole cloth what latter became known as the doctrine of "judicial review" and gave to judges what was traditionally a limited and discrete power to now with godlike authority dictate what the law is (judicial interpretation). But here is the diabolical part: Where no law existed, or the law was vague about what Congress intended, this newly created Super Judge (whom law professor Ronald Dworkin calls "Hercules") could decree to We the People – the ignorant, unwashed masses – what the law ought to be. The radical effects on constitutional law, on jurisprudence, on the rule of law, on society caused

87

by the Marbury v. Madison decision over 200 years ago are still being felt in modern times, with more horrible consequences to come.

### Judge gone wild No. 1: Roy L. Pearson Jr.

Last week, Roy L. Pearson Jr., the judge that infamously sued a mom and pop dry cleaners for $54 million for allegedly loosing his pants that he brought in for $10.50 worth of alterations, has served two years on the bench of the Office of Administrative Hearings. Thankfully, the case against Custom Cleaners and the Chungs was decided in their favor in June. However, because of mounting legal expenses due to Judge Pearson's frivolous and outrageous lawsuit against them, the Chungs were forced to sell their cleaners where the incident occurred.

Although Pearson's two-year term was up in May, remarkably he still remains on the payroll at a $100,000 annual salary as an "attorney adviser." However, the Commission on Selection and Tenure of Administrative Law Judges finally decided last Tuesday evening not to reappoint him. All they have to do is send him a formal letter.

Judge Pearson isn't as much of an aberration, as the mainstream legal community would have you believe. Sure, $54 million is outrageously exorbitant, but setting the monetary value aside, Pearson's action was ultimately an attempted rape of our legal system, a violation of his sacred oath as a judge.

Like that shyster ex-DA from Durham, N.C., who brought bogus rape charges against three Duke lacrosse players (Mike Nifong), we can only hope that Judge Pearson will not only never work as a judge again, but like his ideological twin, he will eventually be disbarred. Clearly, he has some cognitive issues that need immediate attention by a neutral and dispassionate professional.

### Judge gone wild No. 2: John Coughenour

In January of this year, federal appeals court Judge John Coughenour, using Marbury jurisprudence, vacated a sentence against none other than Ahmed Ressam, the Algerian Muslim who tried unsuccessfully to blow up the Los Angeles International Airport. But for the sharp eye of a U.S.-Canadian border agent, this terrorist would have brought in the 21st century with a big bang for the U.S.

In an Associated Press story that came out on Wednesday about the Ressam case, which is being appealed by the Justice Department to the Supreme Court, the reporter wrote:

The U.S. Supreme Court has been asked to intervene in what federal prosecutors say is a procedural gaffe that led to a too-lenient sentence for a terrorist who brought explosive devices into Port Angeles in 1999.

A federal appellate court's decision to toss one of the charges against Ahmed Ressam – an Algerian national who trained in one of the Afghanistan camps of Osama bin Laden before going to Canada – could "significantly diminish" the

government's ability to prosecute terrorists, the Justice Department wrote Thursday in asking the Supreme Court to take the case.

Ressam was sentenced to 22 years in prison in 2005 after being convicted on nine counts for plotting to bomb Los Angeles International Airport around Jan. 1, 2000 – more than one and a half years before the Sept. 11, 2001, terrorist attacks in New York and outside of Washington, D.C.

Prosecutors had asked for at least 35 years in federal prison.

Political analyst Michelle Malkin, writing on her blog about the Ressam case and Judge Coughenhour, whom she called "Hitler's little helper," stated:

Whatever the message the judge hoped to send, the one he in fact did send was to Islamicists all around the globe: Come to America. Try and kill us. Either you succeed and get to your version of heaven, or you'll get a second chance 22 years later after spending a couple of decades setting up networks that can help you with round 2. ... I am ashamed to say Judge Coughenour is a Reagan appointee.

In 2005, Malkin states that Coughenour was the original judge that came up with the 22-year sentence initially and, despite the urging of his colleagues, refused to justify his legal reasoning. Incredulously, he sent the case back to the lower court for them to justify why he (Coughenour) gave Ressam a 22-year sentence in the first place. If you are confused, dear reader, then so am I.

### Judge gone wild No. 3: Justice Stephen Breyer

Justice Stephen Breyer, in a CNN interview with former Justice Sandra Day O'Connor in late 2006, was unusually candid about his vision of a Supreme Court oligarchy when he stated: "The best guarantee that minorities will not be oppressed, that the Constitution will be lived up to, is to give that very last word – under narrow circumstances – to a group of judges." He later said, "Someone has to have the last word."

Yes, Justice Breyer, I agree that someone has to have the last word. However, while your only job as a justice of the Supreme Court is to interpret the Constitution, the legislature (Congress), elected by their voting constituencies (We the People), under our republic, must have the last word on not only what the law is, but what the law ought to be. Remember the words of Justice Robert Jackson, who said, "The Constitution isn't a suicide pact." In my opinion, a cadre of five justices having the omnipotence to force Americans to be or not to be is a suicide pact.

America, if we fail in our duty to reign in these renegade judges at all levels, our culture will always be held hostage by the "Tyranny of One," and society will increasingly witness these alarming examples of judges gone wild.

# APPENDIX K. ENDING ATTORNEY AND JUDICIAL TYRANNY, OP-ED, OCT. 25, 2007

# ENDING ATTORNEY AND JUDICIAL TYRANNY

by Lloyd Selberg
Filed under OP/ED, Vox Populi
October 25, 2007
http://mensnewsdaily.com/2007/10/25/ending-attorney-and-judicial-tyranny/

In America, It's YOUR choice.

Fundamental to our American way of life is law and order. No one including the legal profession is above the law. For years the legal profession has set itself up as a self-policing branch of government and purports to determine for the rest of society what is "legal" and "not legal" supposedly rationally applying the law of the land as established by our Constitution and legislatively established statue law. This worked in a righteous society were the honorable and ethical outnumbered the unrighteous, but that has changed. Few realize how the legal profession makes its own rules and case law that serves attorney interest more than public interest.

Take heed: Millions of Americans including several in the US legislature and one presidential candidate profess the following to be the word of GOD: "And now behold, I say unto you, that the foundation of the destruction of this people is beginning to be laid by the unrighteousness of your lawyers and your judges." - Alma 10:27

With America's taming of the West power shifted from might-is-right to law. If the arena of power is in law, a theoretical good, the structure of power is in the legal profession, the top of the food chain – and therein lays the potential for mischief. Lawyers could be called this country's Nomenklatura, and the rest of us the Proletariat.

Our American laws were derived from English law and that from Roman law based in Judeo-Christian teachings. We now have over 34 million laws and are still grinding them out; yet we haven't improved on the Ten Commandments. James Madison observed "It will be of little avail to the people that the laws are made by men of their own choice if the laws be so voluminous that they cannot be read or so incoherent that they cannot be understood."

Law reflects, but in no sense determines the moral worth of a society.... The better the society, the less law there will be. In Heaven, there will be no law, and the lion will lie down with the lamb.... The worse the society, the more law there will be. In Hell, there will be nothing but law, and due process will be meticulously

observed." - Grant Gilmore, The Age of Anxiety published in the Yale Law Journal (1975)

We have created our own living HELL. Modern law ought to be a science, but has become a hocus pocus quagmire, masquerading behind an elaborate sham in which nearly any preconceived opinion can be found, justified, or accommodated. Laws encircle us all; but, like locked doors, seem to be most effective against the honest; they are what the innocent abide by and the guilty manipulate. Dickens observed "the one great principle of the...law is to make business for itself."

Over the history of America, the fundamental religious principles of equity, fairness and justice have become totally perverted by self-serving attorneys that feed on contention and specializes in finding perverted meaning in words. Attorneys live in a world so divorced from reality that they can argue over the meaning of any word. Recall the arguments Bill Clinton, a Yale Law School graduate, offered regarding the meaning of the word "is." When the Constitution and statute law are nothing but words and words are meaningless we have a serious problem.

Man's law as determined by our current legal system has become simply meaningless with justice defined not by law but rather by emotion, empathy, political correctness and wealth. Mountains of contradictory case law rulings have evolved over the past two century and leave a judge to simply do as they please and play Humpty Dumpty.

"When I use a word," Humpty Dumpty said in rather a scornful tone, "it means just what I chose it to mean - neither more nor less." "The question is," said Alice, "whether you can make words mean so many different things." "The question is," said Humpty Dumpty, "which is to be master - that's all." -Lewis Carroll

God offered his law in the Ten Commandments sufficiently brief to be carved on two stone tablets. It's notable that GOD didn't provide an attorney to interpret them and found no reason to promote a profession dedicated to asking, "What do you want these words to mean?"

The present level of government domination of private affairs violates the principles this country was founded upon. The historic proposition that people are the masters and government is the servant has been reversed. Only summary, or shotgun-justice, is typically found within it. The only difference between law and politics is the spelling. This trend can and must be reversed.

For years the belief that the consequences of exposing corrupt judges and attorneys was not in the best interest of the public as it would undermine public confidence has supported the concept that the judiciary should police itself. Public exposure of a corrupt judge or prosecuting attorney would bring into question all previous cases involving them. This argument may have merit, but the time has come for change when even the dogs on the street are aware of the corruption and attorney jokes are more true than funny. The public outcry of obvious self serving prosecution in the Duke Lacrosse Case has brought this issue to the forefront.

What can be done to reestablish honesty, integrity and general moral character to the legal profession? The American Bar Association Model Rules of Professional Conduct that have been adopted as state supreme court procedural rules in most all states with few alterations to insure the legal profession operate in an ethical manner. It contains two basic parts establishing a code of conduct for judges as well as attorneys. It provides that judges are primarily to police the attorneys and their peers. The supreme court rules generally provide also for a "disciplinary counsel to receive complaints directly from the public regarding unethical attorney behavior, but this counsel refuse to investigate unethical behavior condoned by the judge hearing any given litigation. Herein lies a significant problem as the judge is likely a friend of the very attorneys and other judges he is required to police. It's a classic case of the fox guarding the chicken coop.

If the Model Rules were enforced, to the same extent as parking violations, it would correct many of the ills that plague society including the family courts. Unfortunately judges are not politically in a position to effectively police attorneys, much less other judges. If we continue to ignore the problem the result will be societal collapse with resulting anarchy.

Nothing but public apathy and ignorance prevent this code of professional conduct from being changed from supreme court procedural rules to statue criminal law with public funded investigation and enforcement. Removing the secrecy of prosecution of corrupt legal professionals and the very knowledge of scrutiny will have a significant positive effect.

I checked the Missouri Constitution and find that Article 5, Section 5 assures the Legislature the authority superior to the Judiciary and its Supreme Court Rules. Article 5 Section 5 of the Missouri Constitution states, "Any rule may be annulled or amended in whole or in part by a law limited to the purpose." The public, not the state Bar CAN determine how and when attorneys and judges are prosecuted for ethical violations.

The simple act making false representation of material fact by attorneys has no meaning to a group that can't define the word "is." It is the stock and trade of the legal profession. The public is left to pay someone to misrepresent or distort facts with immunity when a witness or pro se litigant is subject to prosecution for perjury. It gives the legal profession an unfair advantage in any legal proceeding where a party lacks counsel. The more skillful the misrepresentation of fact, the more an attorney is worth.

This neglects the presumption of attorney's and the court's knowledge of the law. How often an attorney, especially when dealing with a pro se litigant, will knowingly argue law contrary to that accepted and the judge, though knowing it to be incorrect will accept it because no one objects. A person unaware of the law and perhaps more often the court rules are unable to act without an attorney and are

therefore at the attorney's mercy with no assurance that they are acting ethically with do diligence.

No where are attorney ethics more abused than in family law and other courts of equity or civil matters. Years ago I was personally criminally prosecuted and found my self appealing a criminal conviction only to have the presiding appellant judge ask the prosecutor why he had chosen to prosecute me rather than others far more guilty of the same offense. The prosecutor replied that I had expressed direct and open contempt for the ruling in a civil proceeding. The words of the presiding appellant judge were almost unbelievable. He expressed that after years on the bench, he had little other than outright contempt for most of what he had witness in civil proceedings and proceeded to ask the assistant district attorney if he planned to trump up criminal charges against him for expressing what he know to be true. Prosecutors like Mike Nifong and Don Hymer aren't interested in justice or ethical behavior, rather they are interest in self-serving gratification and politically correct public support.

Let's review the ABA's Rule 8.4 offering a general statement of misconduct.

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice;

(e) state or imply an ability to influence improperly a government agency or official or to achieve results by means that violate the Rules of Professional Conduct or other law; or

(f) knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law.

Most would find Model Rule 8.4 sufficient to define legal ethics independent of the additional few hundred words composing the balance of the Model Rules. NOT Attorneys! They are so adapted to making work for themselves by arguing that it apparently takes "highly educated" men years to understand all of the possible perverted meanings of a few hundred words. The public would not have much of a problem deciding innocence or guilt based on these words.

Is it not fundament to religious teachings that contention is the work of the devil? We are to strive to avoid contention and forgive rather than pursue a "sue the bastard" mentality so promoted today. Was this not the rational behind the ethical prohibition of attorney advertizing common for most of the 20th century?

93

Don't you love those "We make 'em pay" TV ads where the law firm of Dewey, Cheetam and Hough, advertizes that they have recovered damages "in excess of a billion dollars for clients" without mention of what portion the billion dollars they keep? If the legal profession had ethics it would charge fees based on services rendered, not what they can extort by threaten or protracted litigation.

A good physician certainly deserves a good living for doing his best to save someone's life, but his charge today represents twice what he requires, with half going to the legal profession as insurance against his error. Is it justified? Attorneys won't sue just the physician committing the error, but insist on suing everyone involved with the hope of more money from "deeper pockets". Is this in public's best interest?

Consider the amount of this country's Gross Domestic Product that is represented by the legal profession. Billions of dollars are earned annually by a profession that can't agree on anything and thrives in contention producing nothing of tangible value for the nation. This "service" is actually counter productive to the businesses that actually do produce tangible goods that expand our nation's wealth. How long can the nation survive when more is spent arguing legal matters and shuffling paper than producing things of value? Can a productive society exist when attorneys have substituted, "caveat venditor," let the seller beware for "caveat emptor," let the buyer beware.

A fool that chooses to use his power lawn mower to trim his toenails and his attorney are assured a financial reward should the manufacture not post a prominent warning that the mower that it is not to be used to trim toenails. It's surprising that we manufacture or do anything in this litigious environment.

The university chemist department where I formerly worked has been stripped of almost all chemicals and instruments out of fear that they are "dangerous" and may promote ligation. Learn chemistry by computer simulation is the rule of the day. Sorry it doesn't work. Life is dangerous and self-serving attorneys attempting to defy natural selection of the least fit will breed a nation of fools that can't survive.

Currently Missouri Supreme Court rules requires attorney ethics violations be prosecuted by their appointed Chief Disciplinary Counsel before the supreme court en banc. When the legal ethics violations must be tried before the state supreme court, the odds are highly against many successful prosecutions as for all involved, the words are all but meaningless.

I believe the Missouri Office of Chief Disciplinary Counsel has fourteen full time attorneys to investigate and prosecute attorney ethics violations in Missouri. They must spend their full time responding to public complaints by telling the public that what they perceive to be ethics violations don't exist as almost never does the media report an ongoing ethics investigation.

It's past time the public regain control over the legal profession and insist on public trials of ethics violations. If there ever were justification for government

94

intervention and wage control in a free enterprise society, it would include first and foremost the legal profession.

The family destruction and separation of children from their parents promoted by the family law industry is likely to go down in history as equivalent to the German holocaust. From biblical times the family has been the fundamental unit of society and seen by early philosophers to be the greatest obstacle to tyrannical government control. Today unethical attorneys for personal gain wallow in our personal lives destroying the last barrier to the totalitarian state.

I read one state ethics ruling finding that an attorney's moral character has nothing to do his professional character. Apparently, a thirty-something mini-skirted, bimbo with a "bar card" that is sleeping with a judge is ethically qualified to be appointed as a guardian-ad-litem and make decisions on your children's future. Like the prostitute she is, just pay her the going price for a custody decision. Heaven help the father that doesn't see his daughter's pole dancing interest to be a healthy expression of her "sluttyness" as a positive value. How long can society tolerate this?

Custody has become merely a commodity for sale to the highest bidder. Family law as legislated has become totally irrelevant as case law has promoted "judicial discretion" to judicial omnipotence. Ask your state legislature why they bother to enact family law when it is totally subordinate to judicial discretion.

I encourage all to contact their legislators and demand legislation regulating the legal profession. A simple start is to establish the ABA code of Ethical Conduct as criminal law.

If society can afford meter maids to enforce parking violations, it can surly afford a police force to enforce legal ethics and not leave the fox guarding the chicken coop. It is surprising how many law enforcement officers are also appalled by the legal profession. The media is there with dash cam video to insure the law enforcement officers every action is ethical. Perhaps it's time for court room and judicial chambers surveillance A/V cameras to confirm what really happens behind closed doors.

## APPENDIX L.  PHYLLIS SCHLAFLY SPEAKS OUT ON JUDICIAL ACTIVISM, OCTOBER 18, 2007

# PHYLLIS SCHLAFLY SPEAKS OUT ON JUDICIAL ACTIVISM

**By Colleen Walsh**
*Harvard University Gazette Online*
*Harvard News Office*
http://www.news.harvard.edu/gazette/2007/10.18/11-schlafly.html

The woman credited with defeating the Equal Rights Amendment was on the Radcliffe campus last week to discuss the current target in her crosshairs: judicial activism.

Phyllis Schlafly, who received her master's in government from Harvard in 1945, delivered the first of the 2007-08 Radcliffe Institute for Advanced Study's Dean's Lectures on Monday (Oct. 15).

The activist, author, and founder of the Eagle Forum, a grassroots organization that promotes citizen participation in government, focused her aim squarely on what she calls the country's activist judges and their "supremacist" attitude. She believes that they are influencing the culture of the country with decisions that have no basis in the U.S. Constitution.

Schlafly, author of "The Supremacists: The Tyranny of Judges And How to Stop It," said that the role of a judge should be like that of a baseball umpire.

"Our nation needs judges for the same reason that a baseball game needs an umpire; someone has to call the balls and strikes," she said. But, she argued, fans would never accept an umpire who changed the rules of the game. "And likewise we should not tolerate judges who ignore, bypass, or change the wording of the Constitution."

Her talk at the Agassiz Theatre in Radcliffe Yard before a modest crowd was titled "The Culture Wars in the Courts" and examined six cultural areas: property rights, parents' rights, pornography restrictions, abortion regulations, and religion, all of which she said have been significantly influenced by recent court decisions.

Schlafly gave her talk in a rapid-fire style, possibly honed in the 1940s when she put herself through college as a gunner testing ammunition in rifles and machine guns. She didn't miss a beat when approximately 20 students, many of them from Harvard Divinity School, stood early in her lecture and filed silently out of the hall to protest what they called her "ministry of hate."

According to Schlafly, Chief Justice Earl Warren was at the heart of what she sees as the breakdown of the Supreme Court. His appointment in 1953, she contended, opened the door to a host of far-reaching social, political, and economic decisions that continue to the present day.

"In the 1950s, Chief Justice Warren set out to make the Supreme Court the most powerful branch of government," she said.

And where the Supreme Court goes, asserted Schlafly, the lower federal courts follow.

Parents' rights have been deeply affected by the judicial system, she said.

"In 2005, the 9th Circuit Court ruled that parents' fundamental rights to control the upbringing of their children does not extend beyond the threshold of the school door," said Schlafly. That ruling, she argued, has exposed children to a wide range of material chosen by the schools that is "pornographic, depressing, age-inappropriate and uses language that is profane."

In 1954, Schlafly said, the Warren court re-interpreted the wording in the Fifth Amendment that prohibits the government from taking private property except for a public use to read public interest, or purpose. That change led to a trend of aggressive property acquisition nationwide, Schlafly argued, that wrested private property out of the hands of private citizens and gave it to corporations that could pay higher taxes.

In the 1960s, Schlafly said, the court reversed dozens of pornography cases, "making laws against obscenity impossible to enforce and thereby drastically lowering community decency standards."

That new freedom, she added, had a negative impact on society that extended into neighborhood movie theaters.

"In 1965, the 'best picture' was 'The Sound of Music,' she said. "In 1969, the 'best picture' was 'Midnight Cowboy.'"

The author defined marriage as the union of a man and a woman and said it has suffered under activist judges. Schlafly said one has to look no further than the ruling of the Massachusetts Supreme Court in 2003 that legalized same-sex marriage to find what she called a "broadside attack on our culture."

The Roe v. Wade ruling in 1973 that struck down abortion laws across the country, "grabbed a legislative function away from state legislatures and imposed a judicial fiat without any textual basis in the U.S. Constitution," said Schlafly.

Religion, too — a fundamental part of the moral fiber of the nation, said Schlafly — has been cast aside by the courts. She cited the example of the 9th Circuit Court, which ruled unconstitutional the reciting of the Pledge of Allegiance in public schools because of its reference to God, and the Warren Court's restrictions on prayer and Bible reading in public schools.

In responding to questions after her talk, Schlafly returned time and again to her basic premise that the courts should adhere to the strict language of the Constitution and not use terms such as "emerging awareness" or "evolving standards" to broaden its definition and impose their own personal beliefs about culture on society.

"The only reasonable basis for a court decision is the language of the Constitution itself," she said.

She also urged Congress to limit the power of the judiciary.

"[It's] the duty of Congress to restore the judiciary to its proper role and to protect America from judicial usurpation."

# APPENDIX M: EVIDENCE OF JUDICIAL TREASON AGAINST THE U.S. CONSTITUTION UNDER COHENS V. VIRGINIA

(Begins after this page)

ANNOTATED

# In the U.S. District Court for the District of Columbia
### 333 Constitution Avenue, Washington, DC 20001
## No. 1:07-cv-1616-RMC

| | | |
|---|---|---|
| Don Hamrick, pro se | ) | **Civil RICO Act, 18 U.S.C. § 1964(a)** |
| ***IN THE CAPACITY OF A*** | ) | ●Threefold Damages: $14 million |
| ***PRIVATE ATTORNEY GENERAL*** | ) | Under 18 U.S.C. § 1964(c) Civil Remedies. |
| 5860 Wilburn Road | ) | ●Service by U.S. Marshals Service |
| Wilburn, AR 72179 | ) | In Accordance with Rule 4(c)(2). |
| *PLAINTIFF/APPELLANT* | ) | ●Filing Fee Exempt under |
| v. | ) | 28 U.S.C. § 1916 |
| United States | ) | Plaintiff is a Seaman |
| United Nations | ) | JURY TRIAL DEMANDED |
| *DEFENDANTS/APPELLEE* | ) | |

*EMERGENCY*
## PETITION FOR EX PARTE ORDER
## VERIFYING AND VALIDATING PLAINTIFF'S
## CITIZEN'S ARREST WARRANTS
## AND

## PETITION FOR EX PARTE ORDER
## TO FEDERAL LAW ENFORCEMENT AGENCIES TO
## ASSIST THE PLAINTIFF WITH THE
## CITIZEN'S ARREST WARRANT

*Leave to File GRANTED Rosemary M Collyer 10/9/07*

I, Don Hamrick, hereby Petition for Ex Parte hearing with Judge Rosemary M. Collyer on the matter of the Citizen's Arrest Warrants appended herein.

Respectfully,

*Don Hamrick*

Don Hamrick

# RECEIVED

OCT - 3 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# CASE LAW

*Cohens* v. *Virginia*, 19 U.S. 264, at 404 (6 Wheaton 264) (1821)

"It is most true that this Court will not take jurisdiction if it should not; but it is equally true that it must take jurisdiction if it should. The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the Constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given than to usurp that which is not given. The one or the other would be treason to the Constitution. Questions may occur which we would gladly avoid, but we cannot avoid them. All we can do is to exercise our best judgment and conscientiously to perform our duty. In doing this on the present occasion, we find this tribunal invested with appellate jurisdiction in all cases arising under the Constitution and laws of the United States. We find no exception to this grant, and we cannot insert one."

*Mireles* v. *Waco*, 502 U.S. 9, at 11 (1991):

. . . a judge is not immune from liability for nonjudicial actions, i.e., actions not taken in the judge's judicial capacity. Forrester v. White, 484 U.S., at 227 -229; Stump v. Sparkman, 435 U.S., at 360. *Collection of filing fees is NOT a judicial function but an Administrative function.*

*Chandler* v. *Judicial Council*, 398 U.S. 74, at 140 (1970), Chief Justice Berger:

"If [judges] break a law, they can be prosecuted."

*Chandler* v. *Judicial Council*, 398 U.S. 74, at 141-142 (1970), Justice Black and Douglas in their dissenting opinion agreed with Chief Justice Berger on the point made above:

"While judges, like other people, can be tried, convicted, and punished for crimes . . ."

HAINES V. KERNER, 92 S.Ct. 594; JENKINS V. MCKEITHEN, 395 US 411, 421 (1969); PICKING V. PENNA. RWY. CO. 151 F.2d 240; PUCKETT V. COX, 456 F.2d 233

Pro Se (Without a Lawyer, representing self) pleadings are to be considered without technicality; pro se litigants pleadings are not to be held to the same high standards of perfection as lawyers.

US v. GUEST, 86 S.Ct. 1170; US v.COMPAGNA, 146 F.2d 524

A conspirator is responsible for the acts of other conspirators who have left the conspiracy before he joined it, or joined after he left it; statutes of limitations tolled for previous acts when each new act is done.

YICK WO V. HOPKINS, 118 S.Ct. 356 (1886)

Laws and Court procedures that are "fair on their faces" but administered "with an evil eye and a heavy hand" (discriminatorily) are unconstitutional.

*United States* v. *Lee*, 106 U.S. 196, at 220 (1882):

"No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to

the lowest, are creatures of the law and are bound to obey it. It is the only supreme power in our system of government, and every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives."

*Duncan v. Missouri*, 152 U.S. 377, 382 (1894):

"[T]he privileges and immunities of citizens of the United States protected by the fourteenth amendment are privileges and immunities arising out of the nature and essential character of the federal government, and granted or secured by the constitution; and due process of law and the equal protection of the laws are secured if the laws operate on all alike, and do not subject the individual to an arbitrary exercise of the powers of government; . . ."

*Wilson v. State*, 33 **Arkansas**, 557, 560 (1878) (*striking a ban on unconcealed carry*).

"If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be pre vented by the penitentiary and gallows, and not by a general deprivation of a constitutional privilege."

*Hartford Fire Ins. Co. v. California*, 509 U.S. 764 (1993) **[PLAINTIFF'S NOTE: "I CAN PROVE MY CASE if the Federal Courts were not so corrupt!]**

"[A] complaint should not be dismissed unless `it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 246 (1980) (quoting **Conley v. Gibson, 355 U.S. 41, 45 -46 (1957)**).

*Conley v. Gibson*, 355 U.S. 41 at 48 (1957)

"Following the simple guide of Rule 8 (f) that "all pleadings shall be so construed as to do substantial justice," we have no doubt that petitioners' complaint adequately set forth a claim and gave the respondents fair notice of its basis. The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits. Cf. *Maty v. Grasselli Chemical Co.*, 303 U.S. 197. (1938) (*Pleadings are intended to serve as a means of arriving at fair and just settlements of controversies between litigants. They should not raise barriers which prevent the achievement of that end.*)

*United States v. Chadwick*, 433 U.S. 1, at 16 (1976)

" . . . it is deeply distressing that the Department of Justice, whose mission is to protect the constitutional liberties of the people of the United States, should even appear to be seeking to subvert them by extreme and dubious legal arguments. It is gratifying that the Court today unanimously rejects the Government's position."

*Forrester* v. *White*, 484 U.S. 219 (1988):

This Court has never undertaken to articulate a precise and general definition of the class of acts entitled to immunity. The decided cases, however, suggest an intelligible distinction between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform. Thus, for example, the informal and ex parte nature of a proceeding has not been thought to imply that an act otherwise within a judge's lawful jurisdiction was deprived of its judicial character. See Stump v. Sparkman, 435 U.S. 349, 363 , n. 12 (1978). Similarly, acting to disbar an attorney as a sanction for contempt of court, by invoking a power "possessed by all courts which have authority to admit attorneys to practice," does not become less judicial by virtue of an allegation of malice or corruption of motive. Bradley v. Fisher, 13 Wall., at 354. [484 U.S. 219, 228]   As the Bradley Court noted: "Against the consequences of [judges'] erroneous or irregular action, from whatever motives proceeding, the law has provided for private parties numerous remedies, and to those remedies they must, in such cases, resort." Ibid.

Administrative decisions, even though they may be essential to the very functioning of the courts, have not similarly been regarded as judicial acts. In Ex parte Virginia, 100 U.S. 339 (1880), for example, this Court declined to extend immunity to a county judge who had been charged in a criminal indictment with discriminating on the basis of race in selecting trial jurors for the county's courts. The Court reasoned:

> "Whether the act done by him was judicial or not is to be determined by its character, and not by the character of the agent. Whether he was a county judge or not is of no importance. The duty of selecting jurors might as well have been committed to a private person as to one holding the office of a judge. . . . That the jurors are selected for a court makes no difference. So are court-criers, tipstaves, sheriffs, &c. Is their election or their appointment a judicial act?" Id., at 348.

Although this case involved a criminal charge against a judge, the reach of the Court's analysis was not in any obvious way confined by that circumstance.

Likewise, judicial immunity has not been extended to judges acting to promulgate a code of conduct for attorneys. Supreme Court of Virginia v. Consumers Union of United States, Inc., 446 U.S. 719 (1980). In explaining why legislative, rather than judicial, immunity furnished the appropriate standard, we said: "Although it is clear that under Virginia law the issuance of the Bar Code was a proper function of the Virginia Court, propounding the Code was not an act of adjudication but one of rulemaking." Id., at 731. Similarly, in the same case, we held that judges acting to enforce the Bar Code would be treated like prosecutors, and thus would [484 U.S. 219, 229]   be amenable to suit for injunctive and declaratory relief. Id., at 734-737. Cf. Pulliam v. Allen, 466 U.S. 522 (1984). Once again, it was the nature of the function performed, not the identity of the actor who performed it, that informed our immunity analysis.

# In the U.S. District Court for the District of Columbia
### 333 Constitution Avenue, Washington, DC 20001
## No. 1:07-cv-1616-RMC

| | | |
|---|---|---|
| Don Hamrick, pro se | ) | |
| *IN THE CAPACITY OF A* | ) | |
| *PRIVATE ATTORNEY GENERAL* | ) | **Civil RICO Act, 18 U.S.C. § 1964(a)** |
| 5860 Wilburn Road | ) | |
| Wilburn, AR 72179 | ) | |
| *PLAINTIFF/APPELLANT* | ) | |
| v. | ) | |
| United States | ) | |
| United Nations | ) | |
| *DEFENDANTS/APPELLEE* | ) | |

# ORDER

Based upon the certification of the Court Order from the U.S. District Court for the Western District of North Carolina, Charlotte Division, Case No. 3:04-cv-0344, November 9, 2006 acknowledge the Plaintiff's statutory right to the filing fee exemption provided under the Seamen's Suit law, 28 U.S.C. § 1916, and further based upon the Court Clerk registering that Court Order in accordance with 28 U.S.C. § 1963 as a certified Court Order, and based upon the Plaintiff's Complaint, the subject matter consisting of Seamen's rights under the Second Amendment's right to keep and bear arms the Court finds, in fact and law, that the merits of Plaintiff's case qualify for the filing fee exemption under the "safety" clause, and perhaps even the "welfare" clause of the Seamen's Suit law, 28 U.S.C. § 1916.

● Therefore, it is ORDERED that the filing fee exemption as a statutory right under the Seamen's Suit law, 28 U.S.C. § 1916 is acknowledged as Plaintiff's statutory right in this matter now before the Court.

Based upon the Plaintiff's Complaint and the Court's own inquiries into this matter the Court hereby verifies and validates the Plaintiff's Citizen's Arrest Warrant.

● Therefore, it is ORDERED that the Plaintiff's Citizen's Arrest Warrant is hereby verified and validated as an enforceable Citizen's Arrest Warrant to be executed by the Plaintiff himself with the *Court Ordered* assistance of the Federal Bureau of Investigation to effect actual physical custody.

● It is further ORDERED that the Federal Bureau of Investigation initiate a criminal investigation of the Judicial and Executive Branches relating to the Plaintiff's several cases in the U.S. District Court, the DC Circuit, the U.S. Supreme Court, the U.S. District Court for the Eastern District of Arkansas, and the Eighth Circuit and prosecute for any (if any) criminal acts found.

• If is further ORDERED that Rena Comisac, Acting Assistant Attorney General of the Civil Rights Division of the U.S. Department of Justice initiate a civil rights investigation of the handling of Plaintiff's cases by the federal courts and by the U.S. Department of Justice.

• It is further ORDERED that the Inspector General of the U.S. Department of Justice initiate an investigation of the handling of the Plaintiff's several cases by the involved U.S. Attorney's Offices for any violations of the Plaintiff's due process rights and any misconduct by government defense counsels for the named defendants.

• It is further ORDERED that the U.S. Department of Justice submit to the Court proposed federal guidelines on the right of Citizen's Arrest as applied against employees of the U.S. Government for commissions of felonies witnessed by unrepresented civil plaintiffs. The guidelines are to include Citizen's Arrest by an unrepresented civil plaintiff stipulating to the differences between a regular civil case and a "civil RICO Act case when the unrepresented civil plaintiff is acting in the capacity of a Private Attorney General. The guidelines are to also include the legal and constitutional obligations placed upon federal law enforcement agencies to assist such unrepresented civil plaintiff's with "Citizen's Arrest Warrants" whether or not they are acting in the capacity of a Private Attorney General.

It is further ORDERED that the following cases are to be investigated:

- 8th Circuit, Case No. 07-2400
- U.S. District Court/DC, No. 02-1434
- U.S. District Court/DC, No. 02-1435
- U.S. District Court/DC, No. 03-2160
- U.S. District Court/DC, No. 04-0422
- DC Circuit, No. 02-5334
- DC Circuit, No. 04-5316
- U.S. District Court/Little Rock, No. 06-0044.
- U.S. Supreme Court, Nos. 03-145
- U.S. Supreme Court, Nos. 04-1150
- U.S. Supreme Court, Nos. 04M56

IT IS SO ORDERED.

_____

_____


_____

_____

# Citizen's Arrest Warrant

---

## -FOR-

# CHIEF JUSTICE JOHN G. ROBERTS, JR.

### U.S. SUPREME COURT

**In Re: Hamrick v. President Bush, DC Circuit, No. 02-5334**
**In Re: Hamrick v. President Bush, DC Circuit, No. 04-5316**

# WILLIAM K. SUTER

### COURT CLERK, U.S. SUPREME COURT

**In Re: Hamrick v. President Bush, U.S. Supreme Court, No. 03-145**
**In Re: Hamrick v. President Bush, U.S. Supreme Court, No. 04-1150**

*EACH FOR TWO COUNTS OF*
*EXTORTION OF FILING FEES (28 U.S.C. § 1916)*
*AS PREDICATE ACTS FOR RACKETEERING ACTIVITY*

---

### VERIFIED AND VALIDATED

# BY JUDGE ROSEMARY M. COLLYER

### U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

---

I, Don Hamrick, *sui juris*, citizen of Arkansas and of the United States under the Ninth, Tenth, Thirteenth and Fourteenth Amendments, am the unrepresented civil Plaintiff acting in the capacity of a *PRIVATE ATTORNEY GENERAL* with a civil RICO Act case against the United States Government (President George W. Bush, et al) and against the United Nations for breach of the United Nations Charter, Article 2, Clause 7, in defense of not only my own rights under the Second Amendment but also for the Second Amendment rights of the citizens of the United States at large, and under penalty of perjury, under the laws of the United States of America, hereby warrant that probable cause exists to justify the immediate arrest and arraignment of

federal judges and their court clerks so named or implicated above on formal charges of participating as principals (18 U.S.C. § 2) in racketeering activities (18 U.S.C. § 1962) as accessory after the facts (18 U.S.C. § 3) and misprision of felony (18 U.S.C. § 4), of an unlawful and an unconstitutional protection scheme over the Second Amendment and for felony extortion (18 U.S.C. § 872) and conspiring to engage in a pattern of racketeering activities and related RICO "predicate acts" in connection with the above Civil RICO action, in violation of the criminal statutes at 18 U.S.C. 1961(1)(A), "Extortion" of exempted filing fees from the unrepresented civil Plaintiff Don Hamrick, a fully documented U.S. merchant seamen in violation of the Seamen's Suit law (28 U.S.C. § 1916).

I hereby verify also, under penalty of perjury, under the laws of the United States of America that I am the victim of felony extortion (18 U.S.C. § 872) under color of law (18 U.S.C. § 241 and 18 U.S.C. § 242) in retaliation for participating in Federal Protected Activities (18 U.S.C. § 245) of the federal judicial system as a U.S. merchant seaman and as an unrepresented civil Plaintiff acting in the capacity of a *PRIVATE ATTORNEY GENERAL* in defense of not only my own statutory, civil, and constitutional rights as a U.S. merchant seaman and as a U.S. citizen but also the same statutory, civil, and constitutional rights of all U.S. merchant seamen as a class of citizens and all U.S. citizens at large, and also as an eyewitness to, the criminal violations enumerated above.

## Miranda Warning

*Miranda v. Arizona*, 384 U.S. 436 (1966)

*You have the right to remain silent. Anything you do say may be used against you in a court of law. You have the right to consult an attorney before speaking and to have an attorney present during questioning now or in the future. If you cannot afford an attorney, one will be appointed for you at government expense. If you decide to answer questions now without an attorney present you will still have the right to stop answering at any time until you talk to an attorney.*

IT IS SO ORDERED.

_____

_____


_____

_____

# Citizen's Arrest Warrant

## -FOR-

**CHIEF JUDGE GINSBURG,
JUDGE HARRY T. EDWARDS,
JUDGE DAVID B. SENTELLE,
JUDGE KAREN LECRAFT HENDERSON,
JUDGE A. RAYMOND RANDOLPH,
JUDGE W. ROGERS,
JUDGE DAVID S. TATEL,
JUDGE MERRICK B. GARLAND,**

**MARK J. LANGER, COURT CLERK, DC CIRCUIT
MICHAEL C. MCGRAIL, DEPUTY CLERK/LD
LINDA JONES, DEPUTY CLERK
MARK BUTLER, DEPUTY CLERK
JOHN T. HALEY, DEPUTY CLERK**

## THE DC CIRCUIT

### EACH FOR TWO COUNTS OF
### EXTORTION OF FILING FEES (28 U.S.C. § 1916)
### AS PREDICATE ACTS FOR RACKETEERING ACTIVITY

**In Re: Hamrick v. President Bush, DC Circuit, No. 02-5334
In Re: Hamrick v. President Bush, DC Circuit, No. 04-5316**

## VERIFIED AND VALIDATED

# BY JUDGE ROSEMARY M. COLLYER
## U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

I, Don Hamrick, *sui juris*, citizen of Arkansas and of the United States under the Ninth, Tenth, Thirteenth and Fourteenth Amendments, am the unrepresented civil Plaintiff acting in the capacity of a *PRIVATE ATTORNEY GENERAL* with a civil RICO Act case against the United States Government (President George W. Bush, et al) and against the United Nations for breach

of the United Nations Charter, Article 2, Clause 7, in defense of not only my own rights under the Second Amendment but also for the Second Amendment rights of the citizens of the United States at large, and under penalty of perjury, under the laws of the United States of America, hereby warrant that probable cause exists to justify the immediate arrest and arraignment of federal judges and their court clerks so named or implicated above on formal charges of participating as principals (18 U.S.C. § 2) in racketeering activities (18 U.S.C. § 1962) as accessory after the facts (18 U.S.C. § 3) and misprision of felony (18 U.S.C. § 4), of an unlawful and an unconstitutional protection scheme over the Second Amendment and for felony extortion (18 U.S.C. § 872) and conspiring to engage in a pattern of racketeering activities and related RICO "predicate acts" in connection with the above Civil RICO action, in violation of the criminal statutes at 18 U.S.C. 1961(1)(A), "Extortion" of exempted filing fees from the unrepresented civil Plaintiff Don Hamrick, a fully documented U.S. merchant seamen in violation of the Seamen's Suit law (28 U.S.C. § 1916).

I hereby verify also, under penalty of perjury, under the laws of the United States of America that I am the victim of felony extortion (18 U.S.C. § 872) under color of law (18 U.S.C. § 241 and 18 U.S.C. § 242) in retaliation for participating in Federal Protected Activities (18 U.S.C. § 245) of the federal judicial system as a U.S. merchant seaman and as an unrepresented civil Plaintiff acting in the capacity of a *PRIVATE ATTORNEY GENERAL* in defense of not only my own statutory, civil, and constitutional rights as a U.S. merchant seaman and as a U.S. citizen but also the same statutory, civil, and constitutional rights of all U.S. merchant seamen as a class of citizens and all U.S. citizens at large, and also as an eyewitness to, the criminal violations enumerated above.

## Miranda Warning
*Miranda v. Arizona*, 384 U.S. 436 (1966)

*You have the right to remain silent. Anything you do say may be used against you in a court of law. You have the right to consult an attorney before speaking and to have an attorney present during questioning now or in the future. If you cannot afford an attorney, one will be appointed for you at government expense. If you decide to answer questions now without an attorney present you will still have the right to stop answering at any time until you talk to an attorney.*

IT IS SO ORDERED.

_____

_____

_____

_____



LII / Legal Information Institute

Search Law School        Search Cornell

# U.S. Code collection

TITLE 28 > PART V > CHAPTER 123 > § 1916

## § 1916. Seamen's suits

In all courts of the United States, seamen may institute and prosecute suits and appeals in their own names and for their own benefit for wages or salvage or the enforcement of laws enacted for their health or safety without prepaying fees or costs or furnishing security therefor.

*LII has no control over and does not endorse any external Internet site that contains links to or references LII.*



Cornell University
Law School

Search Law School    Search Cornell

LII / Legal Information Institute

# U.S. Code collection

TITLE 18 > PART I > CHAPTER 41 > § 872

## § 872. Extortion by officers or employees of the United States

Whoever, being an officer, or employee of the United States or any department or agency thereof, or representing himself to be or assuming to act as such, under color or pretense of office or employment commits or attempts an act of extortion, shall be fined under this title or imprisoned not more than three years, or both; but if the amount so extorted or demanded does not exceed $1,000, he shall be fined under this title or imprisoned not more than one year, or both.

*LII has no control over and does not endorse any external Internet site that contains links to or references LII.*

Supreme Court of the United States
Washington, D. C. 20543

August 30, 2007

Mr. Don Hamrick
Seafarers International Union
115 Third Street
Norfolk, VA 23510

Dear Mr. Hamrick:

The purpose of this letter is to advise why you have not received reimbursement from the Supreme Court of the United States for your filings.

In No. 03-145 (Hamrick v. Bush, et al.), you submitted the docket fee of $300.00. The petition for a writ of certiorari was denied October 6, 2003. In No. 04-1150 (Hamrick v. Bush, et al.), the motion for leave to proceed as a seaman was denied. The docket fee of $300.00 was also submitted in this case, and the petition for a writ of certiorari was subsequently denied on April 4, 2005. When a petition for a writ of certiorari is denied by this Court, the petitioner is not reimbursed the docket fee.

If I can be of further assistance, please let me know.

Sincerely,

Krista Jaffe
Supreme Court of the United States Police

Verified Evidence
of Extortion under
28 U.S.C. § 1916
and
18 U.S.C. § 872

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

**No. 02-5334**

**September Term, 2002**

*ADMINISTRATIVE FUNCTIVE*
*NOT A JUDICIAL FUNCTION*

02cv01435

**Filed On: October 30, 2002** [710835]

Don Hamrick,
        Appellant

        v.

George W. Bush, Jr., et al.,
        Appellees

*Obstruction of Justice*
*Corruption of Justice*
*Extortion Under Color of Law*

## O R D E R

Upon consideration of the notice of appeal, it is

**ORDERED**, on the court's own motion, that appellant show cause within 30 days of the date of this order why he should not be required to pay the full appellate filing and docketing fees before this appeal may proceed. Should appellant seek to rely on 28 U.S.C. § 1916, he must demonstrate that he is a "seam[a]n" and that this appeal is one "for wages or salvage or the enforcement of laws enacted for [his] health or safety." Id. Failure to comply with this order will result in dismissal of the appeal for lack of prosecution. See D.C. Circuit Rule 38.

The Clerk is directed to send a copy of this order to appellant both by certified mail, return receipt requested, and by first class mail.

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:

        Mark Butler
        Deputy Clerk

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 05-5414

ADMINISTRATIVE FUNCTION
NOT A JUDICIAL FUNCTION

September Term, 2005

02cv01434
04cv01235

In Re: Don Hamrick,
        Petitioner

Filed On: November 2, 2005 [929349]

Obstruction of Justice
Corruption of Justice
      Extortion under
      Color of Law

## ORDER

    On October 27, 2005, petitioner submitted a petition for writ of mandamus. The petition has been assigned docket No. 05-5414. For this Court to consideration the petition, it is

    **ORDERED**, on the court's own motion, that by December 2, 2005, petitioner must either pay the $250.00 appellate docketing fee, or file a motion for leave to proceed in forma pauperis *in this court.* Petitioner's failure to comply with this order will result in dismissal of the petition for lack of prosecution. See D.C. Cir. Rule 38.

    The Clerk is directed to send this order and a blank copy of an application for leave to proceed in forma pauperis to the petitioner both by certified mail, return receipt requested, and by first class mail.

                  **FOR THE COURT:**
                  Mark J. Langer, Clerk

        BY:

                John T. Haley
                Deputy Clerk

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 04-5316

*ABUSE OF THE JUDICIAL FUNCTION* September Term, 2005

03cv02160

Don Hamrick,
    Appellant

Filed On: January 26, 2006 [945037]

*Obstruction of Justice*
*Corruption of Justice*

    v.

George W. Bush, President, et al.,
    Appellees

**BEFORE:**    Randolph, Rogers, and Griffith, Circuit Judges

## O R D E R

Upon consideration of the motion for summary affirmance and the opposition thereto; the motion to expedite; the motions for extension of time; the motion for permissive intervention; the motions for judicial notice of adjudicative facts; the motions for an appeal conference; the motions for amicus curiae briefs; the motion to include non-participating observers at the appeal conference; the motion to propose conditions for settlement; the motion for sanctions; the motion for declaratory judgment; the motion for reconsideration of this court's March 11, 2005 order; the motions to admit public records as relevant evidence; the motion for leave to file judicial notice; the motion to vacate and for permanent injunction and the supplement thereto; and the petition for writ of mandamus, it is

**ORDERED** that the motion for summary affirmance be granted in part. The merits of the parties' positions are so clear as to warrant summary action on most of appellant's claims. See Taxpayers Watchdog, Inc. v. Stanley, 819 F.2d 294, 297 (D.C. Cir. 1987) (per curiam). As to appellant's claims pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, appellant has not demonstrated the federal government waived its sovereign immunity. See Tri-State Hosp. Supply Corp. v. United States, 341 F.3d 571, 575 (D.C. Cir. 2003); see also Nat'l Commodity and Barter Assoc. v. Gibbs, 886 F.2d 1240, 1246-47 (10th Cir. 1989). In addition, the claims for damages against the judicial defendants are barred by judicial immunity, see Cleavinger v. Saxner, 474 U.S. 193, 199 (1985), and the claims for declaratory judgment against those defendants are meritless. To the extent appellant is bringing claims under criminal statutes, those statutes do not provide for a private right of action. See 18 U.S.C. §§ 1001, 1018; see also AirTrans, Inc. v. Mead, 389 F.3d 594, 597 n.1 (6th Cir. 2004). With respect to appellant's claims brought pursuant to 42 U.S.C. § 1988; the Federal Tort Claims Act, 28 U.S.C. § 1346(b); and the First, Fourth, Fifth, Sixth, Ninth, Tenth, Thirteenth,

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

## No. 04-5316

### September Term, 2005

and Fourteenth Amendments, appellant's complaint does not comport with Fed. R. Civ. P. 8(a), which requires a plaintiff to include "a short and plain statement of the claim showing that the plaintiff is entitled to relief." See, e.g. Mountain States Legal Found. v. Bush, 306 F.3d 1132, 1137 (D.C. Cir. 2002). With the exception of his Second Amendment claim, appellant has not preserved for appeal any other claims. See Doe v. District of Columbia, 93 F.3d 861, 875 n.14. To the extent summary affirmance is granted because appellant's claims do not comply with Fed. R. Civ. P. 8(a), the district court order is modified to dismiss those claims without prejudice. It is

**FURTHER ORDERED**, on the court's own motion, that appellant's Second Amendment claims against the non-judicial defendants, challenging federal firearms statutes and the denial of his "National Open Carry Handgun" endorsement be remanded for further proceedings. Compare United States v. Miller, 307 U.S. 174 (1939), and United States v. Haney, 264 F.3d 1161 (10th Cir. 2001), with U.S. v. Emerson, 270 F.3d 203, 227, 260-61 (5th Cir. 2001). The evidence suggests appellant filed an opposition to appellees' motion to dismiss. See, e.g., Case No. 03cv2160, Docket No. 64, Appellees' Reply to Opposition to Motion to Dismiss. Furthermore, these Second Amendment claims are not barred by res judicata. See Hoffman v. Blaski, 363 U.S. 335, 340 n.9 (1960); United States v. Dean, 752 F.2d 535, 541 (11th Cir. 1985); see also SEC v. Bilzerian, 378 F.3d 1100, 1102 n.1 (D.C. Cir. 2004). It is

**FURTHER ORDERED** that appellant's remaining motions and petition for writ of mandamus be denied.

Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate herein until seven days after disposition of any timely petition for rehearing or rehearing en banc. See Fed. R. App. P. 41(b); D.C. Cir. Rule 41.

### Per Curiam

*ABUSE OF THE FEDERAL RULES OF CIVIL PROCEDURE*

*On REMAND the District Court Judge Reggie B. Walton treated the "remanded for further proceedings" as a redo of Rule 7 Pleadings instead of moving the case to the Discovery Phase under Rule 16 and Rule 26.*

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 04-5316                                September Term, 2004

03cv02160

Filed On: March 11, 2005 [883266]

Don Hamrick,
        Appellant

        v.

George W. Bush, President, et al.,          *Now Chief Justice*
        Appellees                            *U.S. Supreme Court*

BEFORE:    Henderson and Roberts, Circuit Judges

### O R D E R    *Extortion Under Color of Law 18 U.S.C. § 872*

    Upon consideration of the court's October 7, 2004 order to show cause, and the response and supplement thereto, it is

    **ORDERED**, on the court's own motion, that the order to show cause be discharged. It is

    **FURTHER ORDERED**, on the court's own motion, that within 60 days of the date of this order, appellant must either pay the $255 appellate filing and docketing fee to the Clerk of the District Court, see Fed. R. App. P. 3(e); 28 U.S.C. § 1917, or file a motion in the District Court for leave to proceed on appeal in forma pauperis, see Fed. R. App. P. 24(a)(1). Appellant is not exempt from payment because he has not demonstrated that this appeal is one for "wages or salvage or the enforcement of laws enacted for [his] health or safety" as a seaman. See 28 U.S.C. § 1916. Failure to comply with this order will result in dismissal of the appeal for lack of prosecution. See D.C. Circuit Rule 38. It is  *Fraud + False Statement 18 USC § 1001*

    **FURTHER ORDERED** that consideration of appellant's brief and any pending motions be deferred pending further order of the court.

    The Clerk is directed to send a copy of this order to appellant both by certified mail, return receipt requested, and by first class mail.

### Per Curiam

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 04-5316

*[handwritten: ADMINISTRATIVE FUNCTION NOT A JUDICIAL FUNCTION]*

September Term, 2004

03cv02160

**Filed On: October 7, 2004** [853363]

Don Hamrick,
    Appellant

    v.

George W. Bush, President, et al.,
    Appellees

*[handwritten: Obstruction of Justice, Corruption of Justice, Extortion]*

## ORDER

Upon consideration of the notice of appeal, it is

**ORDERED**, on the court's own motion, that appellant show cause on or before November 8, 2004, why he should not be required to pay the full $255 appellate filing and docketing fees before this appeal may proceed. Should appellant seek to rely on 28 U.S.C. §1916, he must demonstrate that he is a "seam[a]n" and that this appeal is one "for wages or salvage or the enforcement of laws enacted for [his] health or safety." Id. Failure to comply with this order will result in dismissal of the appeal for lack of prosecution. See D.C. Circuit Rule 38.

The Clerk is directed to send a copy of this order to appellant both by certified mail, return receipt requested, and by first class mail.

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:

John T. Haley
Deputy Clerk

# United States Court of Appeals

#### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

No. 02-5334

*[handwritten: ADMINISTRATIVE FUNCTION IN PART]*

September Term, 2003

*[handwritten: 02cv01435]*

*[handwritten: ABUSE OF JUDICIAL FUNCTION IN PART]*

Filed On: February 3, 2004 [800878]

Don Hamrick,
        Appellant

v.

George W. Bush, Jr., et al.,
        Appellees

*[handwritten: Now Chief Justice U.S. Supreme Court]*

**BEFORE:**    Ginsburg, Chief Judge, and Edwards, Sentelle, Henderson, Randolph, Rogers, Tatel, and Roberts, Circuit Judges

*[handwritten: Extortion Under Color of Law 18 U.S.C. § 872]*

### O R D E R

Upon consideration of the petition for rehearing en banc, the absence of a request by any member of the court for a vote, and the motion for reimbursement of appellate filing fees, it is

*[handwritten: ADMINISTRATIVE FUNCTION →]*

**ORDERED** that the motion for reimbursement of appellate filing fees be denied. It is

*[handwritten: JUDICIAL FUNCTION - ABUSED →]*

**FURTHER ORDERED** that the petition for rehearing en banc be denied. The Clerk is directed to accept no further submissions from appellant in this closed case.

#### Per Curiam

**FOR THE COURT:**
Mark J. Langer, Clerk

By:

Michael C. McGrail
Deputy Clerk/LD

\* Circuit Judge Garland did not participate in this matter

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

**No. 02-5334**                     **September Term, 2002**

*[handwritten: JUDICIAL FUNCTION]*                     02cv01435

**Filed On: April 30, 2003** [746607]

Don Hamrick,
    Appellant

*[handwritten: Corruption of Justice]*

v.

*[handwritten: Obstruction of Justice]*

George W. Bush, Jr., et al.,
    Appellees

*[handwritten: Criminal Conduct on the Bench]*

**BEFORE:**    Edwards, Sentelle, and Garland, Circuit Judges

## ORDER

Upon consideration of the motion for appointment of counsel; the motions for judicial notice of adjudicative facts and the supplement thereto; the motion to amend the record; the motions to submit evidence; the motion for the issuance of subpoenas; the motion for leave to file an appendix; the motion to substitute a party; the motion for leave to file a petition for a writ of certiorari; the motion to invite <u>amicus curiae</u> briefs; the motion for rulings on motions dismissed as moot by the district court; and the motion for publication; it is

**ORDERED** that the motion for appointment of counsel be denied. With the exception of defendants appealing or defending in criminal cases, appellants are not entitled to appointment of counsel when they have not demonstrated any likelihood of success on the merits. It is

**FURTHER ORDERED** that the motions for judicial notice be denied. This court may only take judicial notice of facts, not legal arguments. <u>See</u> Fed. R. Evid. 201(b)(2) (judicial notice may be taken of a fact that is "not subject to reasonable dispute" and is "generally known within the territorial jurisdiction of the trial court" or is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"). Moreover, to the extent appellant argues that he should not be required to pay the appellate filing fee because the district court did not require him to pay its filing fee pursuant to 28 U.S.C. § 1916, this court is not bound by the actions of the district court. It is *[handwritten: DC Circuit holds itself ABOVE THE LAW (see 1 USC § 204(a))]*

**FURTHER ORDERED** that the motions to amend the record, to submit evidence, and for the issuance of subpoenas be denied. Appellant provides no reason for this court to depart from its general rule not to consider evidence or theories not presented

*[handwritten: The District Court Obeyed 28 USC § 1916.]*
*[handwritten: The DC Circourt broke the law, 28 USC § 1916.]*
*[handwritten: and 18 USC § 872]*

# United States Court of Appeals

## For The District of Columbia Circuit

---

**No. 02-5334**                          **September Term, 2002**

to the district court, see <u>Frito-Lay v. Willoughby</u>, 863 F.2d 1029, 1036 (D.C. Cir. 1988); <u>District of Columbia v. Air Florida, Inc.</u> 750 F.2d 1077, 1084 (D.C. Cir. 1984), nor does he assert that anything "material" has been omitted from the record as it now stands, or that the record does not "truly disclose[] what occurred in district court." Fed. R. App. P. 10(e)(1), (2). It is

    **FURTHER ORDERED** that the motion for leave to file an appendix be denied. Appellant's lodged "appendix" primarily contains legal argument, which is properly included in a brief, not an appendix. Because appellant has not sought leave to exceed the word limits on his brief, this motion will be denied. It is

*Held pro se plaintiff to the standards of an attorney.*

    **FURTHER ORDERED** that the motion to substitute a party be denied. Appellant has not shown that jurisdiction over the Merchant Marine has been transferred from the Department of Transportation to the Department of Homeland Security. See 46 U.S.C. § 2103. It is

*Fraud and False Statement. 18 USC § 1001*

    **FURTHER ORDERED** that the motion for leave to file a petition for a writ of certiorari be denied. Appellant does not need permission from this court to file a petition for a writ of certiorari with the Supreme Court. It is

    **FURTHER ORDERED** that the motions to invite <u>amicus curiae</u> briefs, for rulings on motions dismissed as moot by the district court, and for publication be denied. It is

    **FURTHER ORDERED**, on the court's own motion, that the court will dispose of the appeal without oral argument on the basis of the record and the presentation in appellant's brief and the supplement thereto. The court has determined that oral argument will not assist it in this case. <u>See</u> Fed. R. App. P. 34(a)(2); D.C. Cir. Rule 34(j).

**Per Curiam**

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 02-5334     *ADMINISTRATIVE FUNCTION*     September Term, 2002

02cv01435

Filed On: February 3, 2003 [729570]

*NOT A JUDICIAL FUNCTION*

Don Hamrick,
      Appellant

    v.

George W. Bush, Jr., et al.,
      Appellees

BEFORE:    Randolph, Tatel, and Garland, Circuit Judges

## ORDER

Upon consideration of the court's order to show cause filed October 30, 2002; the motion for leave to appeal without payment of fees pursuant to 28 U.S.C. § 1916; the motion to invite <u>amicus curiae</u> briefs; the motion for rulings on motions dismissed as moot by the district court; the motion to substitute a party; the motion for publication; the motion for leave to file an appendix; the motion for the issuance of subpoenas; the motions for judicial notice of adjudicative facts and the supplement thereto; and the motion for leave to file a petition for a writ of certiorari, it is

**ORDERED** that the order to show cause be discharged. It is

**FURTHER ORDERED** that the motion for leave to appeal without payment of fees pursuant to 28 U.S.C. § 1916 be denied. Appellant has not demonstrated that this appeal is one for "wages or salvage or the enforcement of laws enacted for [his] health or safety" as a seaman. 28 U.S.C. § 1916. It is *Fraud + False Statements 18 USC § 1001*

**FURTHER ORDERED** on the court's own motion, that within 30 days of the date of this order, appellant must either pay the $100.00 appellate docketing fee and the $5.00 filing fee to the Clerk of the District Court, <u>see</u> Fed. R. App. P. 3(e); 28 U.S.C. § 1917, or file a motion in the District Court for leave to proceed on appeal <u>in forma pauperis</u>, <u>see</u> Fed. R. App. P. 24(a)(1). Failure to comply with this order will result in dismissal of the appeal for lack of prosecution. <u>See</u> D.C. Circuit Rule 38. It is *Extortion 18 USC § 872*

**FURTHER ORDERED** that consideration of the remaining motions be deferred pending further order of the court.

# United States Court of Appeals

### For The District of Columbia Circuit

---

**No. 02-5334**                              **September Term, 2002**

The Clerk is directed to send a copy of this order to appellant both by certified mail, return receipt requested, and by first class mail.

**Per Curiam**

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

No. 05-5414                                                    September Term, 2005

*ADMINISTRATIVE FUNCTION*
*DISGUISED AS JUDICIAL FUNCTION*

02cv01434
04cv01235

Filed On: December 27, 2005

[939100]
In re: Don Hamrick,
              Petitioner

---

## O R D E R

By order filed November 2, 2006, petitioner was order to pay the filing fees or submit a motion for leave to proceed *in forma pauperis* by December 2, 2006. To date, nothing has been received. Upon consideration of the foregoing, it is

**ORDERED**, on the court's own motion, that this petition be dismissed for lack of prosecution.

*Obstruction of Justice*

FOR THE COURT:
Mark J. Langer, Clerk

BY:

Linda Jones
Deputy Clerk

*Plaintiff stood behind 28 U.S.C. § 1916*